## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

STANDING TREES, INC.

     *Plaintiff*,

v.

UNITED STATES FOREST SERVICE;
DEREK IBARGUEN, in his official
capacity as Supervisor of the White
Mountain National Forest; and JAMES
INNES, in his official capacity as the
District Ranger for the Saco Ranger
District,

     *Defendants*.

Case No.:

**COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE
RELIEF**

## INTRODUCTION

1.     Plaintiff Standing Trees, Inc. ("Standing Trees") challenges the U.S. Forest Service's ("Service") Sandwich Vegetation Management Project ("Project"), which authorizes 638 acres of commercial timber harvest across 1,325 acres of predominantly mature and old forest, as well as prescribed burns on 306 acres. The Project will reconstruct or alter over sixteen miles of roads, and will construct or reconstruct an estimated five to ten log landings. The Project will significantly alter a treasured region of the White Mountain National Forest ("National Forest") without the required environmental review.

2.     The Project targets publicly owned forests on the southern slopes of the Sandwich Range, which have long been valued as a refuge and sanctuary for both people and wildlife. Although much of the area was previously logged, stately mature and old forests have returned to

1

a majority of the project area over the past century. The Project targets these healthy forests, which provide exceptional recreation opportunities and uninterrupted wildlife habitat. In addition, these mature and old forests produce cold, clean water, reduce the risk of floods and droughts, and store vast quantities of carbon. The Service proposed three timber sales, the Liberty, Ferncroft, and Guinea Hill sales, which will clear large swaths of mature and old forest. The Service already initiated the Guinea Hill sale, where timber operations began in early 2025, and are ongoing.

3.    The Service approved the Project without conducting the required environmental review, in violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq*. NEPA requires that federal agencies review the environmental impacts of major federal actions, including proposals like the Project, and to "study, develop and describe appropriate alternatives to recommended courses of action . . . ." 42 U.S.C § 4332(H); *see also* 36 C.F.R. § 220.7(b)(2); *see also* 40 C.F.R. 1501.5(c)(2) (2020).[1] NEPA requires agencies to compare the environmental impacts of a proposed project and its alternatives to ensure informed decision-making before taking action. *Id.* Here, the Service refused to analyze *any* alternatives, including alternatives that would reduce or avoid logging in mature and old forests or inventoried roadless areas ("IRA").

4.    The Service likewise failed to follow NEPA's mandate to take a "hard look" at the Project's environmental impacts. *See Dubois v. U.S. Dep't of Agric.,* 102 F.3d 1273, 1284 (1st Cir. 1996). Specifically, the Service failed to take a hard look at the Project's impacts on forest health, climate, water quality, road construction, soils, endangered species, scenery, and IRAs. The Service also failed to take a hard look at the cumulative impacts of the Project in

---

[1] In its response to Standing Trees' objection to the Project, the Service stated that it proposed and authorized this Project under the 2020 NEPA implementing regulations.

conjunction with other projects that it recently approved or that it is currently developing in the National Forest.

5.      Regarding forest health, the Service's analysis is deficient because it failed to analyze relevant spatial, qualitative and quantitative data on stand ages, stand surveys, and habitat types in the Project area. It also refused to share such information with the public, despite Standing Trees' explicit timely requests to do so. This failure calls into question the purpose and need for the Project: without such information there is not sufficient material in the record to determine whether the existing conditions in the Project area meet habitat composition and age class objectives outlined in the Forest Plan, and thus, whether management is required.

6.      Regarding climate change, the Service's analysis is deficient because it did not quantify the carbon emissions of the Project, but instead relied on vague comparisons to national and global emissions, running afoul of established case law, and the National Forest's own carbon accounting methodology.

7.      Regarding water quality, the Service failed to explain its proposed deviation from Forest Plan guidelines and failed to establish site-specific, baseline data necessary to assess future water quality impacts.

8.      Regarding transportation and road construction, the Service failed to analyze the existing transportation system in the Project area to justify the need for new road construction and failed to account for the environmental impacts of road construction. The Service did not disclose how it intends to access timber in more than two dozen stands. Furthermore, it proposed to "reconstruct" roads where such work would essentially constitute *new* road construction, dismissing necessary analysis of environmental impacts under NEPA.

9.     Regarding soil impacts, the Service's analysis is insufficient because it relied on outdated, National Forest-wide data from outside the Project area. It failed to rely on current, site-specific baseline conditions, violating NEPA's requirement to assess localized impacts. The Service also wrongly assumed that design features would minimize soil compaction and erosion, despite early evidence from the Guinea Hill sale showing that these measures are not being followed, including unauthorized seasonal logging and improper skid trail construction.

10.     Regarding endangered species, the Service's analysis is inadequate because it failed to conduct an independent investigation and instead improperly relied on a generalized biological opinion that lacks site-specific analysis. The northern long-eared bat, listed as endangered, relies on mature and old forest habitat targeted by the Project. Yet, the Service conducted no surveys or studies within the Project area to assess potential impacts, despite assuming the species' presence.

11.     Regarding scenic and recreational impacts, the Service's analysis is inadequate because it fully assessed only a single viewpoint on the summit of Mount Chocorua, while ignoring foreseeable impacts to other popular peaks. Moreover, it failed to provide sufficient information for public review. The Service authorized logging and prescribed burns near and overlapping several trails in the project area, including the Liberty Trail to Mount Chocorua, but did not analyze these impacts, or produce a recreational report or plan.

12.     Regarding impacts to roadless areas, the Service failed to provide timely analysis by failing to acknowledge impacts to two IRAs in the scoping notice and Draft Environmental Assessment ("EA"). It released this information only in the Final EA, after public comment periods closed, preventing meaningful public review of authorized logging in over 250 acres of roadless areas. The Service also ignored impacts to the IRAs' unique characteristics and future

evaluation for wilderness designation by Congress; it simply concluded there would be no effect due to the absence of road construction. Additionally, it failed to evaluate potential direct and indirect impacts to the Sandwich Range Wilderness and Mount Chocorua Scenic Area from adjacent commercial logging.

13.     Regarding cumulative impacts, the Service's analysis is inadequate because the Final EA relies on vague, conclusory statements rather than providing the detailed analysis NEPA requires. Across multiple resource areas, including climate, wildlife, water, and forest health, the Service simply asserts that the Project will not contribute to cumulative impacts without supporting data or evaluation. It also fails to assess the combined effects of nearby private timber operations and other major Service projects, ignoring the possibility that certain impacts could collectively result in significant environmental harm.

14.     Given this flawed and incomplete environmental review, the Service cannot reasonably determine whether the Project—either by itself or cumulatively with other projects—would have significant environmental impacts. Thus, the Service cannot proceed until it fully discloses and assesses these impacts in an environmental review that complies with NEPA. *See Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1285–87 (1st Cir. 1996).

15.     The Service also violated the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600 *et seq.*, which requires the Project to comply with the 2005 White Mountain National Forest Plan ("Forest Plan"). The Service has failed to explain how the Project complies with Forest Plan objectives. Additionally, the Project violates Forest Plan directives that protect endangered species, old forest habitat, water quality, and forest scenic integrity.

16.     Because the Service's authorization of the Sandwich Project violates federal law, this Court should declare it unlawful, vacate the final decision, and enjoin the authorized logging and road construction.

## JURISDICTION

17.     This Court has jurisdiction over this case under 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1346 (United States as defendant), as well as 5 U.S.C. §§ 701-06 (Administrative Procedure Act's judicial review provisions).

18.     The Court may order relief under 28 U.S.C. §§ 2201 (declaratory judgment), 2202 (further relief), and 2412 (costs and fees), as well as 5 U.S.C. § 706 (vacatur).

19.     Venue is proper in this Court under 28 U.S.C. § 1391 because the lands at issue are in Carroll County, New Hampshire, and because a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district.

## PARTIES

### Plaintiff

20.     Plaintiff Standing Trees is a grassroots membership organization. Its purpose is to protect and restore New England's native ecosystems and safeguard the interests of its supporters and members. To this end, Standing Trees works to protect and restore New England's forests, with a focus on public lands in New Hampshire and Vermont. Consistent with its mission, Standing Trees advocates just and equitable policies and practices for managing public lands, safeguarding and promoting clean water, clean air, forest health, public health, and unfragmented habitat in the region.

21.     Standing Trees participated in available public processes for the Sandwich Project, including filing comments on the Service's scoping notice and Draft EA, and filing an

objection to the proposed decision. Thus, Standing Trees has exhausted its administrative remedies to challenge the Project.

