# Exhibit 1



**Forest Service**
U.S. DEPARTMENT OF AGRICULTURE

White Mountain National Forest, Saco Ranger District | June 2024

# Sandwich Vegetation Management Project

## Decision Notice



**For More Information Contact:**

Responsible Official: Jim Innes
White Mountain National Forest
Saco Ranger District
33 Kancamagus Highway
Conway, New Hampshire 03818
Phone: 603 447 5448 x 5102
Email: james.innes@usda.gov

**Cover photo: Forest in the project area.**

The United States Department of Agriculture (USDA) is committed to making its digital content accessible. USDA customers, employees, job applicants, and members of the public with disabilities must have access to information and communication technology (ICT) comparable to the access available to those without disabilities. The U.S. Access Board ("Access Board") is responsible for developing accessibility standards. In 2017, the Access Board published a Final Rule that updated the accessibility requirements in Section 508 of the Rehabilitation Act of 1973 (Section 508), 29 U.S.C. 794d, and refreshed the guidelines in the law. The Final Rule went into effect on January 18, 2018. The standards are available at Information and Communication Technology: Revised 508 Standards and 255 Guidelines.

For more information, see the USDA Accessibility Statement.

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at How to File a Program Discrimination Complaint and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3): mail to: program.intake@usda.gov.

USDA is an equal opportunity provider, employer, and lender.

# Contents

Decision Notice ........................................................................................................................ 1

Decision and Rationale ......................................................................................................... 1

Summary of Public Involvement ........................................................................................ 4

Administrative Review and Objection Opportunities .................................................... 6

    Description of the User Experience .................................................................................. 7

Findings Required by Other Laws and Regulations ....................................................... 7

Implementation ...................................................................................................................... 7

Contact ..................................................................................................................................... 8

Appendix A: Errata to the Environmental Assessment ................................................. 9

    Errata Introduction ............................................................................................................. 9

    Council on Environmental Quality Regulations (Page 1) ........................................... 9

    Updates Since Draft Environmental Assessment (Pages 8-9) .................................... 9

        Supporting Documents Updated ................................................................................. 9

    Map 3 (Page 13)................................................................................................................. 10

    Permanent Wildlife Opening (Page 17) ........................................................................ 10

    Consequences of No Action (Page 19) .......................................................................... 10

    Issues Not Considered for Detailed Analysis (Page 20) ............................................ 12

    Riparian, Aquatic, and Water Quality or Quantity (Page 25)................................... 12

    Sensitive Species (Forest Service Manual [FSM] 2670) (Page 28)............................ 13

    National Historic Preservation Act – Section 106 Review (Page 28) ...................... 13

    Relevant Executive Orders (Page 30) ............................................................................ 13

    References (Page 37) ......................................................................................................... 14

    Environmental Assessment - Appendix A - Project Design Criteria and Other Measures ............ 14

        Resource Specific Design Criteria and Other Measures ........................................ 14

    Appendix B. Planned Vegetation Management Treatments and Seasons of Harvest (Pages 42 to 43)................................................................................................................................ 15

    Added Table......................................................................................................................... 16

# Decision Notice

This decision notice incorporates all previous information in the Sandwich Vegetation Management Project Environmental Assessment and Finding of No Significant Impact, as well as information included in the project record.

# Decision and Rationale

I have decided to authorize the activities described in the "Purpose and Need" and "Proposed Action" sections of the project environmental assessment and finding of no significant impact, including modifications identified during environmental analysis and review of legal and regulatory compliance. The public will note their comments and concerns were considered throughout the analysis with alterations to the proposal from the draft environmental assessment to the final environmental assessment.

Under the proposed action, management actions for habitat and vegetation management would occur within about 638 acres of management area (MA) 2.1- General Forest Management Lands. The project will address issues identified by the interdisciplinary team related to wildlife habitat, diversity, and timber production as discussed in detail in the environmental assessment. These management actions are planned to be implemented under the guidance of the 2005 White Mountain National Forest Land and Resource Management Plan (forest plan). The proposed action is summarized below:

- Conduct silvicultural treatment on about 638 acres and prescribed burning for habitat improvement on 306 acres of MA 2.1 lands within the Sandwich habitat management unit.

In arriving at this decision, I followed the standard process as outlined in Forest Service manuals and handbooks along with the National Environmental Policy Act. A second public comment period for the draft environmental assessment was requested by the public and added to ensure the public felt they had an opportunity to comment and be heard throughout the process.

In addition to the three 30-day comment periods, we held five public meetings and five meetings with clubs and organizations to address concerns. What stood out to me after reading the comments and hearing questions at the meetings was that the public is very engaged and passionate about the White Mountain National Forest. The National Forest System is managed under a multiple use mission, which not everyone agrees with. Public opinion on forest management has and will continue to be controversial. Federal land management policy can be complex and difficult to understand. My staff and I did our best to explain the "why" of our management actions and will continue this approach for future projects. We enjoyed giving the presentations and appreciated the public's interest. While many people expressed opposition to the project, it was clear that the public is genuinely interested in how White Mountain National Forest is managed. I have considered public comments received throughout the analysis and balanced them with the best available science in making this decision. Changes made to the environmental assessment based on public comments are bulleted below in the "Summary of Public Involvement" section.

