**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| STANDING TREES, INC. | Case No.: 1:25-cv-00237-SE-TSM |
| *Plaintiff*, | |
| v. | |
| UNITED STATES FOREST SERVICE, et al., | |
| *Defendants*. | |

**MEMORANDUM IN SUPPORT OF
STANDING TREES' MOTION FOR SUMMARY JUDGMENT**

Christophe Courchesne
NH Bar No. 20431
Associate Professor and Director
Environmental Advocacy Clinic
Vermont Law and Graduate School
164 Chelsea Street, PO Box 96
South Royalton, VT 05068
(802) 831-1630
(802) 831-1631 (fax)
ccourchesne@vermontlaw.edu

*Counsel for Standing Trees, Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iv

GLOSSARY ................................................................................................... viii

INTRODUCTION ............................................................................................. 1

STATEMENT OF FACTS ................................................................................. 2

JURISDICTION .............................................................................................. 3

STANDING .................................................................................................... 3

STANDARD OF REVIEW ................................................................................. 5

BACKGROUND ............................................................................................... 6

    A. National Forest Management Act ........................................................... 6

    B. National Environmental Policy Act ....................................................... 7

ARGUMENT .................................................................................................. 8

I.    The Service's Approval of the Project Violates the Forest Plan and NFMA. ...................... 8

    A.    The Project Contravenes the Forest Health Requirements of the Forest Plan in Violation of NFMA. ................................................................................................................. 9

    B.    The Project Violates NFMA and Forest Plan Requirements that All Project Sites Be Surveyed for TES Species and Habitat. .................................................................... 11

    C.    The Project Ignores Plan Requirements for Soil Health in Violation of NFMA. ............. 12

    D.    The Service's Authorization of Road Construction is in Violation of NFMA and Contradicts the Forest Plan. ................................................................................... 13

    E.    The Impacts to Scenery and Recreation Violate the Forest Plan and NFMA. ................ 14

II.    The Service Violated NEPA Because It Failed to Consider An Action Alternative and a Genuine No Action Alternative. ................................................................................. 15

    A.    The Service Violated NEPA Because It Failed to Analyze Any Action Alternatives for the Project Despite Unresolved Conflicts Concerning Alternative Resources. ....................... 16

    B.    The Service Violated NEPA Because It Rejected Consideration of Reasonable Alternatives That Would Have Achieved the Project's Purpose and Need. ........................... 17

    C.    The Service Failed to Analyze a Genuine No Action Alternative. ................................. 20

III.    The Service Violated NEPA and the APA Because It Failed to Take a Hard Look at the Project's Environmental Impacts. ............................................................................ 21

    A.    The Service Failed to Take a Hard Look at Forest Health Impacts. ............................... 21

    B.    The Service Failed to Take a Hard Look at Impacts to TES Species. ............................. 23

C.    The Service Failed to Take a Hard Look at the Project's Impacts to Carbon Storage and Climate Change...................................................................................................... 24

D.    The Service Failed to Take a Hard Look at Impacts on Soils. ........................................ 26

E.    The Service Failed to Take a Hard Look at the Environmental Effects of Transportation Actions in the Project.......................................................................................................... 27

F.    The Service Failed to Take a Hard Look at the Project's Impacts to Water Quality. ...... 28

G.    The Service Failed to Take a Hard Look at the Impacts to Roadless Areas..................... 29

H.    The Service Failed to Take a Hard Look at Impacts to Scenery and Recreation. ............ 30

IV.    The Service Failed to Take a Hard Look at the Projects' Cumulative Impacts................ 30

A.    The Service Violated NEPA and the APA Because It Invoked Two Sets of Contrary Regulations to Conduct Its Cumulative Impacts Analysis. ........................................................ 31

B.    The Service Failed to Take a Hard Look at Cumulative Impacts.................................... 32

V.    The Service's Finding of No Significant Impact Violated NEPA and the APA. ................ 34

CONCLUSION....................................................................................................................... 35

## TABLE OF AUTHORITIES

**United States Supreme Court Cases**

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 105 (1983)............................ 6

*Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ............................................... 5

*Federal Communications Commission v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009).... 32

*Marsh v. Or. Nat. Res. Council*, 490 U.S. 360 (1989)............................................................. 7, 21

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010)........................................................ 4

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ...................... 6

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989).............................................. 7

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943) .................................................................................. 32

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 145 S. Ct. 1497 (2025) ...................... 5, 7, 19, 21

*Thomas Jefferson University v. Shalala*, 512 U.S. 504 (1994)...................................................... 11

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519 (1978) ...................... 21

**Circuit Court Cases**

*Bark v. U.S. Forest Serv.*, 958 F.3d 865 (9th Cir. 2020) .............................................................. 35

*Bob Marshall Alliance v. Hodel*, 852 F.2d 1223 (9th Cir. 1988) .......................................... 15, 20

*Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190 (D.C. Cir. 1991) ........................... 18, 19

*Citizens Awareness Network, Inc. v. U.S. Nuclear Regul. Comm'n*, 59 F.3d 284 (1st Cir. 1995) . 5

*Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961 (9th Cir. 2003)....................... 4

*Ctr. For Biological Diversity v. EPA*, 56 F.4th 55 (D.C. Cir. 2022) ............................................. 5

*Ctr. for Biological Diversity v. U.S. Forest Serv.*, No. 23-2882, 2025 WL 586358 (9th Cir.

 Feb. 24, 2025). ................................................................................... 14, 15, 29, 30

*Earth Island Inst. v. U.S. Forest Service*, 87 F.4th 1054 (9th Cir. 2023) .................................... 18

*Forest Guardians v. U.S. Forest Service*, 329 F.3d 1089 (9th Cir. 2003).................................... 23

*Found. for N. Am. Wild Sheep v. U.S. Dep't of Agr.*, 681 F.2d 1172 (9th Cir. 1982)................... 7

*Hanly v. Kleindienst*, 417 F.2d 823 (2d. Cir. 1972)............................................................... 31, 34

*Idaho Sporting Congress v. Rittenhouse*, 305 F.3d 957 (9th Cir. 2002)...................................... 27

*Kern v. Bureau of Land Mgmt.*, 284 F.3d 1062 (9th Cir. 2002) ............................................ 32, 33

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755 (9th Cir. 2014) ................................................................................................ 30

*Lovgren v. Locke*, 701 F.3d 5 (1st Cir. 2012) ............................................................. 17

*Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*, 100 F.4th 1 (1st Cir. 2024) ........................................................................................................ 23, 24

*Nat'l Parks Conservation Ass n v. Semonite*, 916 F.3d 1075 (D.C. Cir. 2019) ........................... 34

*Native Ecosystems Council v Tidewell,* 599 F.3d 926 (9th Cir. 2012) ......................................... 11

*Native Ecosystems Council v. United States Forest Serv.*, 418 F.3d 953 (9th Cir. 2005) ........ 6, 11

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372 (9th Cir. 1998) ................... 24

*New Hampshire Motor Transp. Ass'n v. Rowe*, 448 F.3d 66 (1st Cir. 2006) ................................. 5

*North Cascades Conservation Council v. U.S. Forest Service*, 134 F.4th 816 (9th Cir. 2025).... 20

*Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 361 F.3d 1108 (9th Cir. 2004) ........................... 32

*Pac. Coast Fed'n of Fisherman's Ass'ns v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028 (9th Cir. 2001) ................................................................................................................ 35

Sierra Club v. FERC, 145 F.4th 74 (D.C. Cir. 2025)................................................................. 25

*Sierra Club v. FERC*, No. 24-1099, 2025 WL 2779345 (D.C. Cir. Sept. 30, 2025) ................... 24

*Sierra Club v. Marsh*, 872 F.2d 497 (1st Cir. 1989).................................................................... 7

*Sierra Club v. Martin*, 168 F.3d 1 (11th Cir. 1999).................................................................. 12

*Town Of Winthrop v. F.A.A.*, 535 F.3d 1 (1st Cir. 2008)........................................................... 30

*WildEarth Guardians v. U.S. Dep't Agric.*, 135 F.4th 717 (9th Cir. 2025)........................... 26, 29

**District Court Cases**

*Bob Marshall Alliance v. Lujan*, 804 F. Supp. 1292 (D. Mont. 1992). ......................................... 5

*Comité Dialogo Ambiental, Inc. v. Fed. Emergency Mgmt. Agency*, Civil No. 3:24-cv-01145-JAG, slip op. (D.P.R. Sept. 30, 2025)................................................................................ 34

*Monroe Cnty. Bd. of Commissioners v. U.S. Forest Serv.*, No. 1:24-CV-01560-TWP-KMB, 2025 WL 2687723 (S.D. Ind. 2025) ................................................................................. 5, 27

*Mont Vernon Preservation Soc. v. Clements*, 415 F. Supp 141 (D.N.H. 1976) ........................... 31

*Sierra Club v. Alexander*, 484 F. Supp. 455 (N.D.N.Y. 1980)..................................................... 16

*Standing Trees, Inc. v. U.S. Forest Serv.,* No. 1:24-CV-138-JL-TSM, 2025 WL 2411206 (D.N.H. Aug. 20, 2025) ...................................................................................................... 3, 11

*W. Watersheds Project v. Schultz*, No. CV 22-149-M-DWM, 2025 WL 2658776 (D. Mont. Sept. 17, 2025) ............................................................................................... 23, 33

*Wilderness Society v. U.S. Dep't of Interior*, No. 22-cv-1871, 2024 WL 1241906 (D.D.C. Mar. 22, 2024). ....................................................................................................... 7

**Statutory and Regulatory Authorities**

16 U.S.C. § 1604(a) .......................................................................................... 6, 8

16 U.S.C. § 1604(f)(5)(A ......................................................................................... 8

16 U.S.C. § 1604(g)(3)(A). ...................................................................................... 7

16 U.S.C. § 1604(g)(3)(C) ....................................................................................... 8

16 U.S.C. § 1604(g)(3)(F) ....................................................................................... 9

16 U.S.C. § 1604(i) ............................................................................................... 6

16 U.S.C. § 521b .................................................................................................. 6

16 U.S.C. §§ 472a ................................................................................................ 6

16 U.S.C.§ 1600 .................................................................................................. 6

16 U.S.C.§ 1614 .................................................................................................. 6

28 U.S.C. § 1346 ................................................................................................. 3

28 U.S.C. § 2202 ................................................................................................. 3

28 U.S.C. § 2412 ................................................................................................. 3

28 U.S.C. §§ 1331 ............................................................................................... 3

28 U.S.C. §§ 2201 ............................................................................................... 3

36 C.F.R. § 219.2(b)(2) ......................................................................................... 1

36 C.F.R. § 219.7(e)(1)(iv) .............................................................................. 8, 12, 14

36 C.F.R. § 220.4(f) ............................................................................................ 30

36 C.F.R. § 220.7(b)(2) ........................................................................................ 19

36 C.F.R. § 220.7(b)(2)(i) ..................................................................................... 16

36 C.F.R. § 220.7(b)(2)(ii) .................................................................................... 20

36 C.F.R. § 220.7(b)(3)(i) ....................................................................................... 7

36 C.F.R.§ 219.7(e)(1)(iii) ................................................................................. 8, 13

40 C.F.R. § 1501.3(b) (2022) ................................................................................. 34

40 C.F.R. § 1501.3(b)(1) (2022) ............................................................................. 35

40 C.F.R. § 1501.6(a) (2020) ............................................................................ 34

40 C.F.R. § 1502.1 (2020) ................................................................................ 16

40 C.F.R. § 1502.2(b) (1978) ........................................................................... 34

40 C.F.R. § 1508.1(g) (2020) ........................................................................... 21

40 C.F.R. § 1508.27(a) (1978) ......................................................................... 35

42 U.S.C. § 4321 ................................................................................................ 7

42 U.S.C. § 4332(2)(C) ................................................................................. 7, 19

42 U.S.C. § 4332(H) ........................................................................................ 16

5 U.S.C §§ 701 ................................................................................................... 3

5 U.S.C. § 706 .................................................................................................... 3

5 U.S.C. § 706(2)(A) .......................................................................................... 6

## Other Authorities

73 Fed. Reg. 43084 (July 24, 2008) ................................................................. 16

85 Fed. Reg. 34304 (July 16, 2020) ................................................................. 31

90 Fed. Reg. 29,632 (July 3, 2025) .................................................................. 16

U.S. Forest Serv., Lost River Integrated Resource Project: Carbon and Climate
    Change Report (2025) https://www.fs.usda.gov/r09/whitemountain/projects/63401 .......... 17

**GLOSSARY**

| | |
|---|---|
| Administrative Procedure Act | APA |
| Biological Assessment | BA |
| Biological Evaluation | BE |
| Biological Opinion | BiOp |
| Council for Environmental Quality | CEQ |
| Forest Service | Service |
| Forest Carbon Assessment | FCA |
| Greenhouse Gas | GHG |
| Inventoried Roadless Area | IRA |
| National Environmental Policy Act | NEPA |
| National Forest Management Act | NFMA |
| Northern Long-eared Bat | NLEB |
| White Mountain National Forest | Forest |
| 2005 White Mountain Land and Resource Management Plan | Plan |

## INTRODUCTION

Plaintiff Standing Trees challenges the U.S. Forest Service's (Service) approval of the Sandwich Vegetation Management Project (Project) in the White Mountain National Forest (Forest). This Project authorizes over 1,300 acres of logging on public lands. The mature and old forests of the Sandwich Range are wild, ecological treasures and serve as a southern gateway for the Forest's millions of annual visitors. Despite an outpouring of public concern about the Project, the Service approved it with scant changes to its original proposal.

In considering projects like this one, the Service must comply with the National Forest Management Act (NFMA) by adhering to the Service's 2005 White Mountain Land and Resource Management Plan (Plan). While the Plan is statutorily expired, the Service still must explain how its decisions align with the Plan. 16 U.S.C. § 1604(f)(5); 36 C.F.R. § 219.2(b)(2). Since the expired Plan relies on now-outdated assessments of the ecological and human priorities for the Forest, Project-specific analysis is particularly important as it is a rare chance for the Service to invest its scarce time and resources in on-the-ground work to understand the Project area's ecological health. And yet here the Service approved a Project that not only is inconsistent with Plan provisions regarding forest health, threatened, endangered and sensitive species (TES), soils, transportation, scenery, and recreation, but failed to provide adequate explanation or analysis on how it reached Project conclusions. Thus, the Project violates NFMA.

The Service also violated fundamental requirements of the National Environmental Policy Act (NEPA). The Service must consider alternatives to the Project, including a true no-action alternative and other reasonable alternatives that would avoid or minimize adverse impacts and enhance environmental quality. The Service failed to do so. The Service's analyses also failed to take the required "hard look" at the environmental impacts of the Project on

1

numerous resources, including the combined cumulative impacts with other projects in the Forest and its vicinity. These failures fatally undermine the validity of the Service's conclusion that the Project will have no significant environmental impacts in violation of NEPA.

For these reasons, Standing Trees respectfully moves this Court for summary judgment on all claims and requests that this Court vacate the Service's decision to approve the Project.

## STATEMENT OF FACTS

Per Local Rule 56.1, material facts as to which there is no genuine issue to be tried are incorporated here, as follows:

Plaintiff submitted timely comments on and formal objections to the Project. AR 2346 (comment); 11202 (objection); *see also* Compl. ¶¶ 21–22. The Service made scant changes to the Project. AR 12112, 12125. After an environmental assessment (EA) and "finding of no significant impact" (FONSI), the Service authorized the Project in June 2024. AR 6764.

The Project is located on the southern slopes of the Sandwich Range, in and near the towns of Sandwich, Waterville Valley, Tamworth, and Albany, New Hampshire. Much of the forest in the Project area was cleared in the eighteenth and nineteenth centuries but has grown back over the last century and a half. AR 11224. Today, the Sandwich Range receives more than 3 million visitors every year. Compl. ¶ 74. The Project area includes popular hiking trails including the Liberty and Brook Trails that ascend to the peak of iconic Mount Chocorua as well as the Cabin and Kelley Trails that access the Sandwich Range Wilderness Area. AR 6718–20. The Project area is on the edge of the Forest and borders private property, the Sandwich Town Forest, and the Chapman Sanctuary and Visny Woods, a non-profit wildlife sanctuary. AR 6718.

The purpose of this Project is to "advance forest plan goals, objectives, and desired conditions for vegetation, wildlife, and other resources…." AR 6712. Under these broad

objectives, the Service approved the Project action to conduct timber harvests on ~1,325 acres of the Forest; treat 306 acres with prescribed fire; reconstruct ~4.5 miles of existing road; and convert 12 miles of unauthorized roads to official roads. AR 6716, 6725, 6739. The Service reviewed only this proposed action, and no alternatives were considered. Compl. ¶ 69.

The Project is among at least thirteen other proposed or approved logging projects in the Forest within a decade.[1] Compl. ¶ 68. To date, the Service has not meaningfully assessed the projects' cumulative impacts, though all include commercial timber harvest. AR 11216.[2]

## JURISDICTION

This case challenges a final agency action that is reviewable under the Administrative Procedure Act (APA). 5 U.S.C §§ 701–706. This Court has jurisdiction of the action under 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1346 (United States as defendant). The Court may order relief under 28 U.S.C. §§ 2201 (declaratory judgment), 2202 (further relief), and 2412 (costs and fees), as well as 5 U.S.C. § 706(2) (vacatur).

## STANDING

On behalf of itself and its members, Standing Trees has standing to bring this lawsuit. Standing generally requires an injury that is (i) "concrete, particularized, and actual or imminent; [(ii)] fairly traceable to the challenged action; and [(iii)] redressable by a favorable ruling."

---

[1] The projects are as follows: Albany South Project, Bowen Brook Integrated Resources Management ("IRP"), Cold River IRP, Deer Ridge IRP, Evans Pond Brook Harvest, Evans Brook Vegetation Management Project, Intervale Vegetation Enhancement Project, Lost River IRP, North Chatham Integrated Resources Management, One Mile Lonesome Ridge IRP, Peabody West IRP, Tarleton IRP, and Wanosha IRP.

[2] This Court recently rejected Standing Trees' challenge to two of these projects. *Standing Trees, Inc. v. U.S. Forest Serv.,* No. 1:24-CV-138-JL-TSM, 2025 WL 2411206 (D.N.H. Aug. 20, 2025). Standing Trees disagrees with and intends to appeal the Court's decision and so does not address it as authoritative precedent in this filing.

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010) (quoting *Horne v. Flores,* 557 U.S. 433, 445 (2009)). Those requirements are met here.

Standing Trees is a grassroots organization committed to safeguarding New England's forests, with a focus on public lands in New Hampshire and Vermont. Decl. of Zack Porter ¶ 3 (Exhibit A). Standing Trees advocates fair policies and practices to ensure clean water, clean air, forest health, public health, and unfragmented habitat in the region. *Id.* ¶ 6. The organization represents its members, including those who live near or adjacent to approved logging; those who engage in outdoor activities in the Project area; and those who derive aesthetic enjoyment and spiritual connection to the land, all of which would be directly and negatively impacted by the Project's many environmental consequences. *See generally* Decls. of Zack Porter (on behalf of Standing Trees) (Exhibit A); Gerald Curran (Exhibit C); Eric Jones (Exhibit B); Mary Breasted Smyth (Exhibit G); Vinton Thompson (Exhibit E); Maura King (Exhibit D).

The proposed logging and road construction will harm Standing Trees members' concrete interests in the Project area. *See Citizens for Better Forestry v. U.S. Dep't of Agric*., 341 F.3d 961, 971–72 (9th Cir. 2003). Members live adjacent to or near the project area, visit regularly for recreation, and have developed deep personal and familial connections to the land. *See generally* Decls. of Zack Porter (on behalf of Standing Trees) (Exhibit A); Gerald Curran (Exhibit C); Eric Jones (Exhibit B); Mary Breasted Smyth (Exhibit G); Vinton Thompson (Exhibit E); Maura King (Exhibit D). The Project proposes timber harvest along more than one mile of the Liberty Trail, which members of Standing Trees hike and fear will be spoiled by the "carnage of commercial logging." Decl. of Gerald Curran ¶ 11 (Exhibit C). For adjacent landowners, the proposed logging, including large clearcuts and similar harvests, will cause visible scars to the land and diminish the value of their properties. Decl. of Eric Jones ¶ 13 (Exhibit B); AR 6716.

The Project also threatens water quality due to the runoff and erosion from logging on steep

terrain. Decl. of Mary Breasted Smyth ¶¶ 12, 13 (Exhibit G). The runoff will pollute streams and

suffocate young trees on members' properties. *Id.* Intensive logging likewise poses a risk of

contaminating gravity-fed water systems and private wells. Decl. of Vinton Thompson ¶ 14

(Exhibit E).

Standing Trees has organizational standing to bring this challenge because: (a) its

members have standing to sue individually; (b) the interests it seeks to protect are germane to its

purpose of protecting forests; and (c) neither the claim nor the relief requires each member's

individual participation. *N.H. Motor Transp. Ass'n v. Rowe*, 448 F.3d 66, 71–72 (1st Cir. 2006);

*see also Ctr. for Biological Diversity v. EPA*, 56 F.4th 55, 67–68 (D.C. Cir. 2022) (affirming use

of declarations). Finally, vacating the Project would redress Standing Trees members' injuries.

*See Bob Marshall Alliance v. Lujan*, 804 F. Supp. 1292, 1297 (D. Mont. 1992).

**STANDARD OF REVIEW**

Judicial review of final agency decisions under NFMA and NEPA is governed by the

APA, requiring courts to "undertake a 'thorough, probing, indepth (*sic*) review and a 'searching

and careful' inquiry into the record." *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1285 (1st

Cir. 1996) (citing *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16 (1971));

*see also Monroe Cnty. Bd. of Commissioners v. U.S. Forest Serv.*, No. 1:24-CV-01560-TWP-

KMB, 2025 WL 2687723 (S.D. Ind. Sept. 18, 2025) (holding Service's EA inadequate under

standards reflected in *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 145 S. Ct. 1497 (2025)

(*Seven County*)). Although deferential, this review "is not a rubber stamp." *Citizens Awareness

Network, Inc. v. U.S. Nuclear Regul. Comm'n*, 59 F.3d 284, 290 (1st Cir. 1995). An agency's

position that is contrary to plain statutory, regulatory, or forest plan language receives no deference. *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 962 (9th Cir. 2005).

If agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," a court must "hold [the action] unlawful and set [it] aside." 5 U.S.C. § 706(2)(A). An agency decision violates the APA if it "entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In applying the arbitrary and capricious standard, the court considers whether the Service "articulated a rational connection between the facts found and the choice made," *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 105 (1983), and whether the agency's decision and underlying analysis are "too unreasonable for the law to permit it to stand." *Dubois*, 102 F.3d at 1287.

## BACKGROUND

### A. National Forest Management Act

NFMA outlines both procedural and substantive statutory requirements for the Service's management of Forest lands. *See generally* 16 U.S.C. §§ 472a, 521b, 1600–1614. Procedurally, NFMA requires the Service to develop a Land and Resource Management Plan, i.e., a "forest plan," for each unit of the United States Forest Service system. *Id.* § 1604(a). Following adoption of a forest plan, all current and future agency actions, including plans, contracts, and other agreements for the use of national forest land must be consistent with the forest plan to comply with NFMA. *Id.* § 1604(i). Substantively, NFMA requires the Service to "insure [sic] consideration of the economic and environmental aspects of various systems of renewable resource management, including the related systems of silviculture and protection of forest

resources, to provide for outdoor recreation (including wilderness), range, timber, watershed, wildlife, and fish." *Id.* § 1604(g)(3)(A).

B. National Environmental Policy Act

NEPA "promotes its sweeping commitment to 'prevent or eliminate damage to the environment and biosphere' by focusing Government and public attention on the environmental effects of proposed agency action." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989) (quoting 42 U.S.C. § 4321). "NEPA itself does not mandate particular results, but simply prescribes the necessary process" so that an agency "consider[s] all significant environmental impacts before choosing a course of action." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); *Sierra Club v. Marsh*, 872 F.2d 497, 502 (1st Cir. 1989).

As part of this process, NEPA requires an agency to prepare an in-depth Environmental Impact Statement (EIS) for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C)). An agency is not required to prepare an EIS if it determines—based on an EA—the proposed action will not have a significant impact on the environment (i.e., a FONSI). 36 C.F.R. § 220.7(b)(3)(i). "The omission of any meaningful consideration of…fundamental factors precludes the type of informed decision-making mandated by NEPA." *Found. for N. Am. Wild Sheep v. U.S. Dep't of Agr.*, 681 F.2d 1172, 1178 (9th Cir. 1982); *Monroe Cnty.*, 2025 WL 2687723 at *12 ("the [Service] cannot hang its hat where it never placed a peg") (citation omitted).

While "NEPA is a procedural cross-check, not a substantive roadblock," it requires that an agency's decision to proceed with a project is "fully informed," "well-considered," and "reasonably explained." *Seven County*, 145 S. Ct. at 1507, 1514.

## ARGUMENT

The Service violated NFMA, NEPA, and the APA when it approved the Project. First, the Service failed to meet the legal requirements of the Plan and therefore NFMA. Second, the Service failed to consider any reasonable alternatives, including a genuine no action alternative, as required by NEPA. Third, the Service failed to take a hard look at the Project's environmental effects and cumulative impacts, fatally undermining its FONSI. For these reasons, the Court must vacate the Service's unlawful approval of the Project.

## I.    The Service's Approval of the Project Violates the Forest Plan and NFMA.

The Service's approval of the Project violated NFMA. 16 U.S.C. § 1604(a). To ensure all forest plans remain up-to-date, NFMA requires the Service to continually monitor the effects of the forest plans, and the Plan requires the Service to review land conditions at least every five years. 16 U.S.C. § 1604(g)(3)(C); AR 12166. Additionally, NFMA requires all forest plans to be updated when conditions have changed but at a minimum of every fifteen years. 16 U.S.C. § 1604(f)(5)(A). The Plan provides standards and guidelines for the management and protection of resources in the Forest. AR 12163.[3] Projects carried out in the Forest *must* meet all standards of the Plan and may only deviate from guidelines if site-specific conditions so require. 36 C.F.R. § 219.7(e)(1)(iii)–(iv). The Service must document the rationale for any guideline deviations in the project-specific analysis and include them in its signed decision. AR 12164. The Plan also contains goals and objectives, which help frame Forest management decisions and emphasize, *inter alia,* forest health, using the latest science, ecosystem viability, recreation, and "the importance to society of a natural appearing landscape." AR 12163, 12170.

---

[3] The Plan can be found at AR 12159–12461 or together with its EIS at https://www.fs.usda.gov/r09/whitemountain/planning. Counsel for the Service confirmed that the Forest Plan, its EIS, and all official attachments should be considered part of the administrative record for the Project.

While the Service has not initiated the statutorily mandated revisions, the obligation to use current site-specific information and scientific research in making Project decisions remains. Without conducting site-specific analysis supported by site visits and up-to-date science, the Project cannot meet, and the Service cannot comply with, the standards and guidelines of the Plan or requirements of NFMA.[4] Without a revised Plan, the Service must conduct detailed site-specific analyses to fulfill its obligations in the interim.

A. The Project Contravenes the Forest Health Requirements of the Forest Plan in Violation of NFMA.

NFMA requires the Plan to include certain regulatory provisions to promote forest health,[5] including all even-aged timber management[6] be carried out in a manner that protects "soil, watershed[s], fish, wildlife, recreation, and esthetic resources, and the regeneration of the timber resource."[7] 16 U.S.C. § 1604(g)(3)(F)(v). The Plan contains additional standards and guidelines promoting forest health. *See* AR 12184. Here, the Service did not cogently explain how the project aligns with standards and guidelines in the Plan, violating NFMA and the APA.

One critical prohibition in the Plan precludes timber harvest in old growth forests and stands that provide old forest habitat. AR 12202; Plan Glossary 21. The conditions for old forest

---

[4] The Service would run afoul of the overarching Plan goal stating "[w]e will manage to sustain a healthy forest and use the latest scientific knowledge to restore the land and forest [with management for] ecosystem viability within the context of New England." AR 12170.

[5] 16 U.S.C. § 1604(g)(1) (requiring Forest Plans to be prepared in accordance with NEPA); § 1604(g)(3)(A) (requiring Forest Plans to consider economic and environmental impacts of various resource management systems); § 1604(g)(3)(B) (requiring Forest Plans to contain provisions to preserve natural diversity of tree species in the area); § 1604(g)(3)(C) (requiring continued research and evaluation of impacts of Forest Plan); § 1604(g)(3)(E)(iv) (ensuring timber harvest systems selected for projects do not prioritize monetary returns).

[6] Even-aged timber management practice are timber harvest methods designed to regenerate an even-aged stand of timber, including, but not limited to, clearcutting, seed tree cutting, and shelterwood cutting. 16 U.S.C. § 1604(g)(3)(F).

[7] The Forest Service's obligation to protect specific resources other than forest health is addressed in more detail in the following sections.

habitat "start with those for mature forest and can include greater size, decadence, structural complexity, etc." Plan Glossary 21.[8] However, to avoid harvesting in old forest habitats, the Service must know where those habitats are. As such, the Service is required by NFMA to conduct continuous monitoring and field assessments, and the Plan requires site-level project analysis. AR 12165. In the Sandwich Botany Field Work Summary ("Botany Summary"), the Service provided stand surveys which included a determination of some tree stands "LSI" scores[9] and tree core analysis of some trees. AR 6333–66. The Botany Summary determined 27 of 35 stands have an LSI score of "8" or above, and only one stand under "5." AR 6352, 6356. The Botany Summary also reported many trees around 200 years of age with one upwards of 226 years old.[10] AR 6358. While the Service removed stands with LSI scores of "9" or "10" from the harvest plan, it continued to include at least 16 stands scoring "5" to "8" in harvest plans, contrary to the LSI guidance, without logical rationale. *Id.*; AR 6246, 6333–6366. The Service never analyzed whether old forest habitat is present in stands that scored "5" and above. Without this analysis, the Service risks violating the Plan and NFMA by harvesting in a stand

---

[8] *See infra* note 9 (discussing the inclusion of old forest habitat characteristics in stands scoring "5" and above).

[9] The Late Successional Index ("LSI") score is used by the Service to determine the degree of late-successional conditions in a forest stand. AR 6245. As per the guidance for use of the LSI score:

> Scores above "5" strongly suggest that the stand contains significant LS value (Fig. 2). Stands above "8" suggest that the stand may be an old-growth stand. If the stand scores "5" to "8," we recommend applying a harvest prescription that retains as much LS value as possible.…If the stand scores "8" or above, we recommend not harvesting a stand or asking for expert advice on how to harvest the stand with careful consideration of LS attributes. AR 6246.

Additionally, Figure 2, referenced above, shows that stands scoring "7" could also be old-growth stands. *Id.*

[10] Under the Plan definition, presence of trees over 200 years old is a strong indicator of old growth forest. Plan Glossary 21. Other experts believe that a stand will be deemed old growth if more than 125–150 years old. AR 6235.

that, by its own scoring and Botany Summary, may provide old forest habitat. The Service cannot avoid its legal obligations by refusing to investigate. The Project approval violated the NFMA forest health requirements and failed to meet the Service's duties under the Plan.

B. The Project Violates NFMA and Forest Plan Requirements that All Project Sites Be Surveyed for TES Species and Habitat.

The Service violated the Plan by failing to investigate the presence of endangered species and to mitigate adverse impacts to the northern long eared bat (NLEB). A Plan standard requires "[a]ll project sites must be investigated for the presence of TES species and/or habitat prior to beginning any authorized ground-disturbing activity at the site."[11] The Service must manage all Forest system lands to maintain the viability of TES species and habitat availability by minimizing adverse impacts from management activities. *Native Ecosystems Council v Tidewell*, 599 F.3d 926, 937 (9th Cir. 2012). The Plan requires the Service to incorporate the latest scientific information on affected species and habitat. AR 12170.

The Service concedes in the Biological Evaluation (BE) that it conducted no surveys for the NLEB. AR 4315. Instead, the Service merely concluded the Project "may affect, [but is] not likely to adversely affect" NLEB, unsupported by site-specific data. AR 6734. This failure to conduct required investigations invalidates the subsequent EA. *Sierra Club v. Martin*, 168 F.3d

---

[11] AR 12202. The Court in *Standing Trees, Inc. v. U.S. Forest Serv.* found that the Plan only requires surveys for TES *plant* species. *Standing Trees*, 2025 WL 2411206, at *18. This is a misreading. This standard requires surveys for all TES species and/or habitat, which include plants *and wildlife*. *See* AR 12202; *see also* Plan Glossary 32 (defining TES species as "Plant *or animal* species that are designated as threatened or endangered") (emphasis added). The second sentence of the standard provides an exception for the Service to skip plant surveys if "biologists/botanists determine TES species occurrence is unlikely (e.g., no habitat exists)." AR 12202. An agency's position that is contrary to the clear language of a forest plan receives no deference. *Native Ecosystems*, 418 F.3d at 962; *see also Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512 (1994) (no deference is due to an agency interpretation that contradicts regulation's plain language).

1, 4–5 (11th Cir. 1999) (holding that Service violated forest plan and NFMA by failing to collect data on TES species).

Logging is scheduled to occur during the NLEB's active season, including its maternity season from June 1 to July 31, posing grave risks to the species in violation of the Plan and NFMA. AR 4315, 4324. Despite recognizing the Project area provides roosting habitat, the Service authorized logging during the summer season when the threat of direct harm is greatest. AR 6749–50. Likewise, the Service approved the logging of trees essential to the survival and persistence of the NLEB's local population, in violation of the Plan. AR 12175–76. "Harvesting trees greater than three inches [DBH] with cavities or exfoliating bark occupied by NLEB could cause individuals to be displaced or killed." AR 4315. This Project will clear large swaths of NLEB habitat and cause direct harm, defying the objective to maintain species viability and minimize adverse impacts to TES species, in violation of the Plan and NFMA.

C.  The Project Ignores Plan Requirements for Soil Health in Violation of NFMA.

The Service violated NFMA by not providing a logical rationale for ignoring Plan soil protection measures. One goal of the Plan is to "protect the long-term sustainability of the soil resource," supported by a guideline which limits construction of skid trails to slopes with a grade of less than 20 percent. AR 12183, 6392. But in this Project, the Service authorized construction of skid trails on slopes up to 35 percent grade. *See* AR 6392–93, 12219; Exhibit F.

The Service proposed to deviate from this guideline but did not explain how it will still meet its purpose. *See* 36 C.F.R. § 219.7(e)(1)(iv) (guideline permits "departure from its terms, so long as the purpose of the guideline is met."). The Service explained it will avoid any detrimental soil effects by using New Hampshire (NH) Best Management Practices (BMPs) and asserted "design features" will mitigate the anticipated detrimental soil impacts from construction of skid

roads on steep slopes. AR 6392–93. But the Plan already *requires* the Service to follow NH BMPs. *See* AR 12218 (Standard S–1 requires "[NH BMPs] must be met or exceeded."); *see also* 36 C.F.R.§ 219.7(e)(1)(iii) ("A standard is a mandatory constraint on project and activity decisionmaking, established…to avoid or mitigate undesirable effects…."). Moreover, the Service failed to explain how the NH BMPs will mitigate detrimental soil impacts when they disfavor building skid trails on slopes exceeding 15 percent. *See* AR 8795–96.

The Service violated NFMA because its explanation for deviating from a Plan guideline is arbitrary and does not support its conclusion that BMPs will mitigate detrimental soil impacts.

D. <u>The Service's Authorization of Road Construction is in Violation of NFMA and Contradicts the Forest Plan.</u>

The Service disregards the Plan's limitations on road construction by authorizing four times the amount of road construction allowed in the Plan Final EIS (FEIS). AR 12151.[12] The Service classifies the proposed road construction as a "reconstruction" of existing roads in an attempt to circumvent the stringent new road construction allowances in the Plan FEIS. AR 11237. However, it is clear from photographs that, in many cases, these are not existing roads in any recognizable sense, and it has been many decades since a road existed in these areas. AR 2384–85, 11237; *see* Exhibit H. The Service may decommission roads by "simply allowing the road to return to its natural state." AR 12151. Here, it seemingly confirms that the Service had previously followed the Plan's directive to "decommission roads [from previous projects] not necessary to meet the management objective." AR 12184. But now, decades later, the Service—without analysis—determined that it is merely authorizing "reconstruction" on roads that have, in fact, been effectively decommissioned and reclaimed by the forest.

---

[12] *See supra* note 3.

The Service does not provide adequate explanation or analysis justifying why the Project requires more road construction than the Plan's FEIS allots for. Based on these failures, the authorization of four miles of new road construction contravenes the Plan in violation of NFMA.

E.    The Impacts to Scenery and Recreation Violate the Forest Plan and NFMA.

The Project's impacts on scenery and recreation are at odds with the Plan's guidelines, and the Service provides no justifications for deviating from its guidelines nor evidence of how the Project will still achieve the guidelines' purpose. *See* 36 C.F.R. § 219.7(e)(1)(iv). If the Service employs unclear reasoning or evaluation, the Service violates NFMA. *Ctr. for Biological Diversity v. U.S. Forest Serv.*, No. 23-2882, 2025 WL 586358 at *3 (9th Cir. Feb. 24, 2025).

The Service authorized logging that is visible from key vantage points in the Forest. AR 6224. The Service's guidelines require logged areas to be seen as "natural occurrences and be well distributed in the viewed landscape." AR 12231. Yet, Unit 06 is slated for clearcuts and will not appear as a natural occurrence from Mount Chocorua. AR 12231. The Service analyzed only one viewpoint, despite the comments from Standing Trees on the Draft EA and in an Objection to the project EA and FONSI requesting more analysis. AR 2377; 6223–24, 11230; 11231. The Service did not provide sufficient details in the project assessment concerning what visitors can expect to see after each treatment type, like clearcutting, in the viewshed and how long it will take for the affected area to recover. AR 12146.

Further, another scenery guideline states that created openings should be minimally evident from trails, roads, or other use vantage points. AR 12231. The Project proposes either logging, burning, or both near several popular trails into the Sandwich Range Wilderness and Mount Chocorua Scenic Area. AR 11230. The Service provided no analysis or justification on why it deviates from its Guidelines other than to quickly dismiss such activities as minor and

14

temporary without providing more reasoning or scientific data. AR 11230. The clearcutting of 4.14 highly visible acres, which will take decades to regrow, is neither minor nor temporary. AR 6224. The Service deviated from the Plan by failing to justify the omission of scenic and recreation impacts from its activities in violation of NFMA.

For these and all the above reasons, the Service failed to show adherence to Plan standards and guidelines, violating the Plan, NFMA, and the APA. *Ctr. for Biological Diversity*, 2025 WL 586358 at *3 (finding NFMA violation where impossible to discern how or if Service complied with forest plan standards).

## II.    The Service Violated NEPA Because It Failed to Consider An Action Alternative and a Genuine No Action Alternative.

The Service's failure to develop and study alternatives violated NEPA and the Service's regulations because the Project involves conflicts concerning alternative uses of available resources. The Service also violated NEPA because it used an impermissibly narrow reading of the Project's purpose and need statement to reject study of alternatives proposed by Standing Trees and members of the public. Finally, the Service's discussion of the "consequences of no action" does not comport with NEPA's requirement to study a genuine no action alternative, which must assess the relative merits of taking no action. NEPA's requirement that alternatives be studied and developed is a critical part of the statutory scheme because it "both guides the substance of environmental decision-making and provides evidence that the mandated decision-making process has actually taken place." *Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1228 (9th Cir. 1988). Here, the Service has not undertaken the mandated review of alternatives and engaged in arbitrary decisionmaking contrary to NEPA and the APA.

A.  The Service Violated NEPA Because It Failed to Analyze Any Action Alternatives for the Project Despite Unresolved Conflicts Concerning Alternative Resources.

NEPA and Service regulations are clear: agencies must develop and study alternatives when a proposal involves "unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(H); 36 C.F.R. § 220.7(b)(2)(i) (permitting Service not to study action alternatives in EAs only where "no unresolved conflicts concerning alternative uses of available resources…")[13]; *see also* 40 C.F.R. § 1502.1 (2020) (environmental analyses under NEPA must include "reasonable alternatives that would avoid or minimize adverse impacts or enhance the quality of the human environment…"). In violation of NEPA, the Service failed to develop any alternatives despite the presence of many such unresolved conflicts, including for water, soils, forest health, and carbon.

One such conflict, for example, is between harvesting timber for commercial use and the importance of undisturbed forests for maintaining water quality. The Service authorized logging that would exceed the significant impacts threshold of water quality under the Service's established Basal Area Removal methodology. *See infra*, Section III.F. Instead of developing and studying an alternative that would have met its own methodology's threshold, the Service explained how mitigating factors and the implementation of BMPs would avoid significant impacts. Discussion of mitigation measures alone does not absolve the Service of its independent obligation to develop and consider alternatives under NEPA. *See Sierra Club v. Alexander*, 484 F. Supp. 455, 468–70 (N.D.N.Y. 1980).

---

[13] In explaining this requirement, the Service made it clear *it* "need[s] to develop reasonable alternatives to meet project need" absent "consensus about the proposed action based on input from interested parties." 73 Fed. Reg. 43084, 43,092 (July 24, 2008) (citing and quoting CEQ guidance). The Service NEPA regulations applicable to the Project were in effect at the time of the Project's approval but have since been rescinded. 90 Fed. Reg. 29,632 (July 3, 2025).

Another example of an unresolved conflict is between logging and the ability of the forest to mitigate climate change. Logging hundreds of acres of mature and old forests stops carbon sequestration and storage of carbon and releases thousands of tons of carbon from trees and the soil.[14] The Service identified "climate change related stressors…on habitats within the project area" as a need driving the Project. AR 6712. But it arbitrarily ignored the capacity of the Project area's mature and old forests to sequester and store carbon—helping to mitigate the potential climate impacts it identified. To comply with NEPA, the Service needed to consider an alternative that avoids logging in the old stands that provide important climate and other ecological benefits.

The decision by the Service to not develop or study alternatives given the numerous unresolved conflicts in resource use was arbitrary and capricious and not in accordance with law, in violation of NEPA and the APA.

B.  The Service Violated NEPA Because It Rejected Consideration of Reasonable Alternatives That Would Have Achieved the Project's Purpose and Need.

The Service analyzed the Project using an impermissibly narrow reading of its purpose and need statement, which it used to dismiss all proposed alternatives as insufficient for consideration. In doing so, the Service ignored all alternative means of achieving the Project objectives—including alternatives proposed by Standing Trees—in violation of NEPA.

The Service must "inform decisionmakers and the public of the *reasonable* alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." *Lovgren v. Locke*, 701 F.3d 5, 14 (1st Cir. 2012) (quoting 40 C.F.R § 1502.1)

---

[14] *See* U.S. FOREST SERV., LOST RIVER INTEGRATED RESOURCE PROJECT: CARBON AND CLIMATE CHANGE REPORT (2025) https://www.fs.usda.gov/r09/whitemountain/projects/63401 (estimating project will release 72,123 tonnes of carbon dioxide equivalent emissions).

(emphasis added). "An alternative is reasonable if it 1) advances the project's purpose and need, and 2) 'is significantly distinguishable from alternatives actually considered, or which have substantially similar consequences.'" *Earth Island Inst. v. U.S. Forest Service*, 87 F.4th 1054, 1065 (9th Cir. 2023) (internal citation omitted). However, in determining reasonableness, "an agency may not define the objectives of its action in terms so unreasonably narrow that only one alternative…would accomplish the goals of the agency's action, and the [NEPA review] would become a foreordained formality." *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991).

The Service used an impermissibly narrow reading of the purpose and need statement to constrain its consideration of alternatives. The purpose and need for the project is to "advance forest plan goals, objectives, and desired conditions for vegetation, wildlife, and other resources in the Sandwich [HMU]." AR 6712. The Plan defines more than thirty goals and over sixty unique objectives for twenty resources across the Forest. *See* AR 12170–89. Yet, the Service arbitrarily determined only one specific set of actions—the Proposed Action—could possibly advance this broad set of goals and objectives. For example, the Service dismissed Standing Trees' proposed alternative that would extend buffers from watercourses and wetlands as "a partial implementation of the full Proposed Action," claiming it "would not meet the need as well as the full Proposed Action." AR 12129. The Service's unreasonably narrow reading of its purpose and need statement made the EA a foreordained formality and violated NEPA.

The Service also refused to consider all other alternatives proposed by Standing Trees, including those that would balance harvesting timber with avoiding impacts to roadless, wilderness and scenic areas, and protecting mature and old forests. AR 2393, 11210 – 11, 12129. The Service explained that it need not consider these alternatives because the "WMNF has

considered alternatives which would eliminate timber harvesting in portions of the Project area…in a number of previous decisions where an EA was prepared," and that these previously considered alternatives were also "partial implementation[s] of the full Proposed Action and would not meet the need as well as the full Proposed Action." AR 294, cell 106F. But "[t]he textual focus of NEPA is the 'proposed action'—that is, the project at hand"—not previous decisions. *Seven County*, 145 S. Ct. at 1512 (quoting 42 U.S.C. § 4332(2)(C)); *see also* 36 C.F.R. § 220.7(b)(2). (EA shall describe "alternative(s) that meet the need for action"). Moreover, the reference to more fulsome alternatives analyses in other projects demonstrates the blatant arbitrariness of its refusal to do so here, for a different project with different impacts.

Even if NEPA did allow alternatives considered in other projects to suffice for this Project's required alternatives analysis, the Service did not explain how the previous alternatives referenced are relevant here. *See* AR 294, cell 106F. The EAs for those projects

are not cited in the Final EA, nor are they present in the Record before this Court. The decision to reject the study of all reasonable alternatives was arbitrary and capricious because the Service did not provide any explanation for the public or the Court to understand how alternatives from other projects were relevant here. *See Seven County*, 145 S. Ct. at 1511 (agency action must be "reasonable and reasonably explained"); *State Farm*, 463 U.S. at 43 (a court "may not supply a reasoned basis for the agency's action that the agency itself has not given"). Moreover, the logic that any alternative that reduces timber harvest—for a Project with a broad purpose and need—is unreasonable and therefore need not be considered demonstrates how narrowly the Service defined the objectives for the action. If the Project cannot be modified in any way, the EA has become a foreordained formality, and the Service has violated NEPA. *See Citizens Against Burlington, Inc.*, 938 F.2d at 196.

The Service's rejection of reasonable alternatives by narrowly reading its purpose and need statement, refusing to analyze the project at hand, and inexplicably importing previous decisions is arbitrary and capricious and in violation of NEPA and the APA.

C.   The Service Failed to Analyze a Genuine No Action Alternative.

The Service's regulations provide that an "EA may document consideration of a no-action alternative through the effects analysis by contrasting the impacts of the proposed action and any alternative(s) with the current condition and expected future condition if the proposed action were not implemented." 36 C.F.R. § 220.7(b)(2)(ii). Nonetheless, its analysis of a no action alternative must comply with NEPA, including consideration of the merits of no action. *See Dubois*, 102 F.3d at 1289 (1st Cir. 1996); *North Cascades Conservation Council v. U.S. Forest Service*, 136 F.4th 816, 827 (9th Cir. 2025) ("An EA must consider a no action alternative…") (internal citation omitted); *see also Bob Marshall All.,* 852 F.2d at 1228 ("the no action alternative…is…an integral part of the statutory scheme").

The Service violated NEPA because the analysis in its "Consequences of No Action" section, and throughout the record, shows that the Service ignored the benefits of taking no action despite the availability of information—both the Service's own information and that provided by the public—pointing to numerous benefits. The EA acknowledged that in some stands "natural processes are resulting in desired conditions *without management*." AR 6712 (emphasis added). Despite this observation, the Service arbitrarily presumed that management was necessary. By ignoring the potential benefits of no action altogether, this analysis does not fulfill the Service's obligation to "legitimately assess the relative merits of reasonable alternatives before making its decision." *Dubois*, 102 F.3d at 1289. Accordingly, the Service's

20

failure to analyze alternatives, including the no action alternative, was arbitrary and capricious, or not otherwise in accordance with law, in violation of NEPA and the APA.

**III.    The Service Violated NEPA and the APA Because It Failed to Take a Hard Look at the Project's Environmental Impacts.**

The Service did not conduct the "hard look" review of the Project's environmental impacts that NEPA requires. *See Marsh*, 490 U.S. at 374. NEPA requires evaluation of all "reasonably foreseeable" environmental impacts and those with a "reasonably close causal relationship" to the action. 40 C.F.R. § 1508.1(g) (2020). NEPA is intended to ensure agency decisions on project impacts are "fully informed and well-considered." *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 558 (1978). When determining whether an agency's NEPA analysis is deficient, the Court must review whether the agency addressed its proposed action's environmental consequences. *Seven County*, 145 S. Ct. at 1511. An EA that does not comply with NEPA's requirement to assess all the environmental consequences must be reversed. *See Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1072 (9th Cir. 2002).

The Service unlawfully failed to take a hard look at the environmental impacts of the project because it failed to conduct the necessary site-specific analysis and relied on vague and conclusory statements. As a result, the EA is inadequate and unreasonable, and the resulting FONSI must be vacated.

A.    The Service Failed to Take a Hard Look at Forest Health Impacts.

The Service failed to conduct extensive analysis and review of the Project impacts on forest health adequate to meet the hard look standard of NEPA. Although the record contains some data on stand surveys and tree core analysis in Project areas, the EA failed to address whether any of the stands provide for old forest habitat. AR 6333–64; *see also supra* Section I.A. In fact, the Service failed even to mention "old forest habitat" in the EA and accompanying

documents. This omission is material because the Plan depends on the classification of old forest habitat and *prohibits* harvest in stands with old forest habitat. Plan Glossary 21. Additionally, the Service arbitrarily lumped old growth forest and old forest habitat in with its analysis of mature forest age class stands rather than addressing it as a separate, prioritized age class as specified in the Plan.[15] For example, this inclusion leads 70 year-old stands to be treated the same as 140 year-old stands, which glosses over the distinct and often greater impacts of logging in old stands compared to young or mature stands. AR 6545; *see also* 11614–28. The Service's failure to address old forest habitat and unexplained deviation from the Plan's defined categories shows it did not take a hard look at forest health when analyzing environmental impacts.

Additionally, the Service failed to provide a full analysis of the impacts of proposed treatment. Notably, the Service identified and removed old growth in Project stands from the Project harvest areas in the Final EA. AR 6716. However, the Service failed to weigh the impacts of conducting clearcuts, including "Whole Tree Harvest,"[16] right up to the edge of old growth,[17] and the Service failed to investigate the presence of old forest habitat, which—had it been identified and protected per the Plan—could have offered a buffer for the adjacent old growth. Whatever the merits of the new boundary placements, the Service failed to examine the potential harms of the Project's harvests on adjacent old growth forest and old forest habitat.

---

[15] *Compare* AR 6333–66 (acknowledging likelihood of old growth age class existence in area) *with* AR 6552, 6565 (showing the Service did not analyze stand age classes older than mature).
[16] Whole Tree Harvest is a destructive form of clearcut, which can cause extensive soil release. AR 6823–24, 7068.
[17] When discussing the proximity of clearcutting to old growth forest, a Service official stated "[the Service] did not consider potential buffers or what the adjacent Rx was - [even though] the Rx calls for running a clearcut [] up to the boundary of the old growth." AR 6460.

B.  <u>The Service Failed to Take a Hard Look at Impacts to TES Species.</u>

The Service failed to take a hard look at the impacts of the Project on the NLEB, which was uplisted to endangered status in November 2022. For similar reasons as the EA violated NFMA in this regard, the Service violated NEPA.

Shockingly, the Service failed to confirm whether there are any NLEB or hibernacula present in the Project area. "[N]o acoustic surveys were conducted" to locate NLEBs—the Service simply assumed the presence of the bat because roosting and foraging habitat exists within the action area. AR 4315. But confoundingly, the Service does not make the same assumption about hibernacula, claiming "[t]here are no known hibernacula within the action area." AR 4314.

Without any independent investigation, the Service relied on a broad Biological Opinion (BiOp) that also reflects no investigation of the Project area. AR 11718.[18] As the First Circuit recently explained, "[r]eliance can be arbitrary and capricious…if the agency blindly adopted the biological opinion without conducting its own independent investigation." *Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*, 100 F.4th 1, 12 (1st Cir. 2024). In this Project, the Service did precisely that. The Bi-Op includes no studies specific to the Project area, instead making a blanket assessment of the effects on NLEB of nearly 3,000 "combined and collectively evaluated" Service projects in the entire eastern region of the country's national forests, "[d]ue to the number of planned and ongoing projects and the similarity of effects."

---

[18] Courts have consistently held that inadequate EAs cannot be remedied by analysis contained in a Biological Assessment (BA) or a Bi-Op. *W. Watersheds Project v. Schultz*, No. CV 22-149-M-DWM, 2025 WL 2658776, 10-11 (D. Mont. Sept. 17, 2025) (the court explained that an EA must assess all environmental impacts under NEPA, a broader requirement than the species-specific analysis found in a BA or Bi-Op.); *Forest Guardians v. U.S. Forest Service*, 329 F.3d 1089, 1100 (9th Cir. 2003) (holding that statutory duties of NEPA and ESA preclude the use of a biological assessment to cure an otherwise deficient EA.)

AR 11721. This broad analysis did not include any studies specific to the Project area. The Service's reliance on a generalized assessment, rather than its own site-specific review, was the very blind adoption the case law forbids. *Nantucket Residents Against Turbines,* 100 F.4th at 12.

The Service also failed, without explanation, to adopt mitigation measures to protect the NLEB, such as limiting logging to the winter hibernation season or to avoid trees providing key habitat to the NLEB. *Supra* Section I.B. The Service acts arbitrarily and capriciously when it fails to provide a rational basis for disregarding available mitigation measures recommended in its own planning documents. *Native Ecosystems*, 418 F.3d at 963–966.

The Service failed to take the required hard look under NEPA by relying on a broad Bi-Op that lacked site-specific data and inexplicably refusing to adopt core mitigation measures, which render the Project approval arbitrary and capricious in violation of NEPA and APA.

C. The Service Failed to Take a Hard Look at the Project's Impacts to Carbon Storage and Climate Change.

The Service failed to take a sufficient hard look at the carbon and climate impacts of the Project because it failed to quantify carbon emissions and carbon stock changes caused by the Project. In analyzing emissions, courts have held that "it doesn't matter which way [the agency] present[s] the estimates." *Sierra Club v. FERC*, No. 24-1099, 2025 WL 2779345 at *4 (D.C. Cir. Sept. 30, 2025) (deciding that FERC can present emission estimates as annualized rather than cumulative). But it *does* matter that those estimates are presented, because they are perhaps the most significant aspect of climate consequences. *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1376 (9th Cir. 1998) (stating hard look must include a "reasonably thorough discussion of significant aspects of the probable environmental consequences") (cleaned up). Yet contrary to law, logic, and established practice, the Service failed to do so here.

In 2024, the Service prepared a Forest Carbon Assessment (FCA) for the Forest that provides a framework for carbon analysis. AR 6117. The FCA states that beyond Forest level analysis provided in the document, "[d]etailed analyses of impacts to carbon are site and practice specific" and are "vital for understanding the role of forests in the context of global change." AR 6117. And the FCA makes clear that NEPA analysis "require[s] the use of best available science and data." AR 6118.

Here, the Service unreasonably and inexplicably failed to perform any site- or practice-specific quantitative analysis and failed to consider any data. *Sierra Club v. FERC*, 145 F.4th 74 (D.C. Cir. 2025) (agency must "provide more explanation for its deviation from standard practice"). The three-page Carbon Assessment for the Project claimed that local carbon emissions' effects on global and national pools are difficult to ascertain, and then arbitrarily determines that, because of this difficulty, the contribution to climate change must be negligible. AR 6106. However, there was no attempt to employ the methodologies or framework laid out in the FCA to determine these estimates—indeed, the Project Carbon Assessment contains no data or numbers at all. The lack of data is particularly egregious given that, a year later, the Service produced a Carbon and Climate Change Report for the Lost River Integrated Resource Project that used the methodologies in the FCA to calculate the estimated Project carbon emissions.[19]

The Service also claimed the Project's effects on carbon stores will be minimal, relying on the fact that carbon stores will bounce back as trees re-grow. AR 6106–6107, 6733. However, the FCA admits that "several decades may be needed to recover the carbon removed"—which may be several decades too late in mitigating the worst effects of climate change. AR 6133. Most

---

[19] *See* U.S. FOREST SERV., LOST RIVER INTEGRATED RESOURCE PROJECT: CARBON AND CLIMATE CHANGE REPORT 2 (2025), https://www.fs.usda.gov/r09/whitemountain/projects/63401.

of the Project's logging will be conducted in mature and old forests. AR 6550-52. Studies have shown these forests contain more carbon than younger forests and accumulate more carbon over time due to increasing rates of carbon sequestration in trees, stands, and soils—the FCA calls these forests "hotspots of carbon stock[]." AR 6138, 11594–653. Despite this evidence showing a significant impact of the proposed action, the Service failed to produce any data or analysis on the carbon stocks in the project area that prove their claim of minimal Project consequences. And, once again, the Service proved the analysis possible a year later in the Lost River Carbon Report that applies the methodologies in the FCA to estimate carbon stock in that project area.

In this Project, the Service violated the hard look requirement by failing to use established methodologies for gathering needed data and arbitrarily ignoring its own practice of using data in NEPA analysis, thereby disregarding a significant aspect of climate consequences.

D.  The Service Failed to Take a Hard Look at Impacts on Soils.

The Service failed to take a hard look at the impacts of the Project on soils. NEPA requires an agency to take a hard look at environmental impacts of its proposed action by gathering site-specific information. *WildEarth Guardians v. U.S. Dep't Agric.*, 135 F.4th 717, 730 (9th Cir. 2025). The Service's conclusions regarding Project impacts on soil were arbitrary and capricious because it lacked current, site-specific data and directly contradicted the Project's own goal to protect the soil's "long-term sustainability." AR 12183.

Furthermore, the Service also is in violation of NEPA's clear mandate to "encourage and facilitate public involvement in decisions which affect the quality of the human environment" and to "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures." 40 C.F.R. § 1506.6(a) (2020). While the Service proposed and mapped skid trail routes to access numerous stands, this information was withheld from the public despite requests

and was unavailable for review and comment in violation of NEPA, appearing only in the record provided to this Court. AR 6301–02, 6352–54; *see also* 36 C.F.R. § 220.7(a) ("EA may incorporate by reference information that is reasonably available to the public"). By failing to disclose specific, relevant operational details, the Service prevented the public from offering informed comments and thus did not fulfill NEPA's informational and public participation requirements. *Idaho Sporting Congress v. Rittenhouse*, 305 F.3d 957, 963 (9th Cir. 2002) (failure to disclose site-specific data relevant to environmental impacts violates hard look requirement and prevents informed public comment).

Moreover, the Service has abandoned required soil BMPs. As discussed above in Section I.C., Plan Standard S–4 requires adherence to NH BMPs, which disfavor skid trails on slopes exceeding 15 percent. AR 8795–96. Yet, the Project includes the construction of skid trails on slopes greater than 20 percent, and the Soil Report states that slopes of up to 35 percent may be required. AR 6392–93. In permitting these practices, the Service failed to offer any reasoned explanation for deviating from its own Plan Standard and BMPs. Nor did it provide a site-specific analysis of the resulting high-risk soil impacts, as NEPA requires.

E.  The Service Failed to Take a Hard Look at the Environmental Effects of Transportation Actions in the Project.

The Service failed to take a hard look at the impacts from road construction by not providing baseline data, refusing to consider environmental impacts, and inadequately engaging the public. The Service claims that the Project is partially implemented to address "transportation system needs" but provided no baseline analysis of the current state of transportation in the Project area. AR 11235. The lack of baseline data precludes drawing a comparison between the Service's purported needs and the proposed action, in violation of NEPA. *Monroe Cnty.,* 2025 WL 2687723 at *11 ("the [Service] cannot hang its hat where it never placed a peg") (internal

citation omitted). The Service also failed to satisfy its obligation to consider reasonably foreseeable environmental impacts by neither accounting for, nor explaining why it did not attempt to mitigate the acknowledged impacts of road reconstruction on perennial streams. AR 11236, 12144.

As discussed above, the public never had the opportunity to review maps of the Project's skid trail routes, in violation of NEPA. Without this information, the Service never explained how logging equipment will access many of the units proposed for timber harvest. AR 11236. The Service has either failed to account for the access required for the proposed activities or has chosen not to disclose the planned access.[20] *Id*. Additionally, the 2015 Transportation Analysis the Service relies upon was published without NEPA review or a record of decision, lacking transparency and accountability, including required opportunities for public input and agency response. AR 12519. This document was not available for public evaluation during the NEPA process. AR 11253. Although the Service's objection response cited the document, the link is to the Service's Plan page, where the document does not appear. AR 12144.

F.   The Service Failed to Take a Hard Look at the Project's Impacts to Water Quality.

The Service did not conduct a sufficient hard look at the Project's impacts to water quality. While the Service claimed BMPs will mitigate the Project's harms, it does not justify the excess water quality degradation.[21] AR 6732. The Project water quality impacts analysis seems

---

[20] For example, in the Guinea Hill area, there is no indication of how timber would be accessed in Units 15, 16, 19, 22, 23, 24, 25, 26, 27, 28, 29, 32, 48, and 49. Similarly, it is unclear how other Harvest Units will be accessed in the Ferncroft portion of the Project area (especially Units 39, 40, and 46), and the Liberty portion of the Project area (especially Units 3, 4, 5, 6, 9, 10, 11, 33, 34, and 47). AR 6718.

[21] The Service also failed to consider the similar post-harvest impacts on soil water. AR 9053.

solely based on the expected effects of harvests surpassing the 20 percent basal reduction level[22] and does not account for the current conditions or state of water quality in the Project area. AR 6732. The Service also conducted no site-specific analysis or field visits to ascertain these characteristics of the watershed. Without this information, the Service is left to determine the water impacts based on old data and an expired Plan. Lacking a baseline understanding of the features and water quality in the watershed, the Service cannot hope to accurately predict the impacts of the timber harvest on water quality. The Service failed to take a hard look at water quality impacts by predicating its water quality analysis on general information, in violation of NEPA. *WildEarth.*, 135 F.4th 717, 729  (holding agency EA deficient for insufficient analysis of localized impacts).

    G.  <u>The Service Failed to Take a Hard Look at the Impacts to Roadless Areas.</u>

The Service failed to take a hard look at harvest units in Inventoried Roadless Areas (IRAs), including some harvest units that border the Sandwich Range Wilderness, and failed to provide the requisite opportunity for public participation required by NEPA. The Service's data and assessment was not based on accurate information or defensible reasoning. *Ctr. for Biological Diversity,* 2025 WL 586358, at *4 (project "premised on unsupported assumptions"). As the Service admitted, a map that displays the Project area, Plan IRAs, and Roadless Area Conservation Rule (RACR) boundaries does not exist. AR 11775. The Service also failed to account for the Project's impacts on the numerous unique qualities of each individual IRA, including the baseline conditions described in the Plan. AR 6526–27, 11780. The Service's

---

[22] When evaluating impacts on a watershed, the Service considers only harvests that exceed 20 percent of its "basal area," the feet of an acre covered by tree. AR 6181. This 20 percent limit was developed for another Forest project and is a "rule of thumb" based on the general opinion of Forest Service employees. AR 6170–71.

"failure to explain baseline assumptions frustrated its ability to take a 'hard look' at the effects of" the Project on roadless areas. *Ctr. for Biological Diversity,* 2025 WL 586358, at *4.

Additionally, the Service failed to acknowledge the existence of Plan or RACR IRAs during the NEPA process, thus failing to alert the public to impacts to these areas before the Final EA. AR 11777, 12147. The Service's omissions impede public participation and are in violation of NEPA's mandate, as the public should not have to "parse the agency's statements to determine" the project's impacts. *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 761 (9th Cir. 2014).

H.  <u>The Service Failed to Take a Hard Look at Impacts to Scenery and Recreation.</u>

Similarly, the Service conceded after the Final EA was completed that it failed to take a hard look at scenic and recreational impacts. AR 12146. The Service did not provide "sufficient details concerning what visitors can expect to see after each treatment type in the affected viewshed and how long it will take for the affected area to recover." *Id.* This does not satisfy NEPA. The Service authorized commercial logging within sixty-six feet of popular hiking trails and sixty-five acres of prescribed burns that overlap with the popular Liberty Trail, which climbs to the summit of Mount Chocorua. AR 2377, 6722. Yet the Service did not analyze impacts to two of the most popular peaks in the Sandwich Range—Mount Israel and Whiteface—nor did it assess impacts to hikers, snowshoers, or skiers along impacted trails. AR 12054. In violation of NEPA's hard look requirement, the Service simply dismissed these impacts as "temporary" and without explanation stated these areas would not be impacted. AR 12053–54.

IV.  **The Service Failed to Take a Hard Look at the Project's Cumulative Impacts.**

An agency's final analysis must document an "assessment of the cumulative effects of the actions considered (including past, present, and reasonable foreseeable future actions) on the affected environment." 36 C.F.R. § 220.4(f). The Service's cumulative impacts analysis violated

NEPA and the APA for two reasons. First, it committed a cardinal sin of administrative law by arbitrarily, and without public notice, applying two sets of incompatible regulations. Second, even if the Service's incoherent application of regulations did not violate NEPA and the APA, its purported cumulative impacts analysis for each resource analyzed failed to comply with either regulatory scheme it invoked.

A. The Service Violated NEPA and the APA Because It Invoked Two Sets of Contrary Regulations to Conduct Its Cumulative Impacts Analysis.

Early NEPA case law, which was the blueprint for the NEPA process, emphasizes that NEPA itself requires agencies to study cumulative impacts. *See Mont Vernon Preservation Soc. v. Clements*, 415 F. Supp 141, 147 (D.N.H. 1976) (quoting *Hanly v. Kleindienst*, 417 F.2d 823, 830–31 (2d. Cir. 1972) (agency must consider "*the cumulative harm* that results from [the Proposed Action's] contribution to existing adverse conditions or uses in the affected area").

The Service claimed in its recent objection response that it conducted the analysis for the Project under Council on Environmental Quality (CEQ) regulations promulgated in 2020; however, both the Draft EA and the Final EA cite cumulative impacts analysis under CEQ's earlier regulations which were first promulgated in 1978. *Compare* AR 6765, 12134 ("the analysis presented follows the 2020 regulations") *with* AR 12132 (explaining it conducted its cumulative impacts analysis using the 1978 regulations). The 2020 regulations contain no specific standards for analyzing cumulative impacts under NEPA. *See* 85 Fed. Reg. 34304, 34343–44 (July 16, 2020) (discussing deletion of concept). The Decision Notice indicates that it did not consider cumulative impacts under the 1978 regulations but failed to provide any explanation for the change or how it affected the analysis. AR 6765.

Invoking two sets of regulations, with different provisions, without any explanation of how the analysis did or did not change, both frustrates understanding of the Service's analysis

and is straightforwardly arbitrary and capricious. *Federal Communications Commission v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position"). And neither Standing Trees nor this Court can say with assurance what regulations the Service applied, precluding application of the cardinal administrative law principle that agency action "must be judged by the standards which the [agency] itself invoked." *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943).

B.  <u>The Service Failed to Take a Hard Look at Cumulative Impacts.</u>

For each resource analyzed above, the Service failed to account for the cumulative impacts of past, present, and reasonably foreseeable actions in the Forest, including thirteen commercial logging projects in the Forest and timber harvest on nearby private lands. *Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 361 F.3d 1108, 1128 (9th Cir. 2004) (agency "must provide a useful analysis of the cumulative impacts of past, present, and future projects").

Cumulative impacts analysis avoids "the tyranny of small decisions," as agencies may otherwise underestimate a project's overall effects. *Kern,* 284 F.3d at 1078. "The analysis 'must be more than perfunctory'" and requires "quantified or detailed information." *Ocean Advocs.,* 361 F.3d at 1128 (citing *Kern*); *North Cascades Conservation Council v. U.S. Forest Service*, 136 F.4th 816, 829 (9th Cir. 2025) (internal citations omitted). Here, the Service provided virtually no "quantified or general information" but rather "general statements about 'possible' effects and 'some risk' [which] do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." *Kern*, 284. F.3d at 1075. Plaintiffs "need not show what impacts would occur [to prevail]." *Te-Moak*, 608 F.3d at 605.

The cumulative impacts analysis is critical for the Project because it is one of at least thirteen past, present, and reasonably foreseeable projects in the Forest that take similar actions. In addition to failing to mention these projects, the Service also failed to study the impacts of the Project in conjunction with other State and private land projects. *Schultz*, 2025 WL 2658776 at *6. Notably, the Service neither explicitly incorporated (or "tiered to") the Plan FEIS, nor did it "discuss the relationship between the tiered document and the previous review and summarize and incorporate by reference the issues discussed in the broader document." 40 C.F.R. § 1501.11(b)(1); *see also Kern*, 284 F.3d at 1076 ("EA may be deficient if it fails to include a cumulative impact analysis or to tier to an EIS that has conducted such an analysis").

For example, the Service summarily stated that removing trees in this Project will have an individually minor impact on NLEB habitat but failed to analyze the collectively significant impacts of the thirteen other tree-removal projects in the Forest. Indeed, this Project is just one of several recent projects where, without any supporting data, the Service excused impacts on NLEB habitat because the NLEB supposedly has other places to go. AR 4399. For carbon and climate analysis, the Service writes off the cumulative impacts of the Project in one sentence. Despite failing to provide any carbon emissions and stock data for this Project and failing to reference the existing data for any of the other thirteen projects, the Service somehow decides that the cumulative impacts of this Project "would be negligible." AR 6106. And maybe they *would* be, but due to the lack of data and scientific analysis, the Service clearly cannot say for certain. In transportation and road construction, the Service's four most recent projects approved approximately 24 miles of new or reconstructed roads in the Forest.[23] Yet, the Service did not

---

[23] Combined mileage from Tarleton, Peabody, Lost River, and One Mile Lonesome Ridge with information found at https://www.fs.usda.gov/r09/whitemountain/projects.

provide the public with any information on the overall impact or placement of these roads on the Forest and surrounding environment. AR 6738. *Te-Moak*, 608 F.3d at 605. And in each of these cases, the Service failed to address Standing Trees and the public's concerns by "show[ing] why more study is not warranted." 40 C.F.R. § 1502.2(b) (1978).

Given this flawed and incomplete environmental review, the Service cannot reasonably determine whether the Project—either by itself or cumulatively with other projects—would have significant environmental impacts. Thus, the Service cannot proceed until it fully discloses and assesses these impacts in an environmental review that complies with NEPA. *See Dubois*, 102 F.3d at 1285–87.

**V.      The Service's Finding of No Significant Impact Violated NEPA and the APA.**

The Service's deficient analysis of alternatives and environmental impacts also undermined the reasonableness of its FONSI, based on its flawed EA, that the Project will not have significant effects and did not require an EIS. 40 C.F.R. § 1501.6(a) (2020).[24]

To determine whether an action will significantly affect the environment, agencies must consider the action's context and intensity. *See Comité Dialogo Ambiental, Inc. v. Fed. Emergency Mgmt. Agency*, Civil No. 3:24-cv-01145-JAG, slip op. at 10 (D.P.R. Sept. 30, 2025) (citing *Nat'l Parks Conservation Ass n v. Semonite*, 916 F.3d 1075, 1082 (D.C. Cir. 2019); *Hanly*, 471 F.2d at 830–31); *see also* 40 C.F.R. § 1501.3(b) (2022) (requiring analysis of "setting" and "degree of the effects"). As discussed, the Service failed to consider the relevant context, downplayed cumulative impacts without meaningful analysis, and dismissed the

---

[24] Here also, the Service arbitrarily and without explanation switched its significance analysis, using the 1978 (and 2022) regulations during the NEPA process for the Project and then citing the 2020 regulations in the final Decision Notice. *Compare* AR 6708, 6742 *with* AR 6765; *but see* AR 6682 (incongruently referencing use of 2020 regulations).

Project's environmental effects as negligible at Forest scale. *Supra* Part III, IV; AR 6739. The Service violated its obligation to consider the proper context of the Project because it arbitrarily and capriciously ignored localized adverse effects of the Project. *Supra* Part III; *see also* 40 C.F.R. § 1508.27(a) (1978) ("significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality"); 40 C.F.R. § 1501.3(b)(1) (2022) (similar); *Pac. Coast Fed'n of Fisherman's Ass'ns v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1035–37 (9th Cir. 2001) (agency cannot downplay impact of action by using analysis scale so broad that it trivializes site-level impacts).

Despite a superficial recitation of intensity factors in the regulations, the Service's FONSI repeated the failings of the EA by, *inter alia*, dismissing adverse effects as "limited" without justification or analysis, making generalized assertions about the lack of impacts on public health or safety from prior projects, ignoring the scientific controversy over the Project's targeting of mature and old forests, and baselessly denying the Project's cumulative impacts and impacts on TES. AR 6739–42. This cursory analysis of intensity likewise was arbitrary and capricious. For these reasons, and for all the reasons the Service failed to take a hard look at the Project's environmental impacts, the Service's FONSI should be vacated as contrary to NEPA and the APA. *See, e.g.*, *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 871 (9th Cir. 2020).

## CONCLUSION

For the foregoing reasons, the Court should grant this motion for summary judgment and vacate the agency decision to authorize the Project. *See*, *e.g.*, *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021).

Respectfully submitted, this 17th day of October, 2025.

STANDING TREES, INC.

By its attorney:

/s/ Christophe Courchesne
Christophe Courchesne
NH Bar No. 20431
Associate Professor and Director
Environmental Advocacy Clinic
Vermont Law and Graduate School
164 Chelsea Street, PO Box 96
South Royalton, VT 05068
(802) 831-1630
(802) 831-1631 (fax)
ccourchesne@vermontlaw.edu

*Environmental Advocacy Clinic fellow Rachel Westrate and student attorneys Joe Anderson, Ben Behimer, Lakshita Dey, Blythe Faris, Eric Grimes, and Julia Wickham contributed to this brief.*

## CERTIFICATE OF SERVICE

I hereby certify that on October 17, 2025, I served the foregoing document electronically

through ECF upon all counsel of record.

/s/ Christophe Courchesne
Christophe Courchesne
*Counsel for Standing Trees, Inc.*

36