UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| STANDING TREES, INC.<br><br>    *Plaintiff*,<br><br>v.<br><br>UNITED STATES FOREST SERVICE, et al.,<br><br>    *Defendants*. | Case No.: 1:25-cv-00237-SE-TSM |

**SUPPLEMENTAL BRIEF IN SUPPORT OF**
**STANDING TREES' MOTION FOR SUMMARY JUDGEMENT**

Christophe Courchesne
NH Bar No. 20431
Associate Professor and Director
Environmental Advocacy Clinic
Vermont Law and Graduate School
164 Chelsea Street, PO Box 96
South Royalton, VT 05068
(802) 831-1630
(802) 831-1631 (fax)
ccourchesne@vermontlaw.edu

*Counsel for Standing Trees, Inc.*

Standing Trees submits this brief to supplement its initial memorandum of law in support of its motion for summary judgment (Docket No. 11-1, "Mem.") pursuant to the updated scheduling order (Docket No. 13).[1] The brief makes four further points. First, Standing Trees has appealed Judge Laplante's August decision in the Tarleton and Peabody West case (No. 1:24-cv-00234-JL-TSM, 2025 WL 2411206 (D.N.H. August 20, 2025)) ("*Tarleton*"), which is not binding on this case. *Tarleton*'s legal analysis was flawed, and Standing Trees has challenged the Sandwich Project on distinct factual grounds, including several absent in *Tarleton*. Second, *Seven County*'s rule of deference in NEPA cases does not control the outcome here given the Forest Service's threadbare analysis. *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168 (2025). Third, additional information in the Administrative Record illustrates that the Service failed to consider the Project's impacts on old forest habitat, which is protected by the White Mountain National Forest Plan and NFMA. Finally, the Service failed to take a hard look at site-specific impacts by not mapping and disclosing the skid trails required for timber harvests, violating NEPA.

**I.    *Tarleton* Is Not Binding, Nor Is It Persuasive.**

This Court is not bound by *Tarleton*. "A decision of a federal district court judge is not binding precedent in . . . the same judicial district, or even upon the same judge in a different case." *Barbosa v. Midland Credit Management, Inc.*, 981 F.3d 82, 89, n.10 (1st Cir. 2020) (quoting *Camreta v. Greene*, 563 U.S. 692, 709, n.7 (2011)). Moreover, Standing Trees appealed *Tarleton*[2] and will argue that the Court misapplied the law and failed to properly consider the

---

[1] This brief uses the same defined terms as Standing Trees' initial memorandum of law.
[2] Notice of Appeal (Doc. 39), *Standing Trees, Inc. v. U.S. Forest Service*, 1:24-cv-00138 (D.N.H.); *Standing Trees, Inc. v. U.S. Forest Service*, 1st Cir. No. 25-2086 (docketed Nov. 13, 2025).

1

record. Thus, this Court should proceed to review the merits of this case independently, without deference to *Tarleton*.

*Tarleton* misapplied NFMA and NEPA. The decision did not enforce the Service's obligations under NFMA and the Plan, failed to recognize clear violations of standards and unexplained deviations from guidelines within the Plan, deferred to the Service on arbitrary harvesting decisions, and did not hold the Service accountable for failing to conduct site-specific analysis that would sufficiently establish baselines. *Cf. Tarleton* at *18.

*Tarleton* is also at odds with the law governing NEPA reviews. For example, the Court erred in holding that the Service was not required to consider any action alternative, including those action alternatives proposed by Standing Trees. But, as Standing Trees argues here, Mem. at 16–17, NEPA requires the agency to try on its own to develop alternatives that will 'mitigate the adverse environmental consequences' of a proposed project." *See Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1291 (1st Cir. 1996) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989)). And under its own NEPA rules, the Service must consider at least one action alternative. *See* Mem. at 18; 36 C.F.R. § 220.7(b)(2) ("The EA shall briefly describe the *proposed action and alternative(s)* that meet the need for action.") (emphasis added). Likewise, *Tarleton*'s ruling that stakeholders must propose fully-formed alternatives contradicts binding First Circuit precedent. *See Dubois,* 102 F.3d at 1291 (*quoting Adams v. U.S. Envt'l Prot. Agency*, 38 F.3d 43, 52 (1st Cir. 1994)) ("Such 'specifics' are not required…. the purpose of public participation regulations is simply 'to provide notice' to the agency, not to 'present technical or precise scientific or legal challenges to specific provisions' of the document in question.").

Even if *Tarleton* were correct and binding, this case presents factually distinct issues:

First, Standing Trees argues here the Service classified roads in the Sandwich Project area as "reconstructed" to circumvent the new road construction limitations in the Plan FEIS in violation of NFMA. *See* Mem. at 13; AR 12151; 11327. Road construction and reconstruction were not before the Court in *Tarleton,* and thus the decision does not address the Service's consideration of road construction and reconstruction classifications under NFMA.

Second, the Service only analyzed scenery and recreation impacts from a single viewpoint atop Mount Chocorua for the Sandwich project, while it considered multiple in its analysis in the Tarleton and Peabody West project areas. *Compare Tarleton* at *12 *with* Mem. at 30; AR 2377; 12146; 6223–24; 11230–31 (conceding EA and the Scenery Report did not provide "sufficient details" on scenery and recreation for Sandwich Project). The Service's limited analysis in the Sandwich Project is at odds with the Plan's guidelines for scenery and recreation, in violation of NFMA. Mem. at 14–15. The Service failed to provide analysis of what visitors can expect to see after each treatment type in the viewshed, like clearcutting, and how long it will take for the affected area to recover, constituting a failure to take a hard look, in violation of NEPA. Mem. at 30; AR 12146.

Third, in the Sandwich Project, the Service failed to take a hard look at impacts to soil, a claim not at issue in Standing Trees' challenge to the Tarleton and Peabody West projects. Here, the Service violated NFMA by ignoring Plan requirements for soil health and violated NEPA by failing to take a hard look at soil impacts. *See* Mem. at 12–13; 26–27.

II.     **The *Seven County* Deference Principle Is Legally and Factually Inapposite.**

*Seven County* upheld the longstanding principle of judicial deference to reasonable agency NEPA decisions—specifically, agency choices that are procedurally compliant and reasonably explained fall within a "broad zone of reasonableness." 605 U.S. at 183. However,

*Seven County* does not provide a blank check.[3] An EA is not lawful or reasonable—and not entitled to deference—when its analysis does not comply with NEPA's requirements. The Sandwich EA is devoid of the minimum information necessary for a reasoned decision and thus falls outside the deferential zone. *See* Mem. at 21–30 (describing a lack of current, site-specific data for old age class and old forest habitat, northern long eared bats, carbon storage, soils, transportation needs, water quality, roadless areas, and scenery and recreation).

The Service failed to consider alternatives, including a genuine no action alternative. *See* Mem. at 15–21. Congress included the requirement to consider alternatives because it concluded decisionmakers should have that information. *See* 42 U.S.C. 4332(A). Here, the Service violated NEPA and the APA because it authorized the Project without requisite consideration of alternatives. *See* 36 C.F.R. § 220.7(b)(2); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (a "court must consider whether the decision was based on a consideration of the relevant factors" Congress intended). A decision that is not informed by the relevant factors cannot be reasonable, or reasonably explained, and is not entitled to deference.

---

[3] *See e.g. Comité Dialogo Ambiental, Inc. v. Fed. Emergency Mgmt. Agency,* Civil No. 3:24-cv-01145-JAG, 10 (D.P.R. Sept. 30, 2025), *notice of appeal filed* (1st Cir. Dec. 1, 2025) (finding FEMA's EA inadequate because it "merely offer[ed] conclusory statements not supported by studies, analysis, or data," and requiring an EIS); *North Cascades Conservation Council v. U.S. Forest Service*, 136 F.4th 816, 831 (9th Cir. 2025) (finding that impacts from nearby restoration work were reasonably foreseeable impacts the Service must consider in its final EA); *Monroe Cty. Bd. of Comm'rs v. U.S. Forest Service*, No. 1:24-cv-01560-TWP-KMB, 2025 WL 2687723 at *13 (S.D. Ind. Sept. 18, 2025) (holding the Service failed to take hard look at whether Best Management Practices would be effective in mitigating significant impacts to a major lake and source of drinking water); *Western Watersheds Project v. Schultz*, No. 9:22-cv-00149-DWM, 2025 WL 2658776 at *4–5 (D. Mont. Sept. 17, 2025) (finding the Service's generalized references to information incorporated by reference without any analysis or discussion failed to meet NEPA's hard look requirement); *All. for Wild Rockies v. U.S. Forest Service*, No. 2:24-CV-157-RLP, 2025 WL 2655984 at *12 (E.D. Wash. Sept. 16, 2025) (holding that the Service violated NEPA because its EA's "maps place excessive reliance on condition-based management, rendering them too vague to comply with NEPA").

The Service also violated the NEPA requirement to consider cumulative impacts. *See* Mem. at 30–34. *Seven County* stated that an agency need not consider far-afield cumulative impacts from downstream projects not within the jurisdiction of the agency. 605 U.S. at 191. But here, the Service failed to study the cumulative impacts of more than thirteen past, present, and reasonably foreseeable commercial logging projects, all in the Forest, and all under the Service's control. *See* Mem. at 32–34. The deficient NEPA cumulative impacts analysis is particularly important in this case, as all thirteen of these commercial logging projects are purportedly implementing the same Plan. Cumulative impacts analyses serve as critical checkpoints on Plan implementation because, as the Service acknowledges, the cumulative impacts analysis in a Plan EIS does not provide "useful information at the project or activity level." 73 Fed. Reg. 21,502 (2008). Indeed, "[m]eaningful cumulative effects analyses cannot be conducted until project design and location are known or at least reasonably foreseeable." *Id.* Now, the designs and locations for these thirteen projects *are* known. The Service's failure to conduct the required cumulative impacts analysis—ignoring impacts squarely within its authority—violates NEPA and removes its decision from *Seven County's* "broad zone of reasonableness," forfeiting deference. 605 U.S. at 183.

Additionally, *Seven County* involved judicial review of a lengthy EIS that the Court believed demonstrated thorough environmental analysis, site-specific data evaluation, and reasoned mitigation measures—the hallmarks of "reasonably explained" agency judgment. 605 U.S. at 185. By contrast, here, the Service relied on a cursory EA that failed to consider alternatives, was filled with conclusory statements, lacked site-specific data, and failed to provide the analytical rigor required of EAs. *See* Mem. at 21–30. This threadbare analysis falls far short of *Seven County*'s standard for deference. *See Los Padres ForestWatch v. U.S. Forest*

5

*Serv.*, 25 F.4th 649, 657 (9th Cir. 2022) ("The Court 'cannot defer to a void'" (citation omitted).).

### III. The Service Violated NFMA by Arbitrarily Failing to Rely on Its Own Classification Requirements When Designating Harvest Stands.

As discussed in Standing Trees' initial memorandum, the Service relies on the Late-Successional Index (LSI) to make determinations on the presence of old growth forest. *See* Mem. at 9–11. The Plan prohibits timber harvest in old growth forest. AR 10217. The Service states that it removed any stands that received an LSI score of 9 or 10 from harvest because those stands were considered "old-growth stands." AR 6351–56. However, as illustrated in the Service's own Figure below, stands that receive a score of 7 or 8 can also be old-growth stands. Yet, the Service designated stands with LSI scores of 7 or 8 for harvest without justification, data, or analysis to support the decision. *Id*. The Service's lack of support for its determinations and failure to consider whether old-growth forest exists in those stands shows the Service arbitrarily made stand selections for harvest and disregarded its own measures for protecting vital old-growth forest.

**How to Interpret the LS Index**
Scores above '5' strongly suggest that the stand contains significant LS value (Fig. 2). Stands above '8' suggest that the stand may be an old-growth stand. If the stand scores '5' to '8', we recommend applying a harvest prescription that retains as much LS value as possible. Trees > 16" DBH should be targeted for retention, especially if they have epiphytic lichens such as *Collema* spp or *Lobaria querizans*. If the stand scores '8' or above, we recommend not harvesting a stand or asking for expert advice on how to harvest the stand with careful consideration of LS attributes. In most cases, stands that score below a '5' require no special management attention for LS conservation. Occasionally the LS Index may not reflect the true LS condition of the stand because either the stand is outside the range of conditions under which the LS Index was developed (e.g., post-ag. hardwoods) or is erroneously classified (the LS Index is a probabilistic tool, hence it will occasionally be wrong). Common sense usually can resolve the rare occasion when the LS Index and stand conditions are conflicting.

*Figure 1. LS Index (Revised): Northern Hardwood Forest (AR 6246).*

The Service also arbitrarily failed to follow its own system. The Service's LSI scoring system prioritizes stands with scores greater than 5, stating they "contain[] significant [late successional] value." AR 6246. To preserve this value, the LSI scoring system recommends that harvesting in stands with a score between 5 and 8 apply "a harvest prescription that retains as much [late successional] value as possible." AR 6246. The Plan emphasizes the protection of late successional value by including a clear stipulation that "[n]o harvest will occur in stands identified to provide old forest habitat." Forest Plan Glossary at 21. Old forest "habitat conditions start with those for mature forest and can include greater size, decadence, structural complexity, etc," which would likely include stands with LSI scores 6 and above. *Id.* The Service's botany report recognizes that stands within the Project area with scores of 6 to 8 "surpass the threshold of economically mature/late successional forest," yet the Service still prescribes harvest in those stands. AR 6351; 6355. The record is otherwise devoid of discussion of the presence of late successional forest and old forest habitat, or measures to protect it: the HMU Rationale Document, EA, FONSI, and Decision Notice make no mention of the botany report's findings regarding late successional forest. *See* AR 6558–6570; 6704–6753; 6754–6773. These instances of arbitrary decision-making, along with those discussed in more detail in

7

Standing Trees' initial memorandum, prove the Service's analysis of forest health in the Project EA violates NFMA, NEPA, and the APA. *See Motor Vehicle Mfrs. Ass'n v. State Farm,* 463 U.S. 29, 44 (1983) (reviewing court "may not supply a reasoned basis for the agency's action that the agency itself has not given").

**IV.    The Service's Failure to Take a Hard Look at Site-Specific Impacts of Skid Trails Undermines the Reasonableness of the Service's Analysis and Decision.**

Under NEPA, the Service must take a hard look at the environmental consequences of the project, which "helps 'to insure a fully informed and well-considered decision…'" *Seven County*, 605 U.S. at 185 (citation omitted). *See also Dubois*, 102 F.3d at 1284. NEPA demands disclosure and analysis of reasonably foreseeable site-specific effects before an agency makes a project decision. *See Dubois*, 102 F.3d at 1284; *Seven County*, 605 U.S. at 181 (quoting 42 U.S.C. § 4332(2)(C)) ("The textual focus of NEPA is the 'proposed action'—that is, the project at hand. The agency therefore will obviously seek to assess significant effects from the project at issue."). When harvesting timber, the construction of skid trails is necessary to move heavy logging equipment and remove timber. AR 8598. However, the construction and use of skid trails require additional timber harvesting, and cause soil degradation, erosion, and harm to water quality from exposure of mineral soil. AR 8514–15; 8598–99. Despite these obvious environmental impacts, the Service did not map or analyze the skid trails necessary to reach stands designated for harvesting in many of the harvest units, thus failing to consider and disclose the reasonably-foreseeable impacts of the Project.

The Service's maps reveal entire harvest units are unreachable without the construction of new skid trails. Yet, the record contains only a single map which overlays planned skid trails in a small portion of the Liberty timber sale area. Mem. at 26, 28; *see also* AR 6301, 6302. This map was never shared with the public. The maps in the EA for most timber sale areas, shown in

8

Exhibit A, do not lay out the locations of skid trails. Clearly, the Service is capable of this advance planning, but did not share the information with the public, or explain its refusal to do so, despite Standing Trees' requests for this information. *See* AR 2382.

The location and construction of skid trails is particularly important in this Project because the Service unlawfully authorized a deviation from the Plan guideline by allowing skid trails on slopes exceeding 20 percent without adequate justification or evidence that best management practices would mitigate soil impacts in such areas. *See* Mem. at 12–13. Given the lack of any evidence to support the decision to deviate from the guideline, disclosure of the location of skid trails was essential to design standards for how mitigation will function on the ground. The absence of this critical site-specific information in the analysis shows a lack of consideration by the Service, and it prevents the public and reviewing court from assessing whether the deviation is justified and environmental harms are addressed. This analytical omission undercuts the deference that the Service would otherwise be entitled to. *All. for Wild Rockies,* 2025 WL 2655984 at *8 (finding Service maps were too vague to satisfy NEPA).

**V.      Vacatur is Adequate and Appropriate to Remedy the NEPA and NFMA Violations.**

"[A]n agency action that violates the APA must be set aside." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021); 5 U.S.C. § 706(2)(A). The court retains equitable discretion in "limited circumstances" to remand a decision without vacatur while the agency corrects its errors. *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (quoting *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 994 (9th Cir. 2012)). Here, the "limited circumstances" to remand without vacatur do not apply. The discretion of the reviewing court "depends *inter alia* on the severity of the errors, the likelihood that they can be mended without altering the order, and on the balance of equities and public interest considerations." *Cent. Maine Power Co. v. FERC,* 252 F.3d 34, 48 (1st Cir. 2001).

9

Leaving the Service's approval of the Project in place will result in meaningful environmental harms. *See generally* Mem. 8–35 (detailing harm to Standing Trees' members from the Project); *see Pollinator Stewardship Council*, 806 F.3d at 532 (stating that given the precariousness of certain environmental factors, leaving the agency's action in place would risk more potential environmental harm than vacating it). The Service's decision must be vacated because it is "fundamentally flawed" in interpreting its obligation under NEPA and NFMA by failing to provide crucial information to the public. *North Carolina v. EPA,* 531 F.3d 896, 900 (9th Cir. 2008); *see, e.g.,* Mem. at 27–29 (articulating environmental harms from lack of baseline data for transportation needs or water quality). Moreover, it cannot be said the Service's violations were harmless because its failures were omissions of analysis, and thus "[t]he error here was one of function, not merely of form." *United States v. Coal. for Buzzards Bay*, 644 F.3d 26, 38 (1st Cir. 2011) (finding the agency did not adequately study or analyze environmental impacts of proposed action). The Service violated NFMA and NEPA, and vacatur ensures a just and lawful remedy.

## CONCLUSION

For these reasons, and the reasons set forth in Standing Trees' initial memorandum, the Court should grant Standing Trees' motion for summary judgment and vacate the agency decision to authorize the Project.

Respectfully submitted, this 5th day of December 2025.

STANDING TREES, INC.

By its attorney:

/s/ Christophe Courchesne
Christophe Courchesne
NH Bar No. 20431
Associate Professor and Director
Environmental Advocacy Clinic
Vermont Law and Graduate School
164 Chelsea Street, PO Box 96
South Royalton, VT 05068
(802) 831-1630
(802) 831-1631 (fax)
ccourchesne@vermontlaw.edu

*Environmental Advocacy Clinic fellow Rachel Westrate and student attorneys Joe Anderson, Lakshita Dey, Blythe Faris, Eric Grimes, and Julia Wickham contributed to this brief.*

## CERTIFICATE OF SERVICE

I hereby certify that on December 5, 2025, I served the foregoing document electronically through ECF upon all counsel of record.

/s/ Christophe Courchesne
Christophe Courchesne
*Counsel for Standing Trees, Inc.*

11