22.     Standing Trees has participated in available public processes for similar, contemporaneous projects in the National Forest and has shown in each case that the projects suffer from similar, legally deficient environmental reviews.

23.     Standing Trees brings this case on behalf of itself and its members, including those who live near and regularly visit the Sandwich Project area, which contains portions of the Sandwich Range Wilderness and Mount Chocorua Scenic Area.

24.     In the Project area, Standing Trees members recreate year-round: hiking, skiing, camping, backpacking, and observing wildlife. The members plan to continue visiting these areas for the foreseeable future. However, as detailed below, the Project's adverse environmental impacts threaten their ability to do so.

25.     Debris and runoff from commercial logging will harm the water quality in the Project area and beyond. Upon reaching these waters, logging debris and runoff increases the risk of algal blooms and other contamination, which may degrade water quality to the point where it is no longer safe to recreate in or on these waters.

26.     Logging old and mature trees will harm the health of the forest and the scenic beauty in and near the Project area. Standing Trees members have specifically chosen to recreate and live in the area—some for many decades—because of the area's healthy forests, scenic beauty, and recreational resources. These include the iconic views from Mount Chocorua and other nearby summits, and the popular network of hiking trails that traverse the Project area. These members' recreational and real property interests are certain to be impacted by the authorized logging.

27.    Moreover, the impacts will disturb, displace, or otherwise harm wildlife, thereby limiting the wildlife-viewing opportunities for Standing Trees members in the Project area.

28.    Standing Trees members were denied the right to meaningfully participate in the decision-making process because the Service failed to fully disclose the Project's impacts and harms to affected Standing Trees members and to environmental resources .

29.    The interests of Standing Trees' members have been, and are being, adversely and irreparably injured by the Service's failures to comply with federal law, and these injuries will continue until and unless the relief requested in this Complaint is granted.

30.    These injuries are actual, concrete injuries that are traceable to the Service's decision to authorize the activities described in the attached decision notice.

31.    These injuries would be redressed by the requested relief because an adequate and lawful environmental review would likely lead to changes that would reduce the impacts of the project, or result in its cancellation.

### Defendants

32.    Defendant United States Forest Service is a federal agency within the Department of Agriculture. The Service, which manages the National Forest, issued a decision notice on June 28, 2024, that authorized the Sandwich Project.

33.    Defendant Derek Ibarguen is the Forest Supervisor for the National Forest, responsible for issuing the objection response letters for the Project on June 5, 2024. Defendant Ibarguen is sued in their official capacity.

34.    Defendant James Innes is the District Ranger for the Saco Ranger District and the official who signed the Sandwich Project Decision Notice on June 28, 2024. Defendant Innes is sued in their official capacity.

## LEGAL BACKGROUND

### Administrative Procedure Act (APA)

35.    This case is brought under the Administrative Procedure Act ("APA"). 5 U.S.C. §§ 551–59, 701–06.

36.    The APA allows associations like Standing Trees to challenge federal agency actions in the federal courts. *Id.* §§ 702, 704. The APA declares that a court "shall . . . hold unlawful and set aside agency action[s] . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

37.    As relevant here, an agency decision is arbitrary and capricious if the agency "entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

38.    The APA provides a cause of action for relief from violations of the National Environmental Policy Act and the National Forest Management Act.

### National Environmental Policy Act (NEPA)

39.    Congress enacted NEPA to promote government efforts that "will prevent or eliminate damage to the environment…." 42 U.S.C. § 4321. To effectuate that purpose, Congress directed "that, to the fullest extent possible … the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter . . . ." 42 U.S.C. § 4332. Under NEPA, federal agencies must review and publicly disclose the environmental impacts of proposed actions. 42 U.S.C. § 4332(C)(i); *see also* 36 C.F.R. § 220.4(a); *see also* 40 C.F.R. § 1500.1(a) (2020).

40.     The Council on Environmental Quality ("CEQ") promulgated implementing regulations. 40 C.F.R. §§ 1500–1508 (2020). These regulations were effective and binding on the Service at the time of its review and approval of the Project.[2]

41.     The Service has promulgated its own regulations implementing NEPA. 36 C.F.R. Part 220. The Service is bound by these regulations that supplement the CEQ regulations, in addition to NEPA's statutory requirements.

42.     NEPA requires federal agencies to prepare an environmental impact statement ("EIS") for federal agency actions that have "a reasonably foreseeable significant impact on the quality of the human environment." 42 U.S.C. § 4336(b)(1).

43.     If it is unclear whether an EIS is required, the agency must prepare an EA to determine whether the action may have significant impacts and thus require preparation of an EIS. 42 U.S.C. § 4336(b)(2); *see also* 36 C.F.R. § 220.7 (requiring environmental assessments to include a discussion of the environmental effects of the proposed action and alternatives to determine whether to prepare an EIS or a finding of no significant impact); *see also* 40 C.F.R. § 1508.1(h) (2020) (EA helps agency determine "whether to prepare an [EIS]…."). If the agency determines the action will not have a significant impact, and thus an EIS is not required, it issues a finding of no significant impact ("FONSI"). 36 C.F.R § 220.7(b)(3)(i); 40 C.F.R. § 1508.1(l) (2020).

44.     Agencies must "study, develop, and describe appropriate alternatives" when a proposal "involves unresolved conflicts concerning alternative uses of resources." 42 U.S.C.

---

[2] The CEQ has since issued an interim rule to repeal its regulations, which went into effect on April 11, 2025. Regardless, the Service remains bound by NEPA itself and its own NEPA regulations, which remain in effect. 36 C.F.R. § 220.1(b) ("This part [(the Service's NEPA regulations)] supplements and does not lessen the applicability of the CEQ regulations, and is to be used in conjunction with the CEQ regulations[.]"). Additionally, the now-rescinded CEQ NEPA regulations and the other prior versions of those regulations remain important guidance for interpreting the requirements of NEPA, and the Service stated that it was using them in its review of the Project.

§ 4332(H); *see also* 36 C.F.R. § 220.7(b)(2)(i) (requiring analysis of alternatives that "meet the need for action," where unresolved conflicts are present); *see also* 40 C.F.R. § 1501.5(c)(2) (EA shall discuss "alternatives as required by section 102(2)(E) of NEPA…"). Regardless of whether the agency produces an EIS or an EA, it must take a "hard look" at the environmental impacts of the proposed action. *Kleppe v. Sierra Club*, 427 U.S. 390, 409 n. 21 (1976). In other words, the agency must articulate a rational connection between the facts found and the decision made. *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.,* No. 23-975, slip op. at 3 (U.S. May 29, 2025) (confirming that "adequacy" of NEPA review is relevant to "the question of whether an agency's final decision … was reasonably explained").

45.     An agency must implement measures that "ensure that presently unquantified environmental amenities and values may be given appropriate consideration in decision-making along with economic and technical considerations." 42 U.S.C. § 4332(B).

46.     An agency must disclose to the public the information it relied upon in making its decision. Accordingly, the Service may incorporate material by reference into an EA or EIS only if the "material is reasonably available to the public" during a public comment period during the NEPA process. 36 C.F.R. § 220.4(h); *see also* 40 C.F.R. § 1501.12 (2020) ("Agencies may not incorporate material by reference unless it is reasonably available for inspection by potentially interested persons *within the time allowed for comment*" (emphasis added)).

47.     Furthermore, the EA must identify the direct, indirect, and cumulative impacts of an action, including its ecological, aesthetic, economic, social, and health effects. 36 C.F.R. § 220.4(f) ("analysis of cumulative effects begins with consideration of the direct and indirect effects on the environment…"); *see also* 42 U.S.C. § 4332(C)(i) (agency must disclose "reasonably foreseeable environmental effects of the proposed agency action").

48.     To make a finding of no significant impact, an agency must provide sufficient evidence and analysis in an EA to show that the proposed action will not significantly affect the quality of the human environment. 36 C.F.R. § 220.7(b)(3); 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.6 (2020). Courts hold a FONSI to the following standard: (1) it must accurately identify relevant environmental concerns, (2) the agency must have taken a hard look at the environmental impacts, (3) the agency must make a convincing case for its finding. *Nw. Bypass Grp. v. U.S. Army Corps of Eng'rs*, 470 F. Supp. 2d 30, 61 (D.N.H. 2007) (quoting *Sierra Club v. U.S. Dep't of Transp.*, 753 F.2d 120, 127 (D.D.C. 1985)). A FONSI must contain "quantified or detailed information," not just "general statements about possible effects and some risk." *Conservation L. Found. v. U.S. Army Corps of Eng'rs*, 457 F. Supp. 3d 33, 58 (D.N.H. 2019).

49.     In assessing significance under NEPA, an agency must consider a project's climate effects, including its quantifiable greenhouse gas emissions (GHGs). In federal actions like the Project, it is insufficient to use a "comparative percentage-based standard that can be downplayed and manipulated based on the size of the comparator." *Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1041 (10th Cir. 2023).

50.     To determine significance, agencies "shall analyze the potentially affected environment and degree of the effects of the action." 40 C.F.R. § 1501.3(b) (2020). Agencies must assess the affected area and the resources it contains. 40 C.F.R. § 1501.3(b)(1) (2020). In considering the degree of the effects, agencies should consider the short-and long-term effects, beneficial and adverse effects, and effects to public health and safety. 40 C.F.R. § 1501.3(b)(2) (2020).

51.     The analysis of whether an environmental effect of a site-specific action is "significant" includes the significance of "effects in the *local* area." 40 C.F.R. § 1501.3(b)(1) (2020) (emphasis added).

52.     To determine whether an action will significantly affect the environment, agencies must consider both the context and intensity of the action. *Mont Vernon Preservation Soc. v. Clements*, 415 F. Supp. 141, 147 (D.N.H. 1976) (citing *Hanly v. Kleindienst*, 471 F.2d 823, 830-31 (2d. Cir. 1972)) (In determining significance, the agency must consider "the extent to which the action will cause adverse environmental effects in excess of those created by existing uses in the area affected by it, and… the absolute quantitative adverse environmental effects of the action itself, including the cumulative harm that results from its contribution to existing adverse conditions or uses in the affected area."); *see also* 40 C.F.R. § 1501.3(b) (2020).

53.     To determine an action's context and intensity, agencies must first set a baseline that "succinctly describe[s] the environment of the area(s) to be affected or created by the alternatives under consideration." *Id.* § 1502.15. Without establishing baselines, the Service cannot reasonably determine the significance of an action's environmental impacts and, consequently, cannot comply with NEPA. *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1101 (9th Cir. 2016). Context refers to the affected area and its resources, and significance is relative to the affected area. *See* 40 C.F.R. § 1501.3(b)(1) (2020) ("Significance varies with the setting of the proposed action."); *see also Hanly*, 471 F.2d at 830-31 ("Where conduct conforms to existing uses, its adverse consequences will usually be less significant than when it represents a radical change."). Intensity refers to the degree of the effects of the proposed action. 40 C.F.R. § 1501.3(b)(2) (2020); *see also Hanly*, 471 F.2d at 830-31 (agencies should consider "the absolute quantitative adverse environmental effects of the action itself…").

## National Forest Management Act (NFMA)

54.    NFMA governs the Service's management of the national forests and prescribes the process for management activities.

55.    The Service must develop, maintain, and revise a land and resource management plan for each national forest. 16 U.S.C. § 1604; 36 C.F.R. § 219.2(b). These forest plans guide management activities forest-wide, setting standards and guidelines to meet or achieve management goals and objectives. For the National Forest, the Forest Plan prescribes these requirements along with monitoring and evaluation requirements to track progress in meeting management goals and objectives.

56.    The Service must ensure that its site-specific management activities are "consistent" with broader forest plans. 16 U.S.C. § 1604(i). A project like the one at issue must adhere to all applicable Forest Plan components.

57.    To be consistent with a forest plan, an EA must describe how the action: (1) either contributes to the maintenance or attainment of one or more goals, desired conditions, or objectives or at least does not foreclose the opportunity to do so over the long term; (2) complies with applicable standards; (3) either complies with applicable guidelines or is designed in a way that is as effective in achieving the purpose of the applicable guidelines; and (4) occurs in an area deemed suitable for that type of action or for which the plan is silent with respect to the area's suitability for that type of action. 36 C.F.R. § 219.15(d).

58.    When a project is inconsistent with applicable forest plan components, the Service must do one of four things: (1) modify the action so as to make it consistent with the plan; (2) terminate the action; (3) amend the forest plan so that the action becomes consistent with the

plan; or (4) enact a limited forest plan amendment contemporaneously with the action's approval so that the action will be consistent with the forest plan as amended. *Id.* § 219.15(c).

59.     Standards "must be followed" or establish "a level of attainment that must be reached." Any "[d]eviations from standards must be analyzed and documented in a forest plan amendment." Forest Plan at *iv*.

60.     Guidelines provide "a required course of action or level of attainment." The Service may modify guidelines "if site specific conditions warrant a deviation," which must be documented in a project-level analysis. Forest Plan at 12.

61.     The Forest Plan creates categories of forest based on quantitative and qualitative factors. The varying categories provide differing instruction on appropriate management and offer varying levels of protection to forests. The primary quantitative-based category is forest age-classes. The Forest Plan establishes four age classes, three of which are particularly relevant here: regeneration, mature, and old. Regeneration forest is less than ten years old. Mature forest ranges from forty to 119 years depending on the forest type. Old forest begins when a stand exceeds its respective age for the mature age-class.

62.     The Forest Plan uses multiple qualities to define "Old Growth Forest." Rare and Unique Features Standard 3 provides that "no harvest shall occur in Old Growth Forest." Forest Plan at 21.

63.     The Forest Plan also defines "Old Forest Habitat" as mature or older forest that may include qualities such as greater size, decadence and structural complexity. The Forest Plan states that "[n]o harvest will occur in stands identified to provide old forest habitat." Forest Plan at 21.

64.     The Forest Plan defines "Mature Forest Habitat" as a mature age class forest where tree mortality is just beginning.

65.     A forest plan standard that seeks to protect waters with the potential to be designated "Wild and Scenic Rivers" within the National Forest, Wild and Scenic Rivers Standard 1, requires the Service to manage eligible rivers to maintain "their classification and eligibility until Congress designates the segments or decides not to designate them."

66.     The Forest Plan establishes Scenic Integrity Objectives that "provide an indication of the alteration or disturbance allowed in the viewed landscape." There are four levels of Scenic Integrity Objectives: very high, high, moderate, and low. Relevant here is the high category, where Scenery Management Standard for Management Area 2.1 Lands G-3 states that all projects must be "minimally evident from trail, road, or use area vantage points," with openings "appear[ing] as natural occurrences," and "well distributed in the viewed landscape." Forest Plan at 2-26.

67.     Service regulations require that forest plans "contribute to the recovery of federally listed threatened and endangered species." 36 C.F.R. 219.9(b)(1). Accordingly, Rare and Unique Features Standard 1 requires that "[a]ll project sites must be investigated for the presence of [threatened and endangered species (TES)] and/or habitat prior to beginning any authorized ground-disturbing activity at the site." Forest Plan at 2-13.

## FACTUAL BACKGROUND

68.     The Sandwich Project is among at least thirteen other logging projects that have been or are proposed to be implemented in the National Forest within the span of a decade. To date, the Service has not acknowledged the cumulative impacts of these projects in its environmental reviews even though all include commercial timber harvest. The projects include

16

the Albany South Project, Bowen Brook Integrated Resources Management, Cold River

Integrated Resources Project (IRP), Deer Ridge IRP, Evans Pond Brook Harvest, Evans Brook

Vegetation Management Project, Intervale Vegetation Enhancement Project, Lost River IRP,

North Chatham Integrated Resources Management, One Mile Lonesome Ridge IRP, Peabody

West IRP, Tarleton IRP, and Wanosha IRP.

69.     In the Final EA for the Project, the Service asserted that the purpose of the

Sandwich Project is to "advance forest plan goals, objectives, and desired conditions for

vegetation, wildlife, and other resources…." Final EA at 5. Such broad objectives can be

achieved in myriad ways, yet the Service arbitrarily and unlawfully reviewed only its proposed

action, and no alternatives.

70.     On June 6, 2022, the Service issued a Notice of Proposed Action for the Project,

and Standing Trees submitted a timely comment in response.

71.     On July 31, 2023, the Service published legal notice of its Draft EA and FONSI

for the Sandwich Project, and Standing Trees submitted a timely comment in response.

72.     On February 15, 2024, the Service issued a Final EA and FONSI, and a draft

Decision Notice for the Project, to which Standing Trees submitted a timely objection to the

Service. On June 5, 2024, the Service issued a response to all objections.

73.     On June 28, 2024, the Service issued a Final Decision Notice for the Sandwich

Project. *See* **Exhibit A**.

**A.     Project Area**

74.     The Sandwich Vegetation Management Project area is on the southern slopes of

the Sandwich Range, in and near the towns of Sandwich, Waterville Valley, Tamworth, and

Albany, New Hampshire. Much of the forest in the Project area was cleared in the eighteenth and

nineteenth centuries , but has grown back over the last century and a half. Today, the mature and

old forests of the Sandwich Range serve as the southern gateway to the White Mountain National Forest, which receives more than 3.1 million visitors every year. The Project area includes popular hiking trails including the Liberty and Brook Trails that ascend to the peak of the iconic Mount Chocorua, and the Cabin Trail and Kelley Trail that extend deep into the Sandwich Range Wilderness Area. The Project area is on the edge of the National Forest and borders private property, the Sandwich Town Forest, and the Chapman Sanctuary and Visny Woods, a not-for-profit nature, bird, and wildlife sanctuary.

75.    In early 2025, timber operations for the Guinea Hill timber sale began, one of three timber sales approved as part of the Project.

**B.    The Final EA Violates NEPA by Failing to Consider Reasonable Alternatives**

76.    The Service failed to discuss or analyze alternatives to the proposed Project in the Final EA.

77.    Analyzing alternatives is "the heart" of environmental reviews because the agency must define key issues that are ripe for decision-making. An agency must develop and discuss alternatives when unresolved conflicts concerning the use of available resources are present in a proposal. Such conflicts arise, for example, when stakeholders disagree regarding the merits of and justifications for resource uses authorized in a proposed action.

78.    Here, such unresolved conflicts exist, including regarding the forest health and carbon storage impacts of commercial logging in the Project's mature and old forests, the Project's impacts to scenery and recreational resources, and the Project's impacts to two inventoried roadless areas.

79.    In its comment on the Sandwich Draft EA, Standing Trees proposed alternatives to the proposed Project that would create fewer and less significant impacts on numerous

environmental resources. In addition, Standing Trees emphasized the Service's obligation to fully consider a true no action alternative.

80.     Specifically, in its comment to the Draft EA, Standing Trees proposed alternatives that would avoid logging in roadless areas, increase watercourse and wetland buffers, increase the buffers for the Sandwich Range Wilderness and Mount Chocorua Scenic Areas, and avoid harvest in mature and old forests.

81.     In its objection to the Project, Standing Trees reiterated its proposed alternatives, the Service's obligation to consider a no action alternative, and the significant environmental impacts overlooked by the Service.

82.     The Service refused to consider any proposed alternatives. In its objection response, it mentioned some of Standing Trees' proposed alternatives, only to cursorily dismiss the alternatives as "a partial implementation of the full Proposed Action" that failed to "meet the need as well as the full Proposed Action." In violation of NEPA, such an illogical approach would preclude analysis of virtually all alternatives.

83.     The Service did not consider a genuine no-action alternative. A robust evaluation of a "no action" alternative is an essential requirement of any NEPA analysis because it establishes a baseline against which proposed actions can be measured. The Final EA contained a single short section entitled "Consequences of No Action" that stated—without citing any support, offering further explanation or analyzing the potential benefits— "taking no action would not meet the need to advance forest plan goals or wildlife habitat diversity objectives in the Sandwich Habitat Management Unit." Final EA at 19.

84.     The Service thus failed to consider reasonable alternatives to the proposed Project because it did not provide any rationale—quantitative or otherwise—for dismissing alternatives

the public proposed that would address the unresolved conflicts regarding the use of the Project area. Such conflicts implicate the Project's commitments of resources including forest health, carbon, wildlife, and inventoried roadless areas. Proposed logging impairs the forests' viability as habitat for endangered species, their production of clean and cold water, their ability to mitigate droughts and floods, their suitability for wilderness designation, their scenic integrity and recreational resources, and their value as carbon storage. Moreover, there was no consensus between the Service and stakeholders concerning the use of resources in the Project area.

85.    Rather than consider alternatives during the NEPA process, the Service unlawfully deferred analysis of alternatives that would modify or reduce logging until some later date, after it authorized the project, and after any opportunity for public comment. Such modifications to the Project are alternatives that warrant public consideration and feedback under NEPA and should have been described in the environmental assessment.

## C.    The Final EA Violates NEPA and the APA by Failing to Take a Hard Look at the Project's Environmental Impacts

86.    Without establishing adequate baselines or considering cumulative impacts, the Service cannot meaningfully assess whether the Project will have significant impacts. Specifically, the Service failed to adequately assess the Project's environmental impacts on forest health, climate, water quality, road construction, soils, endangered species, scenery and recreation, and roadless areas, for the reasons described below.

87.    The Service must take a hard look at the direct, indirect, and cumulative environmental effects of the Project and make its findings available for public review. To satisfy the hard look standard, the agency must articulate a "rational connection between the facts found and the choice made." *Baltimore Gas & Electric. Co. v. Nat. Res. Def. Council* 462 U.S. 87, 105

(1983). It must also conduct a site-specific analysis for the proposed action. 40 C.F.R.

1501.3(b)(1) (2020).

> 1.  *The Service Failed to Take a Hard Look at the Impacts of Logging on Mature and Old Forests' Health*

88.     The Service asserted that the purpose of the Sandwich Project is to "advance

[F]orest [P]lan goals, objectives, and desired conditions for vegetation, wildlife, and other

resources." Final EA at 5. It further stated that "existing habitat conditions in the Sandwich

Habitat Management Unit do not meet Management 2.1 Area habitat composition and age class

objectives described in the [F]orest [P]lan." *Id.* The Service asserts that its prescribed treatments

will "improve habitat conditions and the health and diversity of forest vegetation." Final EA at 9.

89.     The Service failed to disclose any data on stand ages, existing old forest habitat,

and early successional forest in the Project area or the National Forest. Thus, the Service did

not—and cannot—show how the Project adheres to Forest Plan requirements or advances forest

plan goals and desired conditions for vegetation resources. Standing Trees alerted the Service to

these omissions in its scoping comments, Draft EA comments, and objection.

90.     The Service also failed to comply with its obligation to conserve forests that

contain old growth or old forest habitats. The Forest Plan prohibits timber harvest in old growth

and old forest habitats and instructs that outstanding natural communities should be conserved.[3]

Yet, the Final EA and Habitat Management Unit Rationale documents do not mention old forest

habitat at all—providing no explanation of how the Service considered these factors in its

decision-making. These documents offer only a conclusory statement that old growth or forest

---

[3] 2005 Forest Plan at 1-21, Standard S-3 ("Timber harvest is prohibited in old growth forest."); *id.*, Guideline G-1 ("Outstanding natural communities should be conserved."); 2005 Forest Plan Glossary at 21 ("Desired habitat conditions start with those for mature forest and can include greater size, decadence, structural complexity, etc. *No harvest will occur in stands identified to provide old forest habitat*.") (emphasis added).

with old growth characteristics were identified and removed from the treatment area. The Service provided no evidence to support this statement.

91.     The Final EA and its supporting documents did not provide detailed spatial, qualitative, or quantitative information to demonstrate whether the Service considered how timber harvest could impact old growth forest, old forest habitat, mature forest habitat, or outstanding natural communities. In fact, the Service improperly incorporated the surveys by reference: it described its methodology for surveying the Project area, but did not make the surveys available for review by interested members of the public—despite numerous timely requests. At this time, the Service still has not shared its surveys with the public.

92.     The Service's decision to authorize commercial timber harvest and prescribed burns was not based on the best available science regarding forest health. The Service asserts the Project will cultivate a healthy forest but ignored up to date scientific literature that cautioned against the Service's proposed harvests and prescribed burns. The Service failed to take a hard look because it deferred some analysis related to forest health until after its decision to authorize the Project. The Final EA states, "[p]rior to implementation, field visits will occur to further refine treatment units based on site conditions. . . ." Final EA at 10. While the Service can and should modify silvicultural treatments if new information is discovered during operations, it cannot defer necessary analysis until after the public's opportunity to comment and after the Project is approved. Here, the Service took the impermissible latter option: it provided no qualitative or quantitative surveys to the public to determine whether treatment units need to be altered. This approach means the Service is not considering all environmental impacts before making a decision, and thus cannot and did not inform and include the public in environmental decision making.

2. *The Service Failed to Address Climate-Related Impacts of the Project*

93. The Service failed to take a hard look at the climate impacts of the project because it relied on vague comparisons and percentage-based standards to determine the Project's climate impacts. Specifically, in a three-page "carbon report" accompanying the EA, the Service stated that the Project's emissions would be an "extremely small contribution" compared to national and global emissions because the Project is "0.1 percent" of the forested area in the National Forest. The only numbers the Service quantified were those representing national and global carbon emissions. The Service did not quantify the project's emissions or impact of logging on carbon stores, despite easy access to documents that quantified the National Forest's baseline of existing carbon stocks, including its "Carbon White Paper" (estimating carbon stock at 69.14±11.60 teragrams in 2020), and the Service's 2015 national Baseline Report. This approach directly contravenes the methodology the Forest Service laid out in its Carbon White Paper, which emphasized that "[c]arbon assessments at the scale of the NFS *unit* help to inform project-level carbon analysis in a consistent, efficient, and unbiased manner." The Service's comparative analysis here obscured the real environmental impact of the Project.

94. Without quantifiable carbon data to use in comparing alternatives the Service did not—and could not—consider the effects of a no-action alternative. This failure to consider essential data prevented the Service from taking a hard look at the Project's climate impacts. Standing Trees brought this omission to the Service's attention multiple times, but the Service failed to correct it.

95. The Service also violated NEPA's public participation requirement because it completed the Project-level carbon assessment without providing an opportunity for interested parties to review or comment prior to its use in decision-making.

96.     The Service failed to take a hard look because it did not use the best available science to inform its decision. For instance, Standing Trees submitted comments and made a substantial showing that carbon sequestration increases as forests age, and that old forests store more carbon than young forests. In response, the Service dismissed the information raised by Standing Trees and simply restated that logging would make the forest "likely to sequester and store carbon more efficiently," without engaging with the science to the contrary. Final EA at 26.

3.     *The Service Failed to Take a Hard Look at the Project's Impacts to Water Quality*

97.     The Service failed to take a hard look because its conclusions regarding the Project's impacts on water quality are arbitrary and not informed by site-specific information or baseline data. For example, the Service concluded that the Project's effects on a stream's acidification would be of "minor and short duration . . . with little or no effect on the aquatic ecosystem in the analysis area" and that aluminum toxicity risks were "reduced." Final EA at 25. This conclusion contradicts the Service's acknowledgement that the stream's watershed will experience 35.8% removal of basal area (i.e., the amount of an area occupied by tree stems) which is well above the 20% limit the Service established to avoid water quality degradation. The Service asserted that the stream's gentle slope, non-fish-bearing status, and beaver activity would buffer against aluminum and acidity risks. Without a baseline, the Service does not know the stream's existing pH and aluminum concentration. Thus, its conclusion regarding aluminum leaching and acidification is arbitrary.

98.     Moreover, the Service's 20% basal area removal methodology is itself arbitrary. When the Service applies its 20% basal area removal methodology, it does not collect baseline information, indeed, the Service did no site-specific analysis of the area's waters. Using this methodology, the Service asserts that the proposed activity will not significantly impact water quality without analysis of the baseline condition of the Project area's waters.

99.     Finally, the Service failed to take a hard look at water quality impacts because it deferred collecting baseline information to after authorizing the project, but "prior to implementation." Final EA at 10. The Service did not identify on-site baseline conditions for water quality in its NEPA analysis. This omission limited the public's ability to make informed comments, and the Service's ability to make an informed decision.

4.      *The Service Did Not Take a Hard Look at How Road Construction Will Impact Environmental Resources*

100.    The Service failed to take a hard look at the environmental impacts of road construction because, first, it failed to establish a baseline to assess the impacts of road construction. The Service provided no analysis of the current state of transportation in the Project area that justifies it being listed as a "need" under the purpose-and-need section of the EA. Specifically, the Final EA does not include a baseline describing existing road conditions or their current uses. The Service did not take a hard look because it failed to investigate an important aspect of road construction: it did not explain why reopening certain roads is necessary, when the Service itself acknowledges those roads will not be used for harvest access. As a result, the public remains in the dark about why a road is proposed to be rebuilt for a project that does not require its use.

101.    Second, the Service failed to take a hard look because it does not present a clear connection between information showing risks of significant environmental impacts from road construction and the decision to authorize the Project. The Final EA notes that unauthorized roads will be "converted" or "reconstructed," but the Service never fully discusses the site-specific harms posed by reconstruction. Final EA at 18. For example, the Final EA acknowledges that multiple roads cross intermittent and perennial streams, yet it does not assess how those

impacts will be prevented or minimized. The Service did not analyze foreseeable environmental impacts it identified.

102.     Third, the Service failed to take a hard look at the impacts of road construction because the Service did not explain how logging operations would access units proposed for timber harvest. This omission raises serious concerns that the Service either failed to analyze an important component of the project or is withholding vital information regarding the extent of that access and its associated impacts—both violations of NEPA.

103.     Fourth, the Service failed to take a hard look because it mischaracterizes what is effectively *new* road construction as road *re*construction. Numerous roads proposed to be "reconstructed" are not recognizable as functioning roads; instead, they have naturally reforested and are virtually unnoticeable and unusable. For example, in the Guinea Hill portion of the Project area, an unidentified segment branching off FS Road 373—likely depicted as road 5460 in the "Travel Rule Subpart A, Minimum Road System" map—is a relic of long-ago agricultural or logging activities. Today, this "road" has naturally reforested, making it nearly imperceptible and completely impassable. As Figure 1 below makes clear, the presence of mature trees indicates that these areas have not functioned as roads for decades, and in many places, no road is discernible. The Service failed to take a hard look at the impacts of road construction because it failed to disclose and analyze this roadbuilding for what it is: new road construction.



*Figure 11: Non-existent road proposed for reconstruction. Photo credit: Zack Porter*

104.     Fifth and finally, the Service never completed a NEPA review for forest-wide transportation needs. In 2015, the Service completed a "transportation analysis process... for long term administration of the national forest's transportation system." Final EA at 6. Although the Service chose to use the term analysis, such a characterization is misleading in the context of NEPA. The 2015 report was published without NEPA review or a record of decision, lacking transparency and accountability, including requisite opportunities for public input and agency response. This document was not available for public review during the project's NEPA review. The document is still not available for public review: the Service cited the document with a link to access it in its objection response, but the link directs to the National Forest's Land and Resource Management page, where the document does not appear to be posted. Yet in the Final EA, the Service states that it "completed a site-specific analysis of routes in the project area and

identified actions for implementing or revising the transportation analysis process recommendations." Final EA at 6. But without any alternatives analysis or rigorous exploration of impacts, the Service failed to compensate for the deficiencies in its 2015 transportation report.

5.   *The Service Failed to Take a Hard Look at Soil-Related Impacts in the Project Area*

105.    The Service failed to take a hard look at impacts to soil because it did not use a current, site-specific baseline upon which to conclude soil conditions in the Project area are suitable for timber harvest. Instead, the Service relies on historical, National Forest-wide data on impacts to "representative" stands outside the Project area, which does not meet NEPA's requirement that the Service take a hard look at site-specific impacts.

106.    The Service failed to take a hard look at soil impacts because it baselessly concluded in its "soil report" accompanying the EA that compaction and erosion of soil would be "temporary" and "minimized by design features" that it assumed would be followed during project implementation. That assumption was unjustified and now is contradicted by Project work already underway: while Soil Design Element 4 (SO-4) instructs that harvesting is limited to specific seasons and conditions in the timber sale contract, unit 14 was authorized for summer and fall harvest, but in fact appears to have been logged in late winter and early spring of 2025.

107.    In addition, the conclusion that the Project will not result in detrimental effects to soil is arbitrary because the Project contemplates construction of skid trails on slopes greater than 20% despite the fact that the best management practices the Service cites do not endorse skid trail construction on slopes greater than 15%.

28



*Figure 2: A skid road that connects Units 14 and 28 at the Guinea Hill Sale. Photo Credit: Zack Porter.*

108.    At Guinea Hill, where timber operations are underway, it appears that soil-retention best management practices are not being implemented. For example, Figure 2 depicts a skid trail from Unit 14 to Unit 28, constructed in early 2025. It does not follow contours, makes consistent runs directly uphill, may exceed a slope of 15% or 20% for significant portions of the trail, and is not covered with slash to reduce the risk of exposed mineral soil.

> 6.    *The Service Failed to Take a Hard Look at the Project's Impacts on the Continued Existence of Federally Listed Endangered Species Including the Northern Long-Eared Bat*

109.    The Service failed to take a hard look at the effect the Project would have on endangered species, including the northern long-eared bat, by not conducting its own site-specific analysis.

110.    The northern long-eared bat is classified as endangered under the Endangered Species Act. Endangered and Threatened Wildlife and Plants; Endangered Species Status for

Northern Long-Eared Bat, 87 Fed. Reg. 73488 (Nov. 30, 2022). The bat's preferred roosting and foraging habitat—mature and old forest with large-diameter trees with exfoliating bark, cavities, or crevices for roosting—is the primary habitat type targeted by the Project. The bat has been documented throughout the National Forest. The Service then relied on an overly broad biological opinion—which considered more than 2,500 projects collectively—that the Project was not likely to adversely affect the bat.

111.    The Service did not investigate the presence of the bat within the Project area itself to inform its decision-making on the Project. Such a failure to conduct a site-specific investigation for the bat also abridged the Service's obligations under the Forest Plan.

112.    Instead, the Service "assumed" the bat to be present in the Project area. Despite this assumption, the Service arbitrarily and capriciously failed to mitigate the Project's admitted harms to the northern long-eared bat.

113.    Worse, the Service made inexplicable decisions inconsistent with the presence of the bat, including failing to limit harvest to the winter, when the bat is hibernating. In another National Forest project, the Service made a similar decision to authorize non-winter harvest and concluded that the project was likely to adversely affect the bat, making its conclusions here more arbitrary.

7.    *The Service Failed to Account for Scenery-Related Impacts to Several Iconic Viewsheds and Recreational Impacts to Hiking Trails*

114.    The Service failed to take a hard look at scenic impacts because, per its objection response, it concededly did not provide during the NEPA process "sufficient details concerning what visitors can expect to see after each treatment type in the affected viewshed and how long it will take for the affected area to recover." This omission undermined the public's ability make informed comments and propose alternatives.

30

115.    The Service conducted a full scenic analysis on a single viewpoint atop Mount Chocorua. It did not analyze impacts to two of the most popular peaks in the Sandwich Range, Mount Israel and Mount Whiteface, nor did it assess impacts to hikers, snowshoers, or skiers along such popular routes as the Liberty, Cabin, or Big Rock Cave Trails.

116.    The Service failed to take a hard look at the Project's impacts on recreational resources because it conducted no analysis of recreational impacts. The Service did not publish or cite a recreational specialist report that informed its conclusions in the Final EA. The Service authorized commercial logging within sixty-six feet of popular hiking trails, including routes that access the Sandwich Range Wilderness and Mount Chocorua Scenic Area. Furthermore, it authorized sixty-five acres of prescribed burns that overlap the popular Liberty Trail, which accesses the Mount Chocorua Scenic Area and climbs to the summit of Mount Chocorua. The Service did not analyze these impacts.

8.    *The Service Failed to Take a Hard Look at Impacts to Inventoried Roadless Areas and Congressionally-Designated Wilderness*

117.    The Service failed to take a hard look at impacts to the Sandwich Range Wilderness Area because it did not study the effects of logging immediately adjacent to that wilderness area. Harvest unit 39 borders the Sandwich Range Wilderness; logging activities there would have direct and indirect impacts on the Wilderness, but none of these impacts are mentioned much less analyzed.

118.    The Service failed to take a hard look at impacts to Wilderness and roadless areas, and it did not even so much as acknowledge impacts to IRAs until the Final EA—after the conclusion of public comment periods. In fact, the Draft EA stated, "[n]o project activities are proposed in wilderness areas or roadless areas…." Draft EA at 28. This statement was false. The Service admitted in an August 25, 2023, email to Standing Trees that it had erred in omitting

those areas from the Draft EA. Indeed, the Final EA makes clear that more than 250 acres of logging is authorized in two IRAs. As a result of this error, no member of the public was able to analyze or comment on proposed impacts to IRAs before the Service authorized the Project. Moreover, Standing Trees proposed an alternative that would avoid harvest in IRAs. Since the Service did not even acknowledge such logging would occur until the Final EA, there is doubt as to whether the Service properly considered alternatives.

119.    The Service failed to take a hard look at impacts to these IRAs' unique qualities or their future wilderness evaluation by the Service or by Congress. The Service stated there was no road construction planned in the IRAs, then concluded that, therefore, the Project will have no effect on the areas' eligibility for future Wilderness consideration. But eligibility for future wilderness consideration is merely one of several important measures that would constitute a "hard look" at impacts. The analysis failed to account for site specific impacts to these roadless areas and for important suitability components, including impacts on the unique characteristics of each IRA as documented in the Forest Plan, and on the Service's future analysis and decision making for wilderness recommendations. The slim analysis fails to even answer whether or to what extent logging may impact qualities of wilderness character that might influence future wilderness designation by Congress.

9.    *The Service Ignored the Cumulative Effects of Similar Actions in the National Forest*

120.    The Final EA failed to take the requisite hard look at the Project's cumulative impacts because it provided vague or generalized statements instead of quantified or detailed information regarding cumulative impacts to resources. The Project will have cumulative impacts to forest health, climate, water, and wildlife in conjunction with at least thirteen other ongoing, recently completed, or reasonably foreseeable commercial timber harvest projects in

32

the National Forest. However, the Final EA dismisses potential cumulative impacts by stating simply that "no measurable cumulative impacts are expected." Final EA at 31. The Final EA's treatment of cumulative impacts across multiple resource areas consists entirely of similar conclusory assertions in which the Service fails to quantify anything, including forest health, climate, wildlife, water and forest health.

121.    The Service failed to take a hard look at cumulative climate impacts because it failed to quantify the Project's emissions or impacts on carbon storage. The Service concluded there will not be significant climate impacts because the Project is on only 0.1% of the National Forest. This anemic analysis ignores the thirteen other recent, ongoing and reasonably foreseeable commercial timber harvest projects in the National Forest that *cumulatively* are set to clear far more mature and old forest.

122.    The Service failed to take a hard look at cumulative impacts to forest health because it did not account for early successional habitat created in at least thirteen other recent, ongoing and reasonably foreseeable projects on the National Forest. Without information on how much early successional forest is present on the landscape of the National Forest and region, the Service cannot justify the central purpose of the Project: advancing Forest Plan goals and vegetation management objectives.

123.    In addition, the Service failed to study the cumulative impacts of timber harvest in conjunction with timber harvest on nearby private lands—something the Service recognizes as regularly occurring. The 2005 Forest Plan Final Environmental Impact Statement ("FEIS") used a broad analysis area, including public and private lands. This accounting has never been updated since the issuance of the now outdated 2005 Forest Plan. Such a change in methodology is arbitrary.

**D.      The Service's Arbitrary and Capricious Finding of No Significant Impact Violates NEPA and the APA**

124.    The Service's FONSI is built on its flawed environmental review of the Project and violates the Service's obligation to justify with reasoned explanation its conclusion that the Project will not have a significant impact on the environment.

125.    The Service's FONSI is arbitrary and capricious, and not in accordance with law because the Service failed to consistently identify the rules that it applied during the review of the Project. For example, the Draft EA states the Project—for which a Notice of Proposed Action was issued on June 6, 2022—was prepared using the 2020 NEPA CEQ regulations, but that it also complies with the 2022 NEPA CEQ regulations—which became effective on May 20, 2022. Then, the Final EA states the "environmental analysis was conducted according to the [CEQ's] 1978 regulations for implementing the procedural provisions of [NEPA]…." Final EA at 1. Finally, the Service in its objection response stated that the "analysis presented follows the 2020 regulations," which do not contain the 10 context and intensity factors, but "[n]evertheless, the EA and project record show consideration of these 10 factors…." The Service's FONSI was arbitrary and capricious for failing to consistently identify the rules and policies that governed its environmental review.

126.    The FONSI is arbitrary and capricious and not in accordance with law because it does not comply with any of the three sets of regulations the Service claimed to follow for analysis of the Project. The FONSI is conclusory and lacks factual support.

127.    The FONSI is arbitrary and capricious and not in accordance with law because it does not accurately identify relevant environmental concerns. The FONSI heavily relies on the flawed analysis in the EA, in particular the assertion that potential effects would be localized to the project area, and not measurable at the regional or larger scale. As documented above, the

Service failed to study or explain why the Project will not have significant impacts on numerous resources including forest health, the climate, water quality, road construction, soils, endangered species, scenery and recreation, inventoried roadless areas and cumulative impacts. *See supra* Part C.

128.    The FONSI is arbitrary and capricious and not in accordance with law because it failed to take a hard look at the Project's environmental impacts or their intensity. As detailed extensively above, the Service failed to take a hard look at impacts to forest health, climate, water quality, road construction, soils, endangered species, scenery, and inventoried roadless areas. *See supra* Part C. Across these resources, the FONSI relies on the flawed analysis of the Final EA to reach its conclusions.

129.    The FONSI is arbitrary and capricious and not in accordance with law because the Service did not provide a reasoned explanation for its finding of no significant impact. The FONSI largely reiterates its conclusory findings from the Final EA to find the project will not have significant impacts. For instance, the Service routinely stated mitigation measures would prevent significant impacts, but its explanations are conclusory or illogical. In a particularly deficient example regarding soils, the Service stated "[e]ffects … will be minimized by implementation of the best management practices and project design criteria." Final EA at 33. But the best management practices contradict exactly the actions the Service authorized. *See supra* Part C.5.

130.    The FONSI is arbitrary and capricious and not in accordance with law because the Service did not identify the context for the project. The FONSI refers to the "affected area," but does not define what that area is. The Service appears to have arbitrarily limited its analysis to exclusively the Project area. Yet the Project's cumulative impacts extend beyond the Project area

and must be analyzed in the context that the Service must logically consider, including for example in combination with the impacts of timber harvest on nearby private lands or other parts of the National Forest.

131.    The FONSI is arbitrary and capricious because the Service only analyzed effects in the Project area, and not the whole affected area. The Forest Service asserted that "environmental effects will be site-specific, localized to the project area, and will not be measurable at a regional or larger scale." Final EA at 32. Yet, as detailed above, the Service failed to analyze cumulative impacts at the regional level for multiple resources, including forest health, carbon, and endangered species. *Supra* Part C.9.

**E.    The Final EA Violates the Forest Plan**

*1.    Forest Health*

132.    In violation of NFMA, the Service has not demonstrated the Project advances Forest Plan goals and objectives for vegetation—or if the Project is even needed. Moreover, it cannot demonstrate compliance with the Forest Plan.

133.    In violation of the Forest Plan, the Service impermissibly deviated from reporting age-classes defined in the Forest Plan and thus failed to analyze whether the Project meets the National Forest's old-age-class targets. As to these issues, the Service repeatedly denied the public access to information that would have helped with drafting comments and suggesting alternatives, and with independently validating whether the Forest Service was in fact meeting the requirements of the Forest Plan. In addition to misreporting age-classes, the Service did not provide information about early successional forest in the Project area or the National Forest.

134.    The Forest Plan identifies four age classes by habitat type. The old age-class begins when a stand exceeds its respective age for the mature age-class. Instead of reporting mature and old as two distinct age-classes, the Service reported all old-age-class and mature-age-

36

class as mature-age-class stands. This approach makes it impossible to assess whether the Service is following the Forest Plan and meeting its age-class goals. Furthermore, it frustrates the public's ability to independently investigate old-age-class stands to ensure that no "old-growth forest" or "old forest habitat" is present in areas proposed for timber harvest.

135.    In violation of the Forest Plan, the Service failed to demonstrate it is not harvesting "in stands that contain old-forest-habitat."  The Service provided no maps of stand boundaries or ages, nor silvicultural or botanical surveys to document the characteristics of the stands or harvest units where logging will occur. The Forest Service only makes conclusory statements regarding its compliance with the Forest Plan's protective requirements. Such a concern is elevated in mature and old forest, where old-forest and old growth habitats are most likely to occur.

136.    In violation of the Forest Plan, the Service failed to describe how even-aged treatments (such as clearcuts) that are approved in "mature forest habitat" will avoid "negatively impacting habitat quality." Forest Plan Abbreviations, Acronyms, and Glossary at 18.

137.    In violation of the Forest Plan, the Service did not use the best available science regarding forest health. The Forest Plan and its accompanying EIS are now 20 years old, beyond the duration NFMA specifies for such plans. Notwithstanding substantial disputes related to management for early-successional habitat, management to improve carbon storage and sequestration, and protection of water quality, the Service failed to respond to or independently consider recent studies that support greater protection of mature and old forests.

2.    *Wild and Scenic Rivers*

138.    The Forest Plan requires the Service to "[m]anage eligible [wild and scenic] rivers to maintain their classification and eligibility until Congress designates the segments or decides not to designate them[.]" Forest Plan at 2-32. Despite recognizing the Cold River as an eligible

wild and scenic river, the Final EA provides no prescribed mitigation measures and plans for clearcuts and other even-aged treatments near the River. Contrary to the Forest Plan, the Service does not meet its obligation to protect the Cold River.

    *3.    Scenery*

139.    In violation of the Forest Plan's Scenic Guideline G-3, the Service authorized logging that is visible from important vantage points, that will not appear as natural occurrences, and that is not well-distributed into the landscape. For example, Unit 06 is slated to be clearcut and will be highly visible from Mount Chocorua, the center of the Mount Chocorua Scenic Area; 4.14 acres of harvest will be visible, which exceeds the low end of the 4–5-acre maximum threshold. The Service did not discuss modifying or not implementing Scenic Guideline G-3. As discussed above, Mount Chocorua was the only viewpoint studied, despite scenic impacts to other area peaks.

    *4.    Northern Long-Eared Bat*

140.    In violation of the Forest Plan, the Project contravenes its obligation to contribute to the conservation or recovery of the northern long eared bat—a federally listed endangered species—and its habitat.

141.    In violation of the Forest Plan, the Service did not investigate the presence of the endangered bat prior to beginning authorized ground disturbing activity at the site; the Biological Evaluation states "no acoustic surveys were conducted for the Sandwich Vegetation Management Project." Despite assuming the bats are present, the Service cannot point to any survey or investigation it conducted for the northern long-eared bat whatsoever. Furthermore, the Project violates the Forest Plan and contravenes the agency's stated assumption of bat presence and obligation to conserve and recover bat species by approving logging a) during seasons when bats

are most likely to be occupying trees within the Project area, and b) of trees greater than 3 inches in diameter with cavities or exfoliating bark.

     *5.*     *Roads*

142.     In violation of the Forest Plan, the Project authorizes four times the amount of new road construction than the Service considered in the FEIS for the Forest Plan. The FEIS anticipated a single mile/year of road construction per decade of implementation. The Service sidesteps this constraint by classifying the proposed road construction as reconstruction of existing roads. The proposed roads to reconstruct are roads in name only as they have been entirely reclaimed by the forest. Based on these failures, the authorization of four miles of new road construction contravenes the Forest Plan.

     *6.*     *Soils*

143.     In violation of the Forest Plan, the Final EA deviates from Vegetation Management Guideline G-5 without a logical rationale. The Final EA acknowledges that skid trails may need to be built on slopes of up to 35%, far over G-5's 20% limit. The Service justifies deviating from the guideline with the conclusory statement that detrimental effects to soil will be avoided "as long as soil and water best management practices and design features are followed." Final EA at 25. However, the Forest Plan Standard S-4 already requires that State of New Hampshire Best Management Practices, which caution against skid trails on slopes exceeding 15%, "must be met or exceeded…." Forest Plan at 2-29. The Service's justification for its decision to deviate from G-5 is no justification at all.

## CLAIMS FOR RELIEF

## <u>Claim 1: Failure to Consider Appropriate Alternatives Under NEPA and the APA</u>

144.     Standing Trees incorporates the above allegations by reference.

145.    The Service violated NEPA by failing to adequately consider alternatives during the preparation of the Final EA. These decisions are arbitrary, capricious, an abuse of discretion, and not in accordance with law in violation of the APA.

146.    The requirement to consider alternatives is central to environmental reviews under NEPA; it commands agencies to consider "appropriate" alternatives when preparing an EA. 40 C.F.R. §§ 1501.2(b)(3) (2020); 1508.9(b) (1978); *see also* 36 C.F.R. 220.7(b)(2); *see also* 42 U.S.C. § 4332(2)(E); *see also Dubois*, 102 F.3d at 1286 (1st Cir. 1996) (agencies have a duty to study all "reasonable and appropriate" alternatives, including those suggested by the public).

147.    The Sandwich project is a major federal action that requires compliance with NEPA and its implementing regulations. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1500–1508.

148.    The Service's authorization of the Sandwich project was a final agency action for purposes of APA review. 5 U.S.C. § 704.

149.    The Service was obliged to consider alternatives because there are unresolved conflicts concerning alternative uses of available resources in the Project area. The Service must analyze alternatives to resolve those conflicts.

150.    The Service dismissed Standing Trees' proposed alternatives that aimed to minimize the scope and impact on environmental resources and did not evaluate them in the Project's EA. This approach violates NEPA and the Service's own regulations in light of the unresolved conflicts concerning alternative uses of available resources in the Project area. *See* 36 C.F.R. § 220.7(b)(2)(i) (requiring analysis of alternatives in EA when conflicts concerning alternatives uses of available resources are present).

151.    The Final EA does not consider a no action alternative. It contains a short section entitled "Consequences of No Action," which contains no analysis, including no analysis of

potential benefits. It merely concludes that taking no action would not meet the purpose and need of the project.

152.    The Service violated NEPA because it failed to analyze appropriate action alternatives and a no action alternative.

153.    This failure to consider alternatives also violates the APA because it is arbitrary, capricious, an abuse of discretion, and not in accordance with law.

154.    The failures regarding alternatives were not harmless; had the Service complied with NEPA, it is likely that the project would either not have proceeded or would have been changed in ways that would have reduced the Project's harms to Standing Trees members.

### Claim 2: Failure to Take a Hard Look Under NEPA and the APA

155.    Standing Trees incorporates the above allegations by reference.

156.    NEPA and its implementing regulations require the Service to take a "hard look" at the environmental impacts of a project and its alternatives, including their direct, indirect, and cumulative impacts, when preparing an EA. *Kleppe*, 427 U.S. at n. 21 ; *see also Hanly*, 471, F.2d at 830-31 (requiring agency to consider " cumulative harm that results from its contribution to existing adverse conditions or uses in the affected area").

157.    Under NEPA, the Service must implement measures that "ensure that presently unquantified environmental amenities and values may be given appropriate consideration in decision-making along with economic and technical considerations." 42 U.S.C. § 4332(B).

158.    In conducting this analysis, the Service must establish baselines against which to assess the extent of the project's environmental impacts; such baselines are necessary in order to satisfy the "hard look" requirement for NEPA reviews.

159.    Regarding GHG emissions, the Service must also use appropriate tools and methodologies and the best available science to create a numerical assessment of GHG emissions rather than comparative percentages that obscure the real environmental impact. *Diné Citizens Against Ruining Our Env't*, 59 F.4th at 1041. A statement that emissions from a proposed Federal action represent only a small fraction of global or domestic emissions is inadequate under NEPA's hard look standard. *Id.*

160.    The Service failed to take the required "hard look" at the Project's environmental impacts, including impacts to forest health, the climate, water quality, road construction, soils, endangered species including the northern long-eared bat, scenic and recreational resources, and roadless areas.

161.    Regarding forest health, carbon, water quality, the northern long-eared bat, and scenic and recreational resources, the Service violated NEPA by using incomplete data, so that it did not analyze the full scope of impacts to these resources.

162.    Regarding forest health, climate, water quality, road construction, soils, endangered species, scenic and recreation, and roadless areas, the Service did not satisfy NEPA's requirement that agencies demonstrate a rational connection between the facts they find and the choices they make.

163.    The Service also violated NEPA by failing to properly consider the direct, indirect, and cumulative environmental impacts from similar, contemporaneous projects in the same region.

164.    These failures to take a hard look also violate the APA because they are arbitrary, capricious, an abuse of discretion, and not in accordance with law.

165.    The failures to take a hard look at the Project's impacts were not harmless; had the Service complied with NEPA, it is likely that the Project would either not have proceeded or would have been changed in ways that would have reduced the Project's harms to Standing Trees members.

## Claim 3: Unlawful Finding of No Significant Impact

166.    Standing Trees incorporates the allegations above by reference.

167.    NEPA requires the Service to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

168.    In considering whether the project will have significant impacts on the human environment, the Service must "analyze the potentially affected environment, and degree of effects of the action." 40 C.F.R. § 1501.3(b) (2020). The context and intensity of the action inform such an analysis. *Hanly*, 471 F.2d at 830-31.

169.    The Service's FONSI for the Sandwich Project violates NEPA and the APA because the Service did not consistently identify the rules it applied during the review of the Project.

170.    The Service's FONSI for the Sandwich Project violates NEPA and the APA because it did not accurately identify all relevant environmental concerns.

171.    The Service's FONSI for the Sandwich Project violates NEPA and the APA because it failed to take a hard look at the Project's environmental impacts.

172.    The Service's FONSI for the Sandwich Project violates NEPA and the APA because it did not provide a reasoned explanation for its finding of no significant impact.

173.    The Service's FONSI for the Sandwich project violates NEPA and the APA because the Service did not adequately analyze the Project's context or intensity.

174.    The Service did not properly identify the Sandwich project's geographic context, stating that "the silvicultural treatments will affect less than 1 percent of the total land acreage of the National Forest." In the FONSI it vaguely referred to the "affected area," while never specifying what the affected area is.

175.    Because the Service did not consistently state the regulations it relied upon, and did not properly analyze the potentially affected environment, nor the degree of effects of the action, the Service's FONSI for the Sandwich project was arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of NEPA and the APA.

176.    The issuance of a FONSI that did not comply with NEPA and the APA was not harmless; had the Service complied with NEPA, it is likely that the project would either not have proceeded or would have been changed in ways that would have reduced the Project's harms to Standing Trees members.

### Claim 4: Failure to Comply with the Forest Plan and NFMA

177.    Standing Trees incorporates the above allegations by reference.

178.    The Service's failures to establish compliance with, and deviations from, the Forest Plan violated NFMA and the APA.

179.    The Sandwich Project is inconsistent with the Forest Plan because the Service failed to disclose information on stand ages, failed to ensure compliance with the Forest Plan's standards and guidelines for wild and scenic rivers and scenic integrity objectives, dismissed the latest scientific knowledge, and failed to contribute to the conservation and recovery of endangered species.

180.    These failures violated NFMA's requirement that the Service ensure that every element of the Sandwich Project complies with the Forest Plan by either contributing to the

maintenance or attainment of one or more goals, desired conditions, or objectives or at least not foreclosing the opportunity to do so over the long term; by complying with all applicable standards; by complying with or justifying the departure from applicable guidelines; and by occurring in a suitable area.

181.    The Sandwich Project is arbitrary and capricious under NFMA because it authorizes four times the amount of new road construction that was considered in the Final Environmental Impact Statement for the Forest Plan.

182.    The Service's authorization of the Sandwich Project was arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of NFMA and the APA, because the Service improperly deviated from the Forest Plan.

183.    The numerous failures to comply with the Forest Plan, in violation of NFMA, were not harmless; had the Service complied with NFMA, it is likely that the project would either not have proceeded or would have been changed in ways that would have reduced the Project's harms to Standing Trees members.

## REQUEST FOR RELIEF

WHEREFORE, Standing Trees respectfully requests that the Court:

A.    DECLARE that Defendants violated the National Environmental Policy Act, National Forest Management Act, and Administrative Procedure Act in the respects set forth above when issuing the June 26, 2024, Decision Notice for the Sandwich Vegetation Management Project;

B.    VACATE and set aside the Decision Notices for the Sandwich Vegetation Management Project as an unlawful agency action under the Administrative Procedure Act;

C.      ENJOIN Defendants from proceeding with the Sandwich Vegetation Management

Project until they have complied with the National Environmental Policy Act, National Forest

Management Act, and Administrative Procedure Act;

D.      AWARD Standing Trees its reasonable costs, litigation expenses, expert fees, and

attorney fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C.

§ 2412; and

E.      GRANT such further relief as the Court deems just and equitable.


Respectfully submitted, this the 23rd day of June, 2025.

STANDING TREES, INC.

By its attorneys:


/s/ Christophe Courchesne
Christophe Courchesne
NH Bar No. 20431
Associate Professor and Director
Environmental Advocacy Clinic
Vermont Law and Graduate School
164 Chelsea Street, PO Box 96
South Royalton, VT 05068
(802) 831-1630
(802) 831-1631 (fax)
ccourchesne@vermontlaw.edu


*Environmental Advocacy Clinic student attorneys Joe Anderson, Ben Behimer, Lakshita Dey, and Blythe Faris contributed to this Complaint.*