There was public concern about old growth habitat in the context of Executive Order 14072. The 2005 White Mountain National Forest Land and Resource Management Plan prohibits timber harvest in old growth forest. During our surveys of the proposed units, we identified, removed from the project, and protected fifty acres of habitat meeting our forest plan definition of old growth. After these changes, no treatments in this project will take place within identified old growth stands. In addition, we identified a stand in the project area outside the proposed units for future protection. To meet the requirements of the Executive order 14072 the Forest Service recently announced the intent to amend all forest plans

nationally with consistent direction to conserve and steward old growth forest conditions. That amendment will apply to the White Mountain National Forest Land Forest Plan; however, our plan includes a definition of old growth forest and is already very restrictive concerning the protection of old growth forest.

Another concern was the project's impact to recreation, specifically visuals from the trails. My staff and I met with trail clubs, walked the trails, and discussed buffers. The primary concern was trails passing through regeneration harvests or group selections where the majority of the trees are removed. Trails meeting this description will be buffered a minimum of 66 feet.

There were questions over the lack of a recreation management section in the project. During the pre-scoping phase in 2020, the original project proposal included recreation management activities, specifically hiking trail relocations and maintenance. The approach we were taking was to work with the White Mountain Trail Collective and trail clubs to accomplish the trail work. However, in the planning process the number of trails we were going to include exceeded the project area boundaries and for simplicity we decided to analyze the trails under a separate analysis. Trail work and relocations are a routine action that does not require the level of documentation that is required under an environmental analysis. For this reason, we typically do these projects outside of large vegetation management projects. Unfortunately, during the early stages of the project The White Mountain Trail Collective dissolved and with it the support and partnership funding we were counting on and the list of what we had hoped to accomplish was reduced. However, we have done some trail analysis work and we are currently finishing the analysis on Carter Ledge, Liberty, and Middle Sister trails.

Many commenters were concerned about what the landscape would look like post-treatment. The treatment units were designed to meet minimum scenery requirements, but also minimize visual impacts while balancing the purpose and need. Due to the types of proposed treatments, unit design features, and the "light touch" approach, color, shadows, lighting, and textural changes on the landscape are most likely to be seen, but not bare ground.

The Forest Service consulted with the U.S. Fish and Wildlife Service (USFWS) under section 7 of the Endangered Species Act on the northern long-eared bat. An official species list from the U.S. Fish and Wildlife Service New England Ecological Services Field Office was generated using the Information for Planning and Consultation (IPaC) tool on March 29, 2023. On May 4, 2023, consultation was submitted in the IPaC tool. On May 9, 2023, the Interim Consultation Framework for the Northern Long-Eared Bat Appendix B: Biological Assessment form was submitted along with a follow-up letter to the U.S. Fish and Wildlife Service on May 9, 2023, confirming the IPaC determination. A concurrence email confirming the IPaC determination was correct was received on June 23, 2023, and concluded Forest Service responsibilities for the project action under the Endangered Species Act Section 7(a)(2) with respect to the northern long-eared bat. The Fish and Wildlife Service determined that the proposed project may affect, but not is likely to adversely affect the northern long-eared bat. As this is a "may effect", but "not likely to adversely affect" determination, there are no reasonable or prudent measures to incorporate. Therefore, the proposed action is in compliance with the Endangered Species Act.

An interdisciplinary team fully evaluated and disclosed the environmental effects of the proposed project based upon field study, resource inventory and survey, applicable best available science, and professional expertise. The project record demonstrates a thorough review of relevant scientific information and the consideration of opposing views.

Applicable forest plan standards and guidelines, national core and state best management practices, and project-specific design features identified by the interdisciplinary team will be implemented as part of the

proposed action. Additional design features were also developed and incorporated into the final proposed action based on public input.

I would like to thank those we heard from related to the project, both supportive and those who shared their concerns, and ask that they consider the reasons for this project with an open mind. No substantive alternatives were brought forward by the public that met the purpose and need, although the comments received were evaluated and the proposed action was continuously updated throughout the analysis based on public input.  The final proposed action is a well-balanced consideration for the purpose and need and an incorporation of public input.

In making my decision I asked the interdisciplinary team to review the alternatives suggested during the comment periods and determine whether the project would still meet the purpose and need. We reviewed the following suggested alternatives and found that none would meet the stated purpose and need. The suggested alternatives and the reasons they were not considered are described below:

- Developing different silvicultural prescriptions for comparison, but different silvicultural prescriptions were not suggested.
  - ♦ This suggested alternative would analyze other silviculture prescriptions with no description of what those should be. The multiple silvicultural prescriptions that were developed for this project are necessary to not only meet the goals of the project but also to reduce effects to resources. The prescriptions were developed collaboratively by the interdisciplinary team to reduce negative impacts while moving the areas to the desired conditions for forest and wildlife habitat and diversity. While other prescriptions could be applied, those that are included in the environmental assessment best meet the objectives while limiting effects to resources.

- Eliminating treatments in roadless areas.
  - ♦ The forest plan allows treatment within forest plan inventoried roadless areas. The project has been designed to further forest plan goals for wildlife habitat and species diversity within management area 2.1. This alternative would not meet the purpose and need of furthering forest plan goals for management areas 2.1 where the project is located.
  - ♦ Additionally, we considered alternatives which would eliminate timber harvesting in portions of the project area (for example, forest plan inventoried roadless areas) in previous environmental assessments (see Deer Ridge Integrated Resource Project Environmental Assessment, p. 36; Albany South Integrated Resource Project Final Environmental Assessment, pp. 41-46; North Chatham Integrated Resource Management Project Environmental Assessment, pp. 28-29). However, this alternative represents a partial implementation of the full proposed action and would not meet the need as well as the full proposed action. Furthermore, because the proposed action considers the broadest scope of potential impacts, this environmental assessment provides the decision-maker with sufficient information to decide whether or not to implement the proposed action, including deciding whether to exclude some or all treatments within forest plan inventoried roadless areas.

- Increasing the size of the buffer around watercourses and wetlands; increasing the size of the buffer from the boundaries of the Sandwich Range Wilderness, Mount Chocorua Scenic Area, and inventoried roadless areas.
  - ♦ The forest plan does not include buffers on different land allocations or designations, the boundaries are designated and were followed when determining the areas for treatment within this project.

♦ The project will apply the riparian buffers as required by the forest plan and this project is not located within wilderness.

♦ Furthermore, the scenery analysis complies with the forest plan scenery standards and guidelines for the management area where it is located. Viewpoints analyzed in the scenery analysis were those that would see impacts from the project. This alternative would not meet the purpose and need of furthering forest plan goals for management areas 2.1 where the project is located.

I considered the need for action and the issues identified during the comment periods in making my decision and I weighed the effects of the proposed action against taking no action. While taking no action would allow the natural successional processes to continue, it would not address the issues identified by the interdisciplinary team, or further the goals and objectives of the forest plan for which I am charged to implement. A point that is understated is that the interdisciplinary team identified the need for these treatments to further the goals of the forest plan, timber sales are simply the most economical means in achieving the desired conditions. Therefore, taking no action would not meet the need for the project. The proposed action will have minimal impact on the environment and will benefit multiple resources.

# Summary of Public Involvement

The conceptual project was published on the Forest Service's schedule of proposed actions (SOPA) in January 2020, and a proposal development open house was held in-person with the public on January 28, 2020, to introduce the project and seek public input.

We initiated scoping for the project on June 7, 2022, with a notice of proposed action and request for comments to be submitted by July 7, 2022. Using mail and email, we sent the notice to 614 interested parties and posted the notice on the project webpage.  A legal notice was published in the *New Hampshire Union Leader* on June 7, 2022, announcing the notice of proposed action, request for comments, and a public meeting. The public meeting was held virtually via Microsoft Teams on June 23, 2022, from 6:30 to 8:00 pm; twenty-one people attended the virtual public meeting. After the meeting, we posted to the project website all of the information presented at the meeting and a summary of questions and answers. We received 29 unique comment letters from the public and interested parties who attended the meeting. The comments received were compiled in a comment summary report that was shared on the project webpage on October 3, 2022.

We initiated a comment period for the draft environmental analysis and preliminary finding of no significant impact for the project on July 31, 2022, with a requirement for comments to be submitted by August 30, 2023. Using mail and email, we sent the notice to 498 interested parties and posted the notice on the project webpage. A legal notice was published in the *New Hampshire Union Leader* on July 31, 2022, announcing the comment period and availability of the documents. We received 379 unique comment letters from the public and interested parties via hardcopy, email, and from the direct project comment page generated by the Comment Analysis and Response Application (CARA), the Forest Service's application for receiving comments on projects.

Due to issues with comment submission through CARA, we held a second 30-day comment period on the draft environmental analysis and preliminary finding of no significant impact for the project. On September 7, 2023, we published a press release to share the upcoming date for the second comment period. Included in the press release was an invitation to a field tour with the project team to see the area firsthand and ask questions. The press release was also shared with local groups for distribution through their channels. On September 20, 2023, a legal notice was published in the *New Hampshire Union Leader*

and the *Conway Daily Sun*, announcing the comment period, availability of the documents, and requesting comments by October 23, 2023. We sent an email notice to 684 interested parties and posted the notice on the project webpage. Members of the project team and 65 interested parties attended the field trip on September 24, 2023. We received 187 unique comment letters from the public and interested parties via hardcopy, email, and from the direct project comment page.

In addition to the field trip and the two comment periods for the draft environmental analysis and preliminary finding of no significant impact, the responsible official Jim Innes, Saco District Ranger and project team members met with multiple interested parties described below.

- September 1, 2023:    The Saco District Ranger met with the Tamworth Outing Club to discuss how logging trucks may affect skiing on Spring Brook Road, which they groom to access a ski trail on an adjoining private parcel.

- September 7, 2023:    Saco District staff met with the Wonalancet Outdoor Club and the Wonalancet Preservation Association for a 3-hour meeting to discuss the project.

- September 11, 2023:    Saco District staff attended the Sandwich Selectmen's meeting to give a presentation on the project. The presentation lasted 90 minutes and 70 people were in attendance.

- September 23, 2023:    Saco staff met with the Wonalancet Outdoor Club president to discuss trail buffers.

- September 28, 2023:    Saco staff attended and presented information at the Tamworth, New Hampshire Selectman's office about the project. Approximately 25 people attended.

- October 17, 2023:    The Saco District Ranger and the forest landscape architect met with a Sandwich, New Hampshire resident to explain how visual analysis is conducted.

- November 16, 2023:    The Saco District Ranger and staff met with the Chocorua Mountain Club and the Chocorua Lake Conservancy to discuss trail buffers on the Brook and Liberty trails. Parties agreed they would collaborate on some public education presentations about forest management.

Since January 2020, White Mountain National Forest has received nearly 600 unique comment letters, all of which have been reviewed by the project team and are saved in the project record.

Public comments have been considered and many adjustments are reflected in the final proposed project. These changes are based on public feedback and internal review and include:

- Additional detail was added to the scenery effects analysis report.

- A design feature was added for a buffer along trails that pass-through units with group selection as the silvicultural prescription.

- A description of the effects to the Chocorua Inventoried Roadless Area was added.

- Details were included to describe the proximity of the project to the eligible wild and scenic rivers within the Sandwich Vegetation Habitat Management Unit.

- Multiple elements were added to the project maps, including the Chocorua and Sandwich Inventoried Roadless Areas, the Cold River, and some additional landmarks for reference.

- Additional information was added related to the Clean Water Act section 303(d) impaired waters within the project area.

- The White Mountain National Forest Carbon White Paper was updated to reflect current calculations in accordance with current agency guidance. The project carbon analysis was then updated to refer to the updated carbon white paper.

- We reduced treatment acres by 10 acres to protect multiple resources and increase distance between the Brook Trail and the nearest unit.

A list of agencies, organizations and persons consulted regarding this proposal is also provided in the "Agencies and Persons Consulted" section of the environmental assessment-finding of no significant impact.

# Administrative Review and Objection Opportunities

In accordance with 36 Code of Federal Regulations (CFR) 218, subparts A and B, an objection period was held from February 15, 2024, through April 1, 2024. Sixty-four objections were received, with 30 being valid objections. The remainder of the objections were either dismissed or set aside due to not previously commenting on the project or their objection didn't meet the requirements outlined in (CFR) 218.10(a)(3).

As part of the objection review process, five instructions were given from the reviewing officer (Derek Ibarguen, Forest Supervisor for the White Mountain National Forest) which are included below.

- Instruction 1: Clarify that the 2020 National Environmental Policy Act (NEPA) regulations, not the 1978 regulations, were used in the NEPA process for the Sandwich project.

  - This has been clarified in Appendix A-Errata to the Environmental Assessment in this document.

- Instruction 2: Include Forest Plan Riparian and Aquatic Habitats Guideline G1 (p. 2-24) for buffering perennial streams in the project design features. If the buffer will be reduced, explain the rationale for the reduction.

  - A design feature is included in Appendix A-Errata to the Environmental Assessment in this document. No reduction in the buffers is planned.

- Instruction 3: Clarify that the Sandwich project does not propose any herbicide treatments because such treatments are proposed and analyzed under a separate NEPA process.

  - This has been clarified in Appendix A-Errata to the Environmental Assessment in this document.

- Instruction 4: Provide more detail on what a person could expect to see once the proposed treatments are completed, how long those effects will last, or how long it will take for the visual quality of affected areas to recover or to meet its scenic integrity objectives.

  - This is described below in the description of the user experience section.

- Instruction 5: Clarify what visitors can expect regarding how the proposed timber harvest activities would affect parking, trail access and availability, and traffic patterns and flow during logging operations.

  - This is described below in the description of the user experience section.

In addition to the instructions described above, there are a few additional clarifications and updates that were made to the environmental assessment which are shown in Appendix A-the Errata to the Environmental Assessment in this document.

## Description of the User Experience

Visitors to the area may experience parking reductions during the week but not on weekends. Parking during the weekdays will be reduced as the roadsides where visitors regularly (illegally) park will need to remain open to allow for safe passage of logging trucks. However, hauling will be excluded on weekends and holidays, so users will not experience a reduction in parking options during these times.

Trails will not have logs skidded on them, but they may occasionally be crossed and will be rehabilitated when this occurs. To reduce conflicts between logging operations and trail use, interruptions in trail use may occur for a few days and trails may be re-routed temporarily but they will still be usable. Other trails in the area will remain open and available for use. Weekday hauling will occur in both summer and winter and visitor use during times of hauling may be impacted. During periods of winter hauling, plowing will leave snow on the road; however, it will not be groom-able for skiing or snowmobiles during winter hauling.

Two timber sales are planned in the area, one in the Guinea Hill area and one in the Ferncroft and Liberty areas. Guinea Hill will be offered in 2024, followed by Ferncroft-Liberty in 2026. Timber sale contracts are typically 5 years in length to allow for adjustments for current market conditions, staffing, the seasons of harvest prescriptions, and to mitigate resource effects. Due to the small size of these sales, we anticipate they will not need the full 5 years, however unpredictable conditions, such as market downturns and bad weather, can extend the contract length. For both timber sales, we would expect them to be completed in a year or two. Forest users can expect them to start and stop a few times over the contract period and should not expect them to be operating continuously from summer through winter.

Visual changes include openings of up to 2 acres in group selection units, and openings of up to 30 acres for clearcut units; all openings will be located at least 66 feet from trails with the exception of the wildlife opening. Where openings occur, they will be visible from a distance, but the main trail impacts will be changes in light, shadows, and textures as described in the project scenery analysis. In the openings, vegetation should regenerate in 3 to 5 years, when evidence of the treatments that occurred in the area will be minimal. Scenic integrity objectives will be met at all times of the project; however, forest users will see some visual changes in the project area as described above.

# Findings Required by Other Laws and Regulations

My decision complies with other law, regulation, and policy applicable to the proposal as documented in the environmental assessment ("Environmental Impacts" section) and finding of no significant impact.

# Implementation

Implementation of the project is expected to begin in summer 2024.

# Contact

For additional information concerning this decision, contact Jim Innes, District Ranger, by email at james.innes@usda.gov or by phone at 603-447-5448 x 5102. For more information regarding the environmental analysis process, please contact Theresa Corless, Forest Environmental Coordinator, by email at theresa.corless@usda.gov or by phone at 603-536-6135.

Thank you for your interest in the management of the White Mountain National Forest.

James Innes

Saco District Ranger

# Appendix A: Errata to the Environmental Assessment

## Errata Introduction

This document includes minor edits and updates to the Sandwich Vegetation Management Project Environmental Assessment, published in February 2024.

## Council on Environmental Quality Regulations (Page 1)

In this section the Council of Environment Quality regulations were corrected.

This environmental analysis is conducted according to the Council on Environmental Quality's 2020 regulations for implementing the procedural provisions of the National Environmental Policy Act (40 Code of Federal Regulations (CFR) sections 1500–1508, as amended).

We removed this sentence:

"The council revised regulations provide the responsible official the option of conducting an environmental analysis under the 1978 regulations if the process was initiated prior to September 14, 2020 (40 CFR section 1506.13, 85 Federal Register 137, p. 43373, July 16, 2020)."

The council issued revised regulations for implementing the procedural provisions of the National Environmental Policy Act, effective September 14, 2020. The Sandwich Vegetation Management Project was first published on the White Mountain National Forest's schedule of proposed actions on January 1, 2020. The public scoping comment period was open from June 6, 2022, through July 7, 2022.

## Updates Since Draft Environmental Assessment (Pages 8-9)

### Supporting Documents Updated

The biological evaluation was updated based on comments received and updated species information becoming available, the sections that were updated are listed below and the updated biological evaluation can be found here: https://usfs-public.app.box.com/v/PinyonPublic/file/1575053684448

The following was updated:

- Map for Liberty area (Figure 4 of the biological evaluation)
- Map for proposed unit stand types (Figure 5 of the biological evaluation)
- Consultation status
- Purpose and intent for the bat conservation strategy
- Effects analysis for the northern long-eared bat
- Added the American goshawk to the Regional Forester Sensitive Species section.
- References were updated to include:
  - The Bat Conservation Strategy,
  - The most recent northern long eared bat species abstract,
  - The species abstract for the American goshawk, and
  - The North American Bat Survey Data.

- Updated Appendix A to include newly listed regional forester sensitive species that will not be affected by the project as their habitats are not present in the project area.

## Map 3 (Page 13)

The legend was updated on figure 4 of the environmental assessment to indicate the actions that will occur in unit 2, the wildlife opening. The updated map is shown on the following page.

## Permanent Wildlife Opening (Page 17)

We added "if present" and a footnote describing what that means.

Under the proposed action, a patch clearcut of about nine acres will be created to establish a new permanent wildlife opening. Treatments include removing existing vegetation, treating non-native invasive species (if present[1])(see Appendix B. Planned Vegetation Management Treatments and Seasons of Harvest), stumping, and mowing. This opening will be maintained via periodic mowing, or brush-hogging, and prescribed fire under the White Mountain National Forest's permanent wildlife opening program.

## Consequences of No Action (Page 19)

Taking no action means the Forest Service would not implement the proposed action, although all other ongoing authorized activities would continue. The habitat management unit rationale document provides an assessment of the existing conditions in the Sandwich Habitat Management Unit. In the absence of management action, current vegetative conditions and trends, and natural successional processes would continue in the project area. Diversity of age and structure in the habitat management unit would remain relatively limited, and a wildlife habitat objective of the forest plan would not be met as wildlife habitat diversity would continue to decline. Overall, stand vigor in the planned treatment units may decline over time due to increasing competition for sunlight, moisture, and nutrients among trees.

We added this sentence:

"Additional resource specific information regarding the effects of not taking action is documented in the soils report on page 3 and by species in the biological evaluation."

Compared to the proposed action, taking no action would result in lower diversity of tree species, ages, and structures in the project area and the Sandwich Habitat Management Unit overall. Therefore, taking no action would not meet the need to advance forest plan goals or the wildlife habitat diversity objectives in the Sandwich Habitat Management Unit.

---

[1]It is important to note that there are no non-native invasive species treatments included in this proposed action. If non-native invasive species are found, treatments will be done in accordance with the White Mountain National Forest Invasive Plant Species Environmental Assessment (USDA Forest Service 2007a and 2007b).



**Figure 1. Planned vegetation and transportation management actions in the Liberty area (Map 3) (Page 13)**

## Issues Not Considered for Detailed Analysis (Page 20)

Several issues and resources were addressed through project design, including design elements, the incorporation of forest plan standards and guidelines, and in timber contract provisions therefore, the following issues were not analyzed in detail:

We edited this point to include additional detail:

- Effects associated with non-native invasive species, including treatment and control by herbicide methods as these treatments are covered by the White Mountain National Forest Invasive Plant Control Environmental Assessment (USDA Forest Service 2007a and 2007b).

## Riparian, Aquatic, and Water Quality or Quantity (Page 25)

The measure used to assess the impacts of timber harvesting on water quality in the White Mountain National Forest is the percent basal area removed in a watershed that contains a perennial stream.

We added this text:

"While there is not a forest plan standard or guideline that limits the reduction of basal area by watershed, based on research,"

when basal area removed in a watershed does not exceed 20 percent, there is high confidence of no measurable effect on water quality or water quantity resulting from timber harvest (

We added this reference:

"USDA Forest Service 2024e,"

Siemion et al. 2011; Wang et al. 2006; Baldigo et al. 2005; Lawrence and Driscoll, 1988; Hornbeck et al. 1993).

In the proposed action, percent basal area removed exceeds 20 percent in one watershed, which is the watershed of an unnamed perennial stream in the vicinity of Unit 23 that flows into Cold River. This watershed is 78.9 acres in size, and the planned basal area reduction is 35.8 percent

We added this text:

"through un-even aged harvest methods."

The potential changes in water quality resulting from the implementation of the proposed action that may be of concern to aquatic ecosystems are a decrease in pH making the water more acidic, or an increase in aluminum.

# Sensitive Species (Forest Service Manual [FSM] 2670) (Page 28)

We updated table 5 to indicate the recently added sensitive species, the American goshawk. The analysis for these species can be found in the updated biological evaluation.

**Table 5. Sensitive species impact determinations.**

| Species | Determination |
|---------|---------------|
| Little brown bat | May impact individuals or habitat, but will not likely contribute to a trend towards federal listing or loss of viability to the population or species |
| Eastern small-footed bat | May impact individuals or habitat, but will not likely contribute to a trend towards federal listing or loss of viability to the population or species |
| Northern bog lemming | May impact individuals or habitat, but will not likely contribute to a trend towards federal listing or loss of viability to the population or species |
| American goshawk | May impact individuals or habitat, but will not likely contribute to a trend towards federal listing or loss of viability to the population or species |
| Monarch butterfly | May impact individuals or habitat, but will not likely contribute to a trend towards federal listing or loss of viability to the population or species |
| Yellow-banded bumblebee | May impact individuals or habitat, but will not likely contribute to a trend towards federal listing or loss of viability to the population or species |
| American ginseng | May impact individuals or habitat, but will not likely contribute to a trend towards federal listing or loss of viability to the population or species |
| Autumn coral-root | May impact individuals or habitat, but will not likely contribute to a trend towards federal listing or loss of viability to the population or species |
| Three-birds orchid | May impact individuals or habitat, but will not likely contribute to a trend towards federal listing or loss of viability to the population or species |

# National Historic Preservation Act – Section 106 Review (Page 28)

We added the date concurrence was received to this section.

"Section 106 review has been completed and concurrence from the State Historical Preservation Office was received on August 31, 2022, for the project and no national register eligible cultural sites are affected."

# Relevant Executive Orders (Page 30)

We added the years to the reference in this paragraph.

**Executive Order 13112, Invasive Species:** Prevent the introduction of invasive species and provide for their control and to minimize the economic, ecological, and human health impacts that invasive species cause. Non-native invasive species shall be managed in accordance with the White Mountain National Forest Invasive Plant Control Environmental Assessment (USDA Forest Service 2007a and 2007b) the project-level risk assessment, and contract provisions.

We added this executive order:

**Executive Order 13186, Migratory Bird Treaty Act**: The project is designed to avoid impacts to migratory birds, including the implementation of project prescriptions, best management practices, forest plan standards and guidelines, and relevant project design criteria.

# References (Page 37)

These references were added:

U.S. Department of Agriculture, Forest Service. 2022. Sandwich Vegetation Management Project-Rationale for Habitat Management Unit Objectives Conway, NH: White Mountain National Forest. Found online at: https://usfs-public.app.box.com/v/PinyonPublic/file/1444399892677

U.S. Department of Agriculture, Forest Service. 2023. Sandwich Vegetation Management Project-Soils Analysis. Campton, NH: White Mountain National Forest. Found online at: https://usfs-public.app.box.com/v/PinyonPublic/file/1444400678169

U.S. Department of Agriculture, Forest Service. 2024a. Sandwich Vegetation Management Project-Scenery Analysis. Campton, NH: White Mountain National Forest. Found online at: https://usfs-public.app.box.com/v/PinyonPublic/file/1444392781412

U.S. Department of Agriculture, Forest Service. 2024b. Sandwich Vegetation Management Project-Biological Evaluation. Campton, NH: White Mountain National Forest. Found online at: https://usfs-public.app.box.com/v/PinyonPublic/file/1575053684448

U.S. Department of Agriculture, Forest Service. 2024c. Sandwich Vegetation Management Project-Carbon and Greenhouse Gas Emissions Assessment. Campton, NH: White Mountain National Forest. Found online at: https://usfs-public.app.box.com/v/PinyonPublic/file/1444398803257

U.S. Department of Agriculture, Forest Service. 2024d. Inventoried Roadless Area Background. Campton, NH: White Mountain National Forest. Found online at: https://usfs-public.app.box.com/v/PinyonPublic/file/1575055963025

U.S. Department of Agriculture, Forest Service. 2024e. Water Quality and Water Quantity White Paper. Campton, NH: White Mountain National Forest. Found online at: https://usfs-public.app.box.com/v/PinyonPublic/file/1575061950022

# Environmental Assessment - Appendix A - Project Design Criteria and Other Measures

## Resource Specific Design Criteria and Other Measures

### Water (Page 40)

The following text and table was added to the project design features.

WR-5   Apply forest plan standards and guidelines to protect water resources, specifically G-1 and G-2 found on page 2-24 and 2-25.

> G-1 Tree cutting and harvest should not occur within 25 feet of the bank of mapped perennial streams, the high-water mark of a pond, or an identified natural vernal pool, unless prescribed to benefit hydrological or ecological function of the associated stream, pond, or riparian area. Exceptions to this include tree removals needed to clear a designated stream crossing, maintaining an existing road or previously cleared skid road that cannot be relocated, or protecting human safety or infrastructure. Trees (greater than 4-inch diameter at breast height) cut or moved in this zone should be placed in a fashion that benefits riparian functions or aquatic habitats when possible.

G-2 Uneven-aged silvicultural practices should be used within the riparian management zone along all perennial streams, lakes, ponds, and vernal pools. Cuts should be designed to maintain a relatively continuous forest canopy for the protection and maintenance of water quality, dead wood recruitment, hydrologic function, wildlife habitat, and scenic values. Regeneration group cuts should be limited to less than one acre in size. Exceptions may apply in areas deemed important for maintaining beaver colonies. In the absence of on-the ground riparian mapping, width of riparian management zones should be defined as in Table 2-01.

**Table 2-01. Width of RMZ for Specific Aquatic Features.**

| Aquatic Feature | Width of riparian management zone[1] (feet) |
|---|---|
| 1st and 2nd order streams | 75 |
| 3rd order streams | 275 |
| 4th and larger order streams | 575 |
| Lakes, ponds, and vernal pools | 75 |

1.- These widths may vary on the ground and may be modified at the project level if a hydrologist or biologist maps the actual riparian zone.

# Appendix B. Planned Vegetation Management Treatments and Seasons of Harvest (Pages 42 to 43)

Table 6, unit 2, prescribed fire was changed from "no" to "yes" as described in all other descriptions of this wildlife opening, corrected table shown below.

- Unit 4 changed from "no" to "yes[4]".

- Unit 38 changed from "no" to "yes[4]".

**Table 1. Planned silvicultural treatments by unit and treatment acres.**

| Unit Number | Estimated Treatment Acres[1] | Silvicultural Treatment | Season Of Harvest, Operating Season[2] | Whole Tree Harvest? | Prescribed Fire? |
|---|---|---|---|---|---|
| 2 | 9 | Patch Cut[3] | Summer or Fall | No | Yes |
| 3 | 17 | Two-aged Shelterwood Establishment and Removal Cut with Reserves | Summer or Fall | No | No |
| 4 | 16 | Clearcut with Reserves | Summer | Yes | Yes[4] |
| 5 | 16 | Group Selection | Winter | No | No |
| 6 | 12 | Clearcut with Reserves | Summer or Winter | Yes | No |
| 9 | 11 | Group Selection | Winter | No | No |
| 10 | 16 | Group Selection | Winter | No | No |
| 11 | 14 | Group Selection | Summer or Fall | Yes | No |
| 12 | 5 | Group Selection | Late Summer or Fall | No | Yes |
| 13 | 17 | Two-aged Shelterwood Establishment and Removal Cut with Reserves | Winter | No | Yes[4] |
| 14 | 9 | Patch Cut | Summer | No | Yes[4] |
| 15 | 11 | Clearcut with Reserves | Summer | Yes | No |
| 16 | 12 | Group Selection | Summer | Yes | No |

Sandwich Vegetation Management Project Decision Notice

| Unit Number | Estimated Treatment Acres[1] | Silvicultural Treatment | Season Of Harvest, Operating Season[2] | Whole Tree Harvest? | Prescribed Fire? |
|---|---|---|---|---|---|
| 17 | 12 | Clearcut with Reserves | Summer | Yes | No |
| 18 | 21 | Two-aged Shelterwood Establishment and Removal Cut with Reserves | Fall | No | No |
| 19 | 4 | Patch Cut | Summer | Yes | No |
| 22 | 3 | Patch Cut | Summer | Yes | No |
| 23 | 16 | Single-Tree and Group Selection | Winter | No | No |
| 24 | 9 | Patch Cut | Summer | No | No |
| 25 | 16 | Clearcut with Reserves | Summer | Yes | No |
| 26 | 4 | Group Selection | Winter | No | No |
| 27 | 25 | Commercial Thinning | Winter | No | No |
| 28 | 21 | Overstory Removal | Winter | No | No |
| 29 | 3 | Group Selection | Summer | No | No |
| 31 | 9 | Patch Cut | Summer | Yes | No |
| 32 | 11 | Group Selection | Summer or Fall | No | No |
| 33 | 8 | Commercial Thinning | Winter | No | No |
| 34 | 65 | Two-aged Shelterwood Establishment and Removal Cut with Reserves – Seed Tree | Late Summer or Fall | No | Yes |
| 35 | 41 | Commercial Thinning | Winter | No | No |
| 36 | 13 | Group Selection | Summer | Yes | No |
| 38 | 41 | Two-aged Shelterwood Establishment and Removal Cut with Reserves | Fall | No | Yes[4] |
| 39 | 49 | Group Selection | Summer | No | No |
| 40 | 16 | Group Selection | Summer | Yes | No |
| 46 | 51 | Single-Tree and Group Selection | Winter | No | No |
| 47 | 27 | Single-Tree Selection | Winter | No | No |
| 48 | 5 | Patch Cut | Summer | Yes | No |
| 49 | 3 | Patch Cut | Summer | Yes | No |

1. Estimated treatment acres are rounded up to nearest whole number (example 8.1 rounded to 9).

2. Operations could begin early or extend beyond the normal season if ground and bark conditions allow (in other words, ground is dry or frozen and bark has tightened). Typical seasons of harvest include Summer: May 15 – September 15; Late Summer: August 1 – September 15; Fall: September 15 – December 15; and Winter: December 15 – March 15.

3. Unit 2 is a patch cut that will be stumped and maintained as a permanent wildlife opening. Maintenance activities include periodic mowing or prescribed fire.

4. Units will be partially burned as a part of larger burn unit.

# Added Table

This text and table were added to the environmental assessment.

"Acres of planned prescribed burning was described narratively and, on the maps, but details regarding acres by area were not well described. The following table describes these details."

Sandwich Vegetation Management Project Decision Notice

**Table 6b. Acres of Prescribed Burning**

| Area | Units within burn block | Total Acres |
|---|---|---|
| Guinea Hill | 12, 13, 14 | 75 |
| Liberty | 4, 34, 38 | 222 |
| Wildlife Opening | 2 | 9 |
| Blank cell | Total Acres | 306 |