# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

STANDING TREES, INC.,

       Plaintiff,

   v.

UNITED STATES FOREST SERVICE;
DEREK IBARGUEN, in his official capacity as
Supervisor of the White Mountain National Forest; and
JAMES INNES, in his official capacity as the District
Ranger for the Saco Ranger District,

     Federal Defendants.

Case No. 1:25-cv-00237-SE-TSM

**FEDERAL DEFENDANTS' MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR
SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

LEGAL BACKGROUND .................................................................................................... 2

    I.      The National Environmental Policy Act ................................................................. 2

    II.     The National Forest Management Act ................................................................... 4

STANDARD OF REVIEW ................................................................................................. 5

FACTUAL BACKGROUND .............................................................................................. 6

ARGUMENT ...................................................................................................................... 8

    I.      The Forest Service Complied with NEPA ............................................................. 8

          A.     The Forest Service's alternatives analysis satisfies NEPA (Count 1) ........ 9

          B.     The Forest Service took a hard look at the environmental effects (Count 2) ................................................................................................... 14

               1.     Forest health ................................................................................. 15

               2.     Northern long-eared bat ................................................................ 17

               3.     Carbon storage and climate change ............................................. 20

               4.     Soils ............................................................................................... 22

               5.     Road construction ......................................................................... 24

               6.     Water quality ................................................................................ 26

               7.     Roadless areas .............................................................................. 28

               8.     Scenery and Recreation ................................................................ 30

               9.     The Forest Service considered cumulative effects ........................ 31

           C.     The Forest Service considered all relevant factors in deciding to prepare an Environmental Assessment (Count 3) ...................................... 34

    II.     The Forest Service Complied with NFMA (Count 4) .......................................... 36

          A.     The Project is consistent with Forest Plan old growth standards ............. 38

i

B.   The Project is consistent with Forest Plan standards for threatened, endangered, and sensitive species, including the northern long-eared bat.................................................................................................... 40

C.   The Project is consistent with Forest Plan guidelines for soil .................. 41

D.   The Project is consistent with Forest Plan transportation guidelines ....... 42

E.   The Project is consistent with Forest Plan scenery guidelines ................ 43

III.   The Court should disregard Plaintiff Amici's submission.................................... 44

IV.   Remedy ............................................................................................................ 45

CONCLUSION........................................................................................................... 45

## **TABLE OF AUTHORITIES**

**Cases**

*Advocs. for Transp. Alts., Inc. v. U.S. Army Corps of Eng'rs*,
    453 F. Supp. 2d 289 (D. Mass. 2006) ................................................................... 27

*Aertsen v. Landrieu*,
    637 F.2d 12 (1st Cir. 1980) ................................................................................... 11

*All. for the Wild Rockies v. Lannom*,
    No. 21-cv-51-M-DLC, 2024 WL 3199780 (D. Mont. June 27, 2024) ................... 16

*Amoco Prod. Co. v. Vill. of Gambell, Alaska*,
    480 U.S. 531 (1987) .............................................................................................. 45

*Assoc. Fisheries of Maine, Inc. v. Daley*,
    127 F.3d 104 (1st Cir. 1997) ................................................................................... 6

*Atieh v. Riordan*,
    727 F.3d 73 (1st Cir. 2013) ..................................................................................... 6

*Camp v. Pitts*,
    411 U.S. 138 (1973) .......................................................................................... 5, 42

*Cent. Maine Power Co. v. FERC*,
    252 F.3d 34 (1st Cir. 2001) ................................................................................... 45

*Center for Biological Diversity v. U.S. Forest Service*,
    No. 23-2882, 2025 WL 586358 (9th Cir. Feb. 24, 2025) ..................................... 38

*Citizens' Comm. To Save Our Canyons v. U.S. Forest Serv.*,
    297 F.3d 1012 (10th Cir. 2002) ............................................................................ 29

*City of Tacoma, Washington v. FERC*,
    460 F.3d 53 (D.C. Cir. 2006) ............................................................................... 19

*Conservation L. Found. v. Ross*,
    374 F. Supp. 3d 77 (D.D.C. 2019) ....................................................................... 31

*Conservation L. Found. v. U.S. Army Corps of Eng'r*,
    457 F. Supp. 3d 33 (D.N.H. 2019) ......................................................................... 9

*Ctr. for Env't Law and Pol'y v. U.S. Bureau of Reclamation*,
    655 F.3d 1000 (9th Cir. 2011) ............................................................................. 12

*Dep't of Transp. v. Pub. Citizen*,
    541 U.S. 752 (2004) .............................................................................. 1, 9, 16, 34

*Dubois v. U.S. Dep't of Agric.*,
    102 F.3d 1273 (1st Cir. 1996) ......................................................................... passim

*Earth Island Inst. v. U.S. Forest Serv.*,
   87 F.4th 1054 (9th Cir. 2023) ............................................................... 12

*Fla. Power & Light Co. v. Lorion*,
   470 U.S. 729 (1985) ............................................................................... 5

*Historic Bridge Found. v. Buttigieg*,
   22 F.4th 275 (1st Cir. 2022) ............................................................ 2, 16

*Housatonic River Initiative v. EPA*,
   75 F.4th 248 (1st Cir. 2023) ................................................................ 43

*Idaho Sporting Cong., Inc. v. Rittenhouse*,
   305 F.3d 957 (9th Cir. 2002) .............................................................. 16

*Ind. Forest All., Inc. v. U.S. Forest Serv.*,
   325 F.3d 851 (7th Cir. 2003) ........................................................ 10, 36

*Jones v. Nat'l Marine Fisheries Serv.*,
   741 F.3d 989 (9th Cir. 2013) .............................................................. 17

*Kern v. U.S. Bureau of Land Mgmt.*,
   284 F.3d 1062 (9th Cir. 2002) ........................................................... 15

*Lands Council v. McNair*,
   537 F.3d 981 (9th Cir. 2008) ................................................................ 5

*Los Padres ForestWatch v. U.S. Forest Serv.*,
   25 F.4th 649 (9th Cir. 2022) ............................................................... 32

*Los Padres ForestWatch v. U.S. Forest Serv.*,
   No. 23-cv-55054, 2024 WL 885130 (9th Cir. 2024) ........................... 32

*Lovgren v. Locke*,
   701 F.3d 5 (1st Cir. 2012) .............................................................. 5, 43

*Lower Alloways Creek Twp. v. Pub. Serv. Elect. & Gas Co.*,
   687 F.2d 732 (3d Cir. 1982) ............................................................... 15

*Marsh v. Or. Nat. Res. Council*,
   490 U.S. 360 (1989) .............................................................................. 27

*Melone v. Coit*,
   100 F.4th 21 (1st Cir. 2024) ........................................................... 5, 11

*Mont. Wilderness Ass'n v. Connell*,
   725 F.3d 988 (9th Cir. 2013) .............................................................. 13

*Montanans for Multiple Use v. Barbouletos*,
   568 F.3d 225 (D.C. Cir. 2009) ............................................................ 37

*Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Management*,
   100 F.4th 1 (1st Cir. 2024) ................................................................. 19

iv

*Native Ecosystems Council v. U.S. Forest Serv.*,
    428 F.3d 1233 (9th Cir. 2005) ........................................ 13

*Native Ecosystems Council v. U.S. Forest Service*,
    418 F.3d 953 (9th Cir. 2005) .......................................... 19

*Native Ecosystems Council v. Weldon*,
    697 F.3d 1043 (9th Cir. 2012) .......................................... 5

*Neighbors of Cuddy Mountain v. Alexander*,
    303 F.3d 1059 (9th Cir. 2002) ........................................ 32

*North Cascades Conservation Council v. U.S. Forest Service*,
    136 F.4th 816 (9th Cir. 2025) ......................................... 13

*Ocean Advocs. v. U.S. Army Corps of Eng'rs*,
    402 F.3d 846 (9th Cir. 2005) .......................................... 35

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
    523 U.S. 726 (1998) .................................................... 4

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.*,
    957 F.3d 1024 (9th Cir. 2020) ................................... passim

*Perkins v. Bergland*,
    608 F.2d 803 (9th Cir. 1979) .......................................... 1

*River Street Donuts, LLC v. Napolitano*,
    558 F.3d 111 (1st Cir. 2009) ........................................... 5

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) ................................................ 2, 10

*Ryan v. U.S. Immigration & Customs Enforcement*,
    974 F.3d 9 (1st Cir. 2020) ............................................ 44

*Safeguarding the Historic Hanscom Area's Irreplaceable Res., Inc. v. FAA*,
    651 F.3d 202 (1st Cir. 2011) ....................................... 3, 31

*Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*,
    123 F.4th 1 (1st Cir. 2024) ............................................ 5

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
    605 U.S. 168 (2025) ...................................... 2, 15, 27, 34

*Sierra Club v. Marsh*,
    872 F.2d 497 (1st Cir. 1989) .......................................... 2

*Sierra Club v. Martin*,
    168 F.3d 1 (11th Cir. 1999) .......................................... 41

*Sierra Club v. U.S. Forest Serv.*,
    46 F.3d 835 (8th Cir. 1995) ........................................... 9

*Sierra Club v. Wagner*,
   555 F.3d 21 (1st Cir. 2009)........................................................................... passim

*Sierra Club v. Wagner*,
   581 F. Supp. 2d 246 (D.N.H. 2008)............................................................. 6, 9, 22

*Sparkle Hill, Inc. v. Interstate Mat Corp.*,
   788 F.3d 25 (1st Cir. 2015)................................................................................ 44

*Standing Trees, Inc. v. U.S. Forest Serv.*,
   No. 1:24-cv-138-JL-TSM, 2025 WL 2411206 (D.N.H. Aug. 20, 2025)........................ passim

*State of N.C. v. Fed. Aviation Admin.*,
   957 F.2d 1125 (4th Cir. 1992)............................................................................ 10

*Town of Norfolk v. U.S. Army Corps of Eng'rs*,
   968 F.2d 1438 (1st Cir. 1992)............................................................................ 27

*Utah Env't Cong. v. Bosworth*,
   443 F.3d 732 (10th Cir. 2006).............................................................................. 5

*Utahns for Better Transp. v. U.S. Dep't of Transp.*,
   305 F.3d 1152 (10th Cir. 2002).............................................................................. 2

*Warth v. Seldin*,
   422 U.S. 490 (1975)........................................................................................ 29

*WildEarth Guardians v. Conner*,
   920 F.3d 1245 (10th Cir. 2019)............................................................................ 12

**Statutes**

5 U.S.C. § 706(2)(A)....................................................................................... 5

7 U.S.C. § 6912(e) ......................................................................................... 16

16 U.S.C. § 1536(c) ....................................................................................... 17

16 U.S.C. § 1604 ............................................................................................ 4

16 U.S.C. § 1604(e)(1)...................................................................................... 1

16 U.S.C. § 1604(f)(5)(A)................................................................................. 37

16 U.S.C. § 1604(g)(1) ..................................................................................... 4

16 U.S.C. § 1604(g)(3) ..................................................................................... 4

16 U.S.C. § 1604(i)....................................................................................... 4, 37

16 U.S.C. § 531) ............................................................................................. 1

42 U.S.C. § 4321 ............................................................................................ 2

42 U.S.C. § 4331 ............................................................................................ 2

42 U.S.C. § 4332(2)(C)(iii) ....................................................................................... 13

42 U.S.C. § 4332(H) ................................................................................................. 10

42 U.S.C. § 4336(b)(1) ............................................................................................... 3

42 U.S.C. § 4336(b)(2) ............................................................................................... 3

42 U.S.C. § 4336e(1) .................................................................................................. 3

42 U.S.C. §§ 4336(b)(2) ........................................................................................... 34

Pub. L. 118-42, 138 Stat. 285 (Mar. 9, 2024) ......................................................... 37

**Rules**

L.R. 40.1(a)(1) ............................................................................................................ 6

L.R. 56.1 ...................................................................................................................... 6

**Regulations**

7 C.F.R. § 1b.5 .......................................................................................................... 32

36 C.F.R. § 212.10 .................................................................................................... 42

36 C.F.R. § 212.5(b)(1) ............................................................................................ 24

36 C.F.R. § 218.11(a) ............................................................................................... 16

36 C.F.R. § 218.8(c) ................................................................................................. 16

36 C.F.R. § 219.15(d) ............................................................................................... 37

36 C.F.R. § 219.17(c) ............................................................................................... 37

36 C.F.R. § 219.7(e) ................................................................................................... 4

36 C.F.R. § 219.7(e)(1)(i) ........................................................................................... 4

36 C.F.R. § 219.7(e)(1)(iii) ......................................................................................... 4

36 C.F.R. § 219.7(e)(1)(iv) .......................................................................................... 4

36 C.F.R. § 219.7(e)(2) ............................................................................................... 4

36 C.F.R. § 220.1 (2008) ............................................................................................ 3

36 C.F.R. § 220.7(b)(2) ........................................................................................ 13, 14

40 C.F.R. § 1500.3 (1978) .......................................................................................... 3

40 C.F.R. § 1501.3 (2020) ........................................................................................ 34

40 C.F.R. § 1501.3(b)(1) (2020) .............................................................................. 35

40 C.F.R. § 1501.5 (2020) ........................................................................................ 10

40 C.F.R. § 1501.5(c)(1) (2020) ............................................................................. 3, 9

40 C.F.R. § 1501.5(e) (2020) ................................................................ 24, 29

40 C.F.R. § 1502.1 (2020) ...................................................................... 11

40 C.F.R. § 1502.14 ................................................................................ 14

40 C.F.R. § 1502.14(d) (2020) ............................................................... 13

40 C.F.R. § 1502.16 (2020) .................................................................... 19

40 C.F.R. § 1502.2(b) (2020) ...................................................... 20, 22, 31

40 C.F.R. § 1503.4 (2020) ...................................................................... 12

40 C.F.R. § 1508.27(a) (2019) ............................................................... 35

50 C.F.R. § 402.13 .................................................................................. 18

**Other Authorities**

66 Fed. Reg. 3244 (Jan. 12, 2001) ......................................................... 28

73 Fed. Reg. 43084 (July 24, 2008) ......................................................... 3

90 Fed. Reg. 10610 (Feb. 25, 2025) ...................................................... 3, 4

90 Fed. Reg. 29632 (July 3, 2025) ............................................................ 4

91 Fed. Reg. 618 (Jan. 8, 2026) ................................................................ 3

## INTRODUCTION

The U.S. Forest Service manages National Forest System land for multiple uses, including timber, wildlife, and recreation. 16 U.S.C. § 1604(e)(1); *id.* § 531. The Forest Service accordingly holds broad discretion to determine how best to balance multiple, often competing uses of these lands. *See Perkins v. Bergland*, 608 F.2d 803, 806 (9th Cir. 1979) (section 531 "breathes discretion at every pore."). The Forest Service balanced competing uses when it authorized the Sandwich Vegetation Management Project (the "Project") on the White Mountain National Forest (the "Forest"). The Project includes silviculture treatments on 638 acres and is designed to increase forest and habitat diversity and resiliency while producing high-quality timber products for local communities.

Plaintiff Standing Trees challenges the Project as violating the National Environmental Policy Act ("NEPA") and the National Forest Management Act ("NFMA"). Standing Trees's claims lack merit. The Forest Service engaged in an extensive public process, including multiple public comment periods, open houses, and interest group meetings, before completing an Environmental Assessment ("EA") of the Project's environmental effects and issuing a Finding of No Significant Impact ("FONSI") in compliance with NEPA. The Project is consistent with all applicable Forest Plan standards in compliance with NFMA.

"[I]nherent" in NEPA is a "rule of reason." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004). Nevertheless, Standing Trees "flyspecks" the Forest Service's analysis at every turn, presenting a laundry list of alleged deficiencies with little explanation of how such shortcomings impaired the Forest Service's analysis or conclusions. The case law in this Circuit is clear: a Plaintiff challenging an agency action under NEPA and NFMA must do more. *Sierra Club v. Wagner*, 555 F.3d 21, 24 (1st Cir. 2009); *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1287 (1st

1

Cir. 1996). That Standing Trees may disagree with the Project—or Forest Service management objectives more generally—does not amount to a violation of law. *Wagner*, 555 F.3d at 30. Standing Trees has not met its burden to show the Forest Service's decision approving the Project was arbitrary, capricious, or a violation of law. The Court should grant summary judgment in favor of Federal Defendants.

## LEGAL BACKGROUND

### I. The National Environmental Policy Act.

NEPA is a "purely procedural" statute that "ensures that the agency and the public are aware of the environmental consequences of proposed projects." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 177 (2025); 42 U.S.C. §§ 4321, 4331. It does not itself "mandate particular results," *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); *Historic Bridge Found. v. Buttigieg*, 22 F.4th 275, 280 (1st Cir. 2022), and it is not meant to be a "substantive roadblock" to agency action. *Seven Cnty.*, 605 U.S. at 173. Rather, the goal of NEPA is informed decisionmaking and public participation. *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1163 (10th Cir. 2002) ("We apply a rule of reason standard (essentially an abuse of discretion standard) in deciding whether claimed deficiencies in a FEIS are merely flyspecks, or are significant enough to defeat the goals of informed decisionmaking and informed public comment."). "When assessing significant environmental effects and feasible alternatives for purposes of NEPA, an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry." *Seven Cnty.*, 605 U.S. at 182-83. A reviewing court must uphold these choices if "they fall within a broad zone of reasonableness." *Id.* at 183; *see also Sierra Club v. Marsh*, 872 F.2d 497, 502 (1st Cir. 1989) ("[O]nce an agency has made a decision subject to NEPA's procedural requirements, the only role

for a court is to [e]nsure that the agency has considered the environmental consequences.").

Federal agencies fulfill their NEPA obligation to study the environmental effects of "major federal actions" in one of three ways. For a major federal action that will have significant environmental effects, the agency prepares a detailed Environmental Impact Statement ("EIS"). 42 U.S.C. § 4336(b)(1). If significance is uncertain, the agency may prepare a brief EA to determine whether an EIS is required. *Id.* § 4336(b)(2). An EA must only "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a finding of no significant impact." 40 C.F.R. § 1501.5(c)(1) (2020). It is "meant to be less detailed than an EIS." *Safeguarding the Historic Hanscom Area's Irreplaceable Res., Inc. v. FAA*, 651 F.3d 202, 217 (1st Cir. 2011). If an EA "finds a significant impact, a full EIS must be prepared; if not, the agency makes a [FONSI], which exhausts its obligation under NEPA." *Wagner*, 555 F.3d at 24. Finally, categorical exclusions are classes of agency actions that normally do not have significant effects and therefore do not require an EA or EIS absent extraordinary circumstances. 42 U.S.C. §§ 4336(b)(2), 4336e(1) .

The Council on Environmental Quality ("CEQ") issued regulations implementing NEPA in 1978, revised in 2020 and 2024. *See* 90 Fed. Reg. 10610, 10612 (Feb. 25, 2025) (providing history of regulations). CEQ's regulations purported to bind federal agencies, 40 C.F.R. § 1500.3 (1978), and directed federal agencies to develop procedures for implementing NEPA and CEQ's regulations, *id.* at § 1507.3. The Forest Service issued its own NEPA regulations in 2008, codifying its NEPA procedures from the Forest Service Manual and Handbook. 73 Fed. Reg. 43084, 43093 (July 24, 2008); 36 C.F.R. § 220.1 (2008). CEQ subsequently rescinded its NEPA regulations without replacement, effective April 11, 2025. *Removal of National Environmental Policy Act Implementing Regulations*, 91 Fed. Reg. 618 (Jan. 8, 2026) (adopting interim final rule published

on February 25, 2025). CEQ concluded that it "may lack authority to issue binding rules on agencies[.]" 90 Fed. Reg. 10610, 10611 (Feb. 25, 2025).[1] Thereafter, the U.S. Department of Agriculture ("USDA") issued an interim final rule rescinding the Forest Service's NEPA regulations and revising USDA's department-level NEPA regulations to provide guidance for implementing NEPA, effective July 3, 2025. 90 Fed. Reg. 29632, 29635 (July 3, 2025).

## II.    The National Forest Management Act.

Under NFMA, the Forest Service manages National Forest System lands at the forest level and the individual project level. *See* 16 U.S.C. § 1604; *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 729-30 (1998). At the forest level, the Forest Service develops a forest plan, which is a programmatic, long-term planning framework for future decisionmaking. 16 U.S.C. § 1604(g)(1), (3) . Forest plans contain various components, including standards, desired conditions, and guidelines, to "guide future project and activity decisionmaking." 36 C.F.R. § 219.7(e). Standards create "mandatory constraint[s] on project and activity decisionmaking." *Id.* § 219.7(e)(1)(iii); *see id.* § 219.7(e)(1)(i), (iv) . But guidelines are more flexible; a guideline is "a constraint on project and activity decisionmaking that allows for departure from its terms, so long as the purpose of the guideline is met." *Id.* § 219.7(e)(1)(iv). Optional goals are "broad statements of intent" without completion dates. *Id.* § 219.7(e)(2). While forest plans establish management goals and broad standards and guidelines, they do not authorize any on-the-ground action. *Ohio Forestry*, 523 U.S. at 729-30. At the project level, site-specific projects must be consistent with the applicable forest plan, or the forest plan must be amended. 16 U.S.C. § 1604(i).

"[T]he Forest Service's interpretation and implementation of its own Forest Plan is entitled

---

[1] All versions of CEQ's NEPA regulations, as published in the Federal Register, are available at https://ceq.doe.gov/laws-regulations/regulations.html.

to substantial deference." *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 957 F.3d 1024, 1035 (9th Cir. 2020) (quoting *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012)); *see also Standing Trees, Inc. v. U.S. Forest Serv.*, No. 1:24-cv-138-JL-TSM, 2025 WL 2411206, at * 16 (D.N.H. Aug. 20, 2025) (adopting the deferential standard employed by Ninth and Tenth Circuits). A court may "conclude that the Forest Service acts arbitrarily and capriciously only when the record plainly demonstrates that the Forest Service made a clear error in judgment in concluding that a project meets the requirements of the NFMA and relevant Forest Plan." *Lands Council v. McNair*, 537 F.3d 981, 994 (9th Cir. 2008), *overruled on other grounds by Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 n.10 (9th Cir. 2009).

## STANDARD OF REVIEW

NEPA and NFMA do not contain a private right of action and are enforced through the judicial review provisions of the APA. *Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*, 123 F.4th 1, 9 (1st Cir. 2024) (citation omitted); *Utah Env't Cong. v. Bosworth*, 443 F.3d 732, 739 (10th Cir. 2006). Under the APA, the Court's review is limited to the administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 742 (1985); *Lovgren v. Locke*, 701 F.3d 5, 20 (1st Cir. 2012). "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). Under the APA, a court may not set aside a decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Melone v. Coit*, 100 F.4th 21, 29 (1st Cir. 2024). Under the arbitrary and capricious standard, the reviewing court is "required to determine whether the agency's decision is supported by a rational basis, and if so, we must affirm." *River Street Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009) (citation omitted). "Because the APA standard affords great deference to agency

decisionmaking and because [agency] action is presumed valid, judicial review, even at the summary judgment stage, is narrow." *Assoc. Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997) (citation omitted). Plaintiffs bear the burden of proving the agency's decision is arbitrary or capricious, and "must do more than simply identify potential shortcomings in the projects themselves or their environmental assessments/decision notices." *Sierra Club v. Wagner*, 581 F. Supp. 2d 246, 268 (D.N.H. 2008).

This case is brought under the APA and has been assigned to this district's Administrative Track, L.R. 40.1(a)(1). Dkt. No. 9. Consequently, "material facts" cannot be admitted or opposed as they might in other civil actions with discovery and possible trial. *See* L.R. 56.1; *Atieh v. Riordan*, 727 F.3d 73, 76 (1st Cir. 2013) ("APA review . . . involves neither discovery nor trial."). The following factual background provides an overview of the challenged project.

## FACTUAL BACKGROUND

The Forest consists of approximately 800,000 acres in New Hampshire and Maine. AR_12333. Management activities on the Forest are guided by the Forest's 2005 Land and Resource Management Plan ("Forest Plan"), which promotes multiple uses including timber harvesting, recreation, and wilderness. AR_12163. The Forest Plan allocates the Forest into different Management Areas according to management goals. AR_12164; AR_12667. In total, the Forest Plan identifies 281,292 acres of the Forest's approximately 800,000 acres as appropriate for timber harvesting. AR_12333.

The Project is located within Management Area 2.1 – General Forest Management Lands. AR_6757. The purpose of Management Area 2.1 is to provide high quality timber products on a sustained yield basis; a mix of wildlife habitats; and recreational opportunities. AR_12228. The Forest Plan describes the desired conditions for Management Area 2.1, including species and age

6

class objectives. AR_12187-88; AR_12228.

The Project is designed to meet the Forest Plan's desired conditions for Management Area 2.1 by producing timber products and improving forest diversity and wildlife habitat. AR_6708; AR_6712. Many of the stands identified for treatment are dominated by American beech, which is threatened by beech bark disease complex and beech leaf disease, and lack shade intolerant species such as birch, maple, aspen, pine, and oak. AR_6708-9. By creating openings in the forest, shade intolerant species will be able to compete, "creating species and size class diversity, which will benefit wildlife and grow desirable species for future forests and harvest." AR_6709. These diverse stands will also be more resilient to insects and disease and sequester carbon over time. *Id.*

The Project includes silviculture treatments on 638 acres. AR_6757. Silviculture treatments will be implemented in two timber sales, one in the Guinea Hill area and one in the Ferncroft and Liberty areas. AR_6763; AR_6638 (Project area map); AR_6640 (map 1 Guinea Hill); AR_6695 (map 2 Ferncroft); AR_6641 (map 3 Liberty). Table 1 of Appendix B in the Decision Notice identifies the stand unit number, acreage, silviculture treatments, and whether there will be prescribed burning on the unit. AR_6771-72. Prescribed burning will occur on 306 acres within the total 638 managed acres. AR_6773. "For each stand, [the Forest Service] identified site-specific objectives to improve habitat conditions and the health and diversity of forest vegetation[.]" AR_6716; *see also* AR_6547-56 (Project Habitat Management Unit Objectives). Clear-cutting with reserves will occur on 65 acres, patch cutting on 44 acres, and overstory removal on approximately 21 acres. AR_6716; AR_6721. These prescriptions are designed to create early successional forest habitat and species diversity. AR_6721-22

The Forest Service engaged an interdisciplinary team that included a forester, wildlife biologist, hydrologist, soil scientist, and recreational specialist, among others, to assess the

environmental effects of the Project on different resources. AR_6708; AR_6758. The Forest Service initiated its NEPA analysis for the Project in January 2020, holding a pre-scoping open house, AR_6709, followed by a 30-day scoping period in June 2022, AR_6710. Thereafter, the Forest Service issued a draft EA, which was available for two separate 30-day comment periods in the summer of 2023. *Id.* The Forest Service hosted five public meetings and five meetings with clubs and organizations, AR_6757, as well as a field trip to the Project area attended by 65 interested parties, AR_6710. The Forest Service considered all public comments and incorporated changes to the NEPA analysis and ultimate Project design. AR_6761-62. In February 2024, the Forest Service issued its Final EA and FONSI, AR_6704, and draft decision notice approving the Project, AR_6696. In accordance with Forest Service regulations, the Forest Service initiated an objection period from February 15, 2024, through April 1, 2024. AR_6762. Following revisions identified in the objection process, the Forest Service approved the Project by Decision Notice on June 28, 2024. AR_6764. The Project was reviewed and authorized in accordance with CEQ's 2020 regulations and the Forest Service's then-applicable regulations. AR_6765.

## ARGUMENT

The Forest Service complied with NEPA by taking a hard look at the environmental effects of the Project as well as the consequences of no action and reasonably concluding that the effects of the Project would not be significant. The Forest Service complied with NFMA by determining that the Project is consistent with applicable Forest Plan standards. Standing Trees has not met its burden to prove the decision was arbitrary, capricious, or a violation of law. The Court should grant summary judgment in favor of Federal Defendants on all counts.

## I.    The Forest Service Complied with NEPA.

The Forest Service engaged in an extensive analysis of the reasonably foreseeable

environmental effects of the Project, inviting public participation in three separate comment periods and an objection period, offering multiple open houses and interest group meetings, and conducting a site visit with interested members of the public. Following this multi-year process, the Forest Service issued an EA and FONSI, in compliance with NEPA requirements, and approved 638 acres of silviculture treatments.

Standing Trees demands a searching inquiry into every conceivable impact, no matter how remote or insignificant. But the purpose of an EA is to "briefly" determine whether an EIS is required. 40 C.F.R. § 1501.5(c)(1) (2020). "An EA cannot be both concise and brief and provide detailed answers for every question." *Sierra Club v. U.S. Forest Serv.*, 46 F.3d 835, 840 (8th Cir. 1995); *Standing Trees*, 2025 WL 2411206, at * 2 ("There is no universal formula for what an EA must contain and consider[.]") (quoting *Conservation L. Found. v. U.S. Army Corps of Eng'r*, 457 F. Supp. 3d 33, 43 (D.N.H. 2019)). "[I]nherent" in NEPA is a "rule of reason[,]" *Pub. Citizen*, 541 U.S. at 767, and, accordingly, courts should not "fly speck" a NEPA analysis and "hold it insufficient based on inconsequential or technical deficiencies." *Dubois*, 102 F.3d at 1287 (citation omitted). The Forest Service complied with NEPA by considering the effects of the Project and the consequences of no action, completing an EA, and issuing a FONSI. Standing Trees has not met its burden to show this was arbitrary or capricious. *Wagner*, 581 F. Supp. 2d at 268.

A.    **The Forest Service's alternatives analysis satisfies NEPA (Count 1)**.

The Forest Service satisfied NEPA by considering the Project's environmental effects as compared to the consequences of no action. This district recently affirmed that the Forest Service satisfies its NEPA obligations when it considers only the proposed action and the consequences of

no-action, consistent with precedent in other circuits.[2] *Standing Trees*, 2025 WL 2411206, at * 6 ("The Ninth Circuit Court of Appeals, for example, has 'repeatedly held that an agency satisfies NEPA when it considers only two alternatives—action and no action." (citing cases)). The purpose and need for the Project includes producing a sustained yield of timber, improving wildlife habitat, and moving the Project area to desired vegetation conditions pursuant to the Forest Plan provisions for Management Area 2.1. AR_6712 ("The lack of age class diversity within the project area puts the landscape at risk to large scale climate change stressors."). To meet this purpose and need, the Forest Service engaged an interdisciplinary team of subject matter experts to design the Project. AR_6708; AR_6758. These experts conducted an in-depth analysis of the Project's effects and the consequences of taking no action. AR_6726-33.

Standing Trees argues that the Forest Service was required to develop and study additional alternatives to the Project because the Project presents "unresolved conflicts." Dkt. No. 11-1 at 24 (citing 42 U.S.C. § 4332(H)). But "unresolved conflicts" does not mean mere disagreement with a project. *See Ind. Forest All., Inc. v. U.S. Forest Serv.*, 325 F.3d 851, 857 (7th Cir. 2003) (noting NEPA does not contain a "heckler's veto" (citing *State of N.C. v. Fed. Aviation Admin.*, 957 F.2d 1125, 1134 (4th Cir. 1992)). NEPA directs agencies to study alternatives "in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42

---

[2] In its supplemental briefing, Standing Trees argues that NEPA requires the Forest Service to develop alternatives to mitigate environmental consequences, citing *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273 (1st Cir. 1996). Dkt No. 14 at 3. But *Dubois* pertained to the requirements of an EIS, not an EA. *Dubois*, 102 F.3d at 1288 ("Our conclusion is buttressed by NEPA's requirement that an agency consider and an EIS discuss 'steps that can be taken to mitigate the adverse environmental consequences' of a proposed project." (citing *Robertson*, 490 U.S. at 351)). The Forest Service was not required to develop alternatives to mitigate environmental consequences in an EA. *See* 40 C.F.R. § 1501.5 (2020) (describing requirements for an EA).

U.S.C. § 4332(H).[3] The only "unresolved conflicts" Standing Trees identifies call for the Forest Service to do nothing. Dkt. No. 11-1 at 24 ("One such conflict, for example, is between harvesting timber for commercial use and the importance of undisturbed forests for maintaining water quality."); *id.* at 25 ("Another example of an unresolved conflict is between logging and the ability of the forest to mitigate climate change."). The Forest Service expressly considered the consequences of doing nothing. AR_6726. NEPA requires nothing more. *Aertsen v. Landrieu*, 637 F.2d 12, 21 (1st Cir. 1980) ("Thus the only unresolved conflict concerning an alternative . . . was a continuation of the status quo. That alternative [the department] plainly considered. The department had no obligation to go further.").

Additionally, and like in this district's discussion in *Standing Trees*, the Project here does not make the area unsuitable for any future use. *See Standing Trees*, 2025 WL 2411206, at * 7 n.40. The Project area is in Management Area 2.1, and the purpose of Management Area 2.1 is to provide high quality timber products, a mix of wildlife habitats, and recreational opportunities. AR_12228. The Project fulfills those purposes and will allow the area to continue to be used for those purposes in the future. AR_6709 (stating the Project increases species and age class diversity, "which will benefit wildlife and grow desirable species for future forests and harvest."). That Plaintiff would prefer the Forest to remain "undisturbed," Dkt. No. 11-1 at 24, runs counter to the purpose of the Forest Service's management obligations and Forest Plan direction.

Standing Trees next argues that the Forest Service failed to consider alternatives proposed by the public, but the record clearly shows otherwise. *See* AR_294 (response to scoping comments); AR_1360-80 (response to comments on draft EA); AR_12125-50 (response to

---

[3] Plaintiff also cites the CEQ regulations applicable to an EIS, not an EA, Dkt. No. 11-1 at 24, 25 (citing 40 C.F.R. § 1502.1 (2020) (stating an *Environmental Impact Statement* shall inform decision makers and the public of reasonable alternatives)), which have no bearing on this case.

objections); AR_6759-60 (discussion of proposed alternatives in Decision Notice). In fact, the Forest Service's consideration and response to these proposals satisfies and goes beyond what NEPA requires. 40 C.F.R. § 1503.4 (2020) (requiring written responses to public comments only for an EIS, not an EA).

Standing Trees highlights its suggestion that the Forest Service extend buffers around watercourses and wetlands. Dkt. No. 11-1 at 26. The Forest Service addressed this suggestion in response to scoping, AR_294 (line 105); public comment, AR_1375; and objections, AR_12129. Likewise, the Forest Service considered Standing Tree's comments regarding roadless areas, wilderness areas, and mature forests. AR_ 294 (lines 103, 130); AR_6736 ("No project activities are planned in designed wilderness areas or roadless conservation rule designated areas."); AR_12139-40, AR_12146  (response to objections).

In essence, Standing Trees proposes to decrease the size of the Project and the amount of logging—a partial implementation of the Project. AR_294 (line 105). NEPA does not require the Forest Service to consider "mid-range" alternatives. *Earth Island Inst. v. U.S. Forest Serv.*, 87 F.4th 1054, 1065 (9th Cir. 2023); *Standing Trees*, 2025 WL 2411206, at * 8 ("[T]he court credits the Forest Service's explanation that Standing Tree's proposed alternative represents a partial implementation of the full proposed action, which it was not required to evaluate fully." (citing cases)); *see also Ctr. for Env't Law and Pol'y v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1012 (9th Cir. 2011) (upholding decision where EA analyzed only proposed alternative and no action despite plaintiffs' preferred alternatives). The EA analyzes the maximum effects of the Project; thus, the environmental effects of Plaintiff's smaller-scale proposals are encompassed within the EA. *See WildEarth Guardians v. Conner*, 920 F.3d 1245, 1258 (10th Cir. 2019) ("The Service used that discretion reasonably, assessing the Project's maximum possible effect [in EA]"); *Mont.*

*Wilderness Ass'n v. Connell*, 725 F.3d 988, 1004-05 (9th Cir. 2013) (holding mid-range alternative unnecessary for informed decisionmaking or participation). The Forest Service can always decide to cut less than what it analyzed in the EA. AR_294 (line 105). But alternatives proposed by Standing Trees and others do not meet the purpose and the need for the Project, and thus, the Forest Service did not need to consider them in more detail. 36 C.F.R. § 220.7(b)(2).

Standing Trees challenges the purpose and need for the Project as too narrow, pointing to the 30 goals and 60 objectives in the Forest Plan as a whole. But the purpose of the Project is to advance the Forest Plan goals and objectives for Management Area 2.1 specifically, and those goals and objectives include timber harvesting at a sustained yield, providing wildlife habitat, and providing opportunities for recreation. AR_6712; AR_6708 ("As described in detail in the Sandwich HMU Rationale document, the goal of the project is to manage stands in MA 2.1 lands to provide a diversity of habitats across the Forest, including various forest types and age classes as directed by the Forest Plan on pages 2-33 and 3-3.").

Lastly, Standing Trees erroneously asserts that NEPA requires analysis of a standalone no-action alternative in an EA. NEPA only requires consideration of a standalone no-action alternative in an EIS, 42 U.S.C. § 4332(2)(C)(iii); 40 C.F.R. § 1502.14(d) (2020), not in an EA. Standing Trees relies on *North Cascades Conservation Council v. U.S. Forest Service*, 136 F.4th 816, 827 (9th Cir. 2025), for the proposition that an EA must consider a no action alternative. Dkt. No. 11-1 at 28. The Ninth Circuit's statement, however, is unsupported by law or regulation. Rather, the Ninth Circuit cites to *Native Ecosystems Council v. U.S. Forest Service*, but the Court in that case was assessing the adequacy of an EIS, not an EA, and in turn cites the CEQ regulations requiring a no action alternative for an EIS. *See Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1245-46 (9th Cir. 2005) (noting an EIS must consider a no action alternative (citing 40

C.F.R. § 1502.14)). Plaintiff also cites *Dubois*, but similarly, *Dubois* pertained to the sufficiency of an EIS, not an EA. 102 F.3d at 1288. No law or regulation requires the Forest Service to consider a standalone no action alternative in an EA.

Further, Forest Service regulations applicable at the time of the decision state that an "EA may document consideration of a no-action alternative through the effects analysis by contrasting the impacts of the proposed action and any alternative(s) with the current condition and expected future condition if the proposed action were not implemented." 36 C.F.R. § 220.7(b)(2). The Forest Service described the consequences of taking no action in a separate section of the EA, AR_6726, and by resource, *see e.g.*, AR_6712 (vegetation and wildlife habitat); AR_6392 (soils); AR_4618-10 (bats). For this analysis, the Forest Service detailed the existing condition of the Sandwich Habitat Management Unit (25,369 acres) in which the Project is located, AR_6548-52, and compared it to the desired future condition as set forth in the Forest Plan, AR_6552-55. Without the Project, "[d]iversity of age and structure in the habitat management unit would remain relatively limited, and a wildlife habitat objective of the forest plan would not be met as wildlife habitat diversity would continue to decline." AR_6726. "Compared to the proposed action, taking no action would result in lower diversity of tree species, ages, and structures in the project area and the Sandwich Habitat Management Unit overall." *Id.* In short, taking no action would not achieve Forest Plan desired conditions and goals for this area and would leave the area vulnerable to declining diversity, insects and disease, and climate change impacts. *See* AR_6708-09. This analysis satisfies NEPA. The Court should find in favor of Federal Defendants on Count 1.

## B.   The Forest Service took a hard look at the environmental effects (Count 2).

Standing Trees argues that the Forest Service failed to take a hard look at the environmental impacts of the Project on forest health, endangered species, climate change, soils, transportation,

water quality, roadless areas, and scenery and recreation. Dkt. No. 11-1 at 21-30. But each argument is a mere passing reference without development or support, demonstrating Standing Trees litany of grievances without meeting their burden of proof. *Wagner*, 555 F.3d at 28 (explaining that a plaintiff must explain just what harms might result and make "at least some effort" to demonstrate that the agency "misinterpreted the evidence, overlooked certain testimony, or unreasonably reached its 'no significant impact determination.'" (quoting *Lower Alloways Creek Twp. v. Pub. Serv. Elect. & Gas Co.*, 687 F.2d 732, 747 (3d Cir. 1982)). Disagreement is not enough. *Id.* at 30. The Record shows that the Forest Service's analyses and Decision fall within the "broad zone of reasonableness" standard articulated by the Supreme Court in *Seven County*, 605 U.S. at 183, and the Court should find in favor of the Federal Defendants on Count 2.[4]

### 1.    Forest health

This Project is designed to *improve* forest health and wildlife habitat through species and age class diversity. AR_6708-09. To consider the Project's effects on forest health, the Forest Service conducted extensive surveys, documenting the characteristics of stands in the Project area and every tree greater than 16 inches in diameter at breast height. AR_6332 (tree data); AR_6303-31 (site details); AR_6279-84 (vegetation summaries); AR_6333-6366 (fieldwork summary). The Forest Service then "identified, removed from the project, and protected fifty acres of habitat meeting [the] forest plan definition of old growth." AR_6757. For each remaining stand, the Forest Service "identified site-specific objectives to improve habitat conditions and the health and diversity of forest vegetation[.]" AR_6716.

Standing Trees makes three arguments why they think this analysis was insufficient. First,

---

[4] Standing Trees cites *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1072 (9th Cir. 2002), which pertains to the regulatory requirements for an EIS, and is inapplicable. Dkt. No. 11-1 at 29.

Standing Trees conflates the requirements of NEPA and NFMA, suggesting an alleged Forest Plan violation is a NEPA violation. Dkt. No. 11-1 at 29-30. But NEPA is a procedural statute that requires consideration of environmental effects, not a specific outcome. *Historic Bridge Found.*, 22 F.4th at 280 (1st Cir. 2022) ("NEPA does not mandate any specific outcome; it only requires agencies to conduct environmental studies."). Accordingly, a NFMA violation is not necessarily a NEPA procedural violation. *See All. for the Wild Rockies v. Lannom*, No. 21-cv-51-M-DLC, 2024 WL 3199780, at *5 (D. Mont. June 27, 2024) ("[T]he Court disagrees with Alliance's uncited proposition that an NFMA violation necessarily assumes a NEPA violation").

Next, Standing Trees appears to challenge the Forest Service's consideration of old forest habitat as not sufficiently distinct from mature forest habitat. Dkt. No. 11-1 at 30. Putting aside that Standing Trees does not explain how this would violate NEPA, the Record explains that the distinction between these two habitat conditions is immaterial because there are no wildlife species in the area that require old (as opposed to just mature) habitat. AR_6531-32; AR_6532 ("There are no species on the WMNF that require old (instead of mature) forest habitat, so combining the two age classes does not substantially alter the analysis of habitat suitability in an HMU.").

Lastly, Standing Trees challenges the lack of buffer between harvest units and old growth. Having failed to raise this issue during the administrative process, however, Standing Trees cannot assert it for the first time in litigation. A plaintiff must exhaust all administrative procedures before bringing an action in court, 7 U.S.C. § 6912(e), which limits the issues to those that were properly presented to the agency during public comment and objection periods, 36 C.F.R. §§ 218.8(c), 218.11(a). A plaintiff challenging an agency action must "structure their participation so that it . . . alerts the agency to [their] position[.]" *Pub. Citizen*, 541 U.S. at 764; *see also Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 965 (9th Cir. 2002) (requiring exhaustion to give the

agency the "first shot at resolving a claimant's difficulties"). Regardless, nothing in the Forest Plan, law, or regulation, requires the buffer Standing Trees now seeks. The Forest Service considered how to appropriately protect nearby old growth stands, AR_6429; AR_6460, and NEPA requires nothing more.

### 2. Northern long-eared bat

The Forest Service considered the environmental effects of the Project on endangered, threatened, and sensitive species, including the northern long-eared bat, in compliance with NEPA. The Forest Service conducted a bat survey in the Forest in 2023, which detected the presence of the northern long-eared bat, AR_4614; AR_6572, and a biological evaluation[5] addressing the Project's effects on northern long-eared bats. AR_4601. The Forest Service noted that the Project area contains a variety of forest types that may provide suitable habitat for the northern long-eared bat. AR_4615. Rather than conducting additional surveys of the Project area specifically, the Forest Service assumed bats were present—a far more conservative approach than looking for bats that may not be found. AR_4611. The Forest Service concluded that timber harvesting could have direct effects by potentially displacing or killing individuals and that these effects would potentially be the greatest during the spring and summer, when a maximum of 253 acres is planned for harvest. AR_4615. However, "[w]ith populations reduced from white-nose syndrome and ample roost trees available . . . , the likelihood of a bat being in a tree when it is cut is low." *Id.*

---

[5] In a footnote, Plaintiffs argue that a Biological Assessment cannot cure deficiencies in an EA. Dkt. No. 11-1 at 31 n.18. To be clear, a Biological Assessment is a term of art under the Endangered Species Act. 16 U.S.C. § 1536(c). Conversely, a biological evaluation is a generic term, and while it may be used in informal consultation with FWS, it is not required. Further, the biological evaluation produced here was incorporated into the EA by reference and available to the public on the Project website. AR_6734 ("A biological evaluation was prepared for the proposed project and is incorporated here by reference."); *Jones v. Nat'l Marine Fisheries Serv.*, 741 F.3d 989, 998 (9th Cir. 2013) (noting material may be incorporated into an EA by reference).

The Forest Service also considered indirect effects from removal of preferred roost trees. *Id.* Seventy-seven percent of the treatment area will receive treatments that would result in "most or all potential roost trees remaining within treated stands." *Id.* Thus, "[t]here would still be ample roost trees available within treated stands" and the greater Project area and surrounding landscape. *Id.* "The cumulative reduction of roosting habitat is also not anticipated to be adverse because the northern long-eared bat is not considered to be limited by the availability of such habitat[.]" AR_4614. While there may be short-term impacts to roosting, the Forest Service concluded that managing for a more heterogeneous forest may yield long-term benefits to the bat, AR_4616, and there may also be indirect benefits by increasing foraging habitat, AR_6741.

Pursuant to Section 7 of the Endangered Species Act, the Forest Service also consulted with U.S. Fish & Wildlife Service ("FWS") on the presence of the northern long-eared bat. FWS determined that the proposed project "may affect, but is not likely to adversely affect the northern long-eared bat." AR_4605; AR_4619; AR_4380-85 (FWS letter); *see* 50 C.F.R. § 402.13 (finding of not likely to adversely affect ends consultation requirement). In short, since up to 1.0 percent the New Hampshire northern long-eared bat population will be disturbed "annually from the combination of timber harvest, prescribed fire, and forest conversion, and wind turbine operation" across the state, the vast majority of the population will be undisturbed. AR_4614. Project timber harvesting is therefore unlikely to lead to species population decline. *Id.*

Standing Trees argues that no acoustic surveys were conducted, citing the April 2023 biological evaluation. Dkt No. 11-1 at 31. But this disregards the November 2023 Forest survey, which documented the presence of northern long-eared bat in the Forest, AR_6591, and that the Project biological evaluation was then updated in June 2024. AR_4601; AR_4604 (noting updates). Standing Trees then challenge the Forest Service's conclusion that there are no known

hibernacula. Dkt. No. 11-1 at 31. Hibernacula for the northern long-eared bat include caves and mines. AR_4644. There are no caves or mines in the Project area. AR_4381. The Forest Service's conclusion was inherently reasonable.

Standing Trees cites *Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Management*, 100 F.4th 1, 12 (1st Cir. 2024), as stating that an agency may not "blindly" rely on a Biological Opinion without its own independent investigation. Dkt No. 11-1 at 31. The First Circuit in *Nantucket Residents Against Turbines* relied on *City of Tacoma, Washington v. FERC*, 460 F.3d 53, 75 (D.C. Cir. 2006), for this proposition, but that is not what the D.C. Circuit said. Quite the opposite: "If the law required the action agency to undertake an independent analysis, then the expertise of the consultant agency would be seriously undermined." *City of Tacoma, Washington*, 460 F.3d at 76. The question is whether the lead agency's reliance was arbitrary or capricious. *Id.* Regardless, the Forest Service did not rely on the programmatic ESA rule 4(d) Biological Opinion cited by Plaintiffs because it was no longer applicable after the species was uplisted to endangered. AR_4605 (noting 4(d) rule removed), AR_4586 (2024 FWS letter concluding ESA consultation). And the Forest Service conducted its own investigation of the Project's effects on the bat in its biological evaluation and EA. AR_4614-16; AR_6741-42.

Lastly, NEPA does not require the Forest Service to adopt mitigation measures to "minimize adverse effect" where the agency finds that those effects will not be significant. *See* 40 C.F.R. § 1502.16 (2020) (requiring discussion of "means to mitigate adverse environmental effects" in an *EIS* not an EA). Plaintiffs cite *Native Ecosystems Council v. U.S. Forest Service*, 418 F.3d 953, 965 (9th Cir. 2005), but like other cases cited by Standing Trees, this case involved an EIS and the regulations applicable to an EIS, which differ from those applicable to an EA. No law or regulation requires the Forest Service to adopt mitigation measures to minimize effects

where those effects will not be significant.

### 3.    Carbon storage and climate change

The Forest Service considered the effects of the Project on carbon storage and climate change in proportion to their significance in its 2024 Forest carbon assessment, AR_6111-6163, Project-specific carbon assessment, AR_6103-10, and the EA, AR_6733 (summarizing carbon assessment); 40 C.F.R. § 1502.2(b) (2020) (requiring "only enough discussion to show why more study is not warranted."). In the Forest carbon assessment, the Forest Service quantifies the carbon stocks across the entire Forest, estimating that the Forest holds 69.14+/-11.60 teragrams of carbon[6] as of 2020, a 20.47 percent increase between 1990 and 2020. AR_6125. Conversion of forested land to non-forested land "is one of the largest contributions to reduction of the forest carbon pool[,]" but the Forest, like all national forests, is protected from that land conversion. AR_6127.

As recognized in the Forest carbon assessment, "[t]imber harvest initially reduces the amount of forest carbon but can transfer carbon to wood products or energy use, while increasing the productivity and health of remaining trees[.]" AR_6121. Wood-based energy, as a substitute for fossil fuel energy, can reduce greenhouse gas emissions, AR_6128; carbon can be stored in wood products after harvest, *id.*; and younger forests sequester carbon at a faster rate, AR_6115. Further, where management decreases density, it can increase resiliency, lowering risks from carbon releases from mortality and wildfire. AR_6119. "In some cases, removing carbon from forests for human use can result in lower net contributions of [greenhouse gases] to the atmosphere than if the forest was not managed, if carbon stored in wood products, substitution effects, and forest regrowth is considered[.]" AR_6133. Historically, timber harvests in the Forest have had a

---

[6] "For context, 69.14 Tg C is equivalent to the emissions from approximately 55 million passenger vehicles in a year." AR_6125.

small impact on stored carbon, "resulting in a loss of about 0.8 percent of non-soil carbon from 1990 to 2011." AR_6142.

In the Project carbon assessment, the Forest Service explains that this loss of less than 1 percent of carbon stocks from historic harvesting corresponded to timber harvesting on approximately 2.3 percent of the forested land in the Forest. AR_6105. The Project, by contrast, would affect a maximum of 0.1 percent[7] of the 800,000 acres of forested land in the Forest. *Id.* Thus, by obvious extension, the Project will impact much less than 1 percent of the carbon stored in the Forest. *Id.*; *see also* AR_6733 (stating the Project is not likely to affect carbon stored in soils). Further, considering 1,881 teragrams of annual carbon emissions nationally, "the Sandwich Vegetation Management Project makes an extremely small contribution to overall emissions." AR_6105. The Forest Service concluded that "[t]he relatively small quantity of carbon released to the atmosphere and the short-term nature of the effect of the proposed action on the forest ecosystem are justified, given the overall change in condition increases the resistance to wildfire, drought, insects and disease, or a combination of disturbance types that can reduce carbon storage and alter ecosystem functions." AR_6107. And carbon emissions from the Project will be "balanced and possibly eliminated" as the area regrows. *Id.* In the absence of this Project, however, the area would otherwise thin from natural disturbances, resulting in dead trees, decay, and carbon emissions. *Id.* This district, and others, have found the Forest Service's level of analysis here— quantifying the carbon in the Forest and conducting a qualitative analysis of the effects of a specific project—to satisfy NEPA. *See Standing Trees*, 2025 WL 2411206, at * 15-16 (citing cases).

Standing Trees argues that the Forest Service's assessments were insufficient because the

---

[7] The Forest Service calculated this percentage based on the size of the total Project area, 1,230 acres, not the acreage of silviculture treatments, 638 acres, and rounded up to the nearest tenth of a percent. AR_6105.

Forest Service did not "quantify" carbon emissions or carbon stock changes from the Project. Dkt. No. 11-1 at 32. NEPA requires no such quantification, nor does the above qualitative assessment in conjunction with a forest-wide quantification run afoul of the rule of reason, particularly given the relatively very small emissions from this Project. That the Forest Service may have engaged in a more in-depth analysis for a different project is immaterial. The Forest Service considered the impacts in proportion to their significance. 40 C.F.R. § 1502.2(b) (2020) (requiring "only enough discussion to show why more study is not warranted.").

Standing Trees suggests that detailed site assessments are "vital for understanding the role of forests in the context of global change." Dkt. No. 11-1 at 33. But Standing Trees quotes the Forest carbon assessment out of context. The Forest carbon assessment states that "evaluating current and future *trends* of forest carbon is vital for understanding the role of forest in the context of global change." AR_6117 (emphasis added). This is what the Forest Service did in its Forest carbon assessment.

Finally, Standing Trees argues that the Forest Service's analysis does not "prove their claim of minimal Project consequences." But the Forest Service does not have to "prove" anything in this case—Standing Trees has the burden of proof, and it must show that the Forest Service's decision was arbitrary, capricious, or a violation of law. *Wagner*, 581 F. Supp. 2d at 268. Standing Trees has failed to meet that burden with respect to carbon storage and climate.

### 4.    Soils

The Forest Service considered the Project's effects on soils in the Soils Report, which was incorporated into the EA by reference and was available to the public. AR_6709. In its analysis, the Forest Service referenced the Forest Plan EIS's comprehensive analysis on the effects of timber

harvesting on soil,[8] AR_6390, as well as studies and surveys in the region that found soil compaction from timber projects lasts for two to three years after project operations, AR_6391.

The Forest Service also engaged in a site-specific analysis of the Project area. In the summer of 2022, the Forest Service conducted field surveys of soil properties across the Project area to inform Project design and minimize impacts. AR_6384 (recommending operation restrictions by sale unit). The Project area includes an extensive, existing skid trail and landing network that supported historic timber activities, and surveys showed minimal erosion or compaction issues, demonstrating that historic harvesting activities did not impact soil productivity, consistent with other monitoring data across the Forest. AR_6390. The harvesting area is gently to moderately sloped, but slopes are short enough to minimize soil erosion potential. AR_6392. Winter operations would result in little compaction due to frozen ground, while summer operations may have greater effects. *Id.* However, the Project's design will "utiliz[e] breaks in terrain, avoid[] steep slopes where feasible, and limit[] operations to dry soil conditions (per best management practices)[, which] would largely minimize or avoid detrimental soil erosion." *Id.* The Forest Service also considered the impacts of silviculture operations on nutrient cycling. AR_6393-95. The Forest Service concluded that the Project could result in a short-term increase in erosion and compaction on approximately 3.2 percent of the Project area, but that no detrimental effects are anticipated due to best management practices and design features. AR_6397-98.

Standing Trees claims the Forest Service has "abandoned" soil best management practices, but its dramatic rhetoric is untethered to the Record. As described below in response to Standing Trees's NFMA claim, the Project area includes slopes of up to 35 percent, AR_6392, but the Forest

---

[8] Standing Trees states that the Project's goals include soil "long-term sustainability," Dkt. No. 11-1 at 34, but this is a Forest Plan goal, not a Project goal. AR_12183.

Service only authorized skid trails on grades of less than 20 percent, "with only short steeper pitches," consistent with Forest Plan standards and best management practices. AR_6746.

Finally, Standing Trees complains that it was not aware of the exact locations of skid trails for the Project during the public comment period. Dkt. No. 11-1 at 34-35. For an EA, NEPA requires an agency to involve the public only "to the extent practicable." 40 C.F.R. § 1501.5(e) (2020). Here, the exact location of skid trails is determined during the contracting process with the successful bidder after a Project is approved, and those specifics depend on the type of equipment available to the purchaser. AR_1374 (Response to draft EA comments) ("Skid trails are laid out by the Forest Service in conjunction with the purchaser."); AR_1359 (line 288) (noting the ultimate "locations of skid roads and landings are subject to agreement with the purchaser of timber sale and different equipment requires different kinds of access, so identification of these features [during the NEPA process] is not realistic or required."). The Forest Service analyzed the reasonably foreseeable effects from skid trails based on where they were most likely to be needed—length and spacing—for planned silviculture activities. AR_6392; AR_6397. Disclosure of the *exact* location of skid trails would not be possible during the NEPA process because they would be subject to change during contracting. AR_1359 (line 288). Accordingly, maps of hypothetical skid trail locations would inform neither decisionmaking nor public participation. The Forest Service analyzed the reasonably foreseeable effects on soil in compliance with NEPA.

## 5. Road construction

Standing Trees fails to articulate a NEPA challenge to Project roads, let alone meet its burden of proof. The Forest Service conducted a Forest-wide Travel Analysis Report in 2015, AR_12515, consistent with its obligation to "identify the minimum road system" needed for administration of the Forest, 36 C.F.R. § 212.5(b)(1). The Travel Analysis Report describes current

conditions, risks, benefits, and opportunities for future action. AR_12519. It does not authorize any changes in the transportation system; rather it provides background information for future actions.[9] *Id.* Accordingly, this analysis, referenced here in the EA, provides the baseline data for the transportation plan in the Project area. AR_6725; AR_12519 (noting the Travel Analysis Report provides a "broad scale analysis" of all Forest Service and unclassified roads in the Forest); AR_12627 (map of roads in Forest and maintenance level).

The Project includes reconstructing approximately four miles of existing system roads (maintenance level 1 and 2) and decommissioning 0.5 miles of existing system roads. AR_6725. "No new roads will be constructed." *Id.*; *see also* AR_6400-04 (describing road maintenance needs). As explained in the EA, reconstruction and maintenance include surface blading, ditch cleaning, installation of drainage structures, and similar work. AR_6726. The Forest Service system roads needed for the Project are shown on the Forest-wide roads map, AR_12627, as well as Project-specific maps. AR_6402-04.

The Forest Service considered the environmental effects of all aspects of the Project, including road reconstruction, by resource. AR_6728 (noting effects are analyzed according to resource). Standing Trees makes a one-sentence allegation that the Forest Service did not consider the effects of road reconstruction on perennial streams, citing its own objection letter and the Forest Service's response to that objection. Dkt. No. 11-1 at 36. As stated in the Forest Service's response to Standing Trees' objection, road reconstruction will stabilize the road system; bridges and

---

[9] Standing Trees argues there was no opportunity for public input on the Travel Analysis Report, Dkt. No. 11-1 at 36, but the Forest Service held three open houses, AR_12642-45 (detailing public outreach), and received and responded to public comments. AR_12633-41. In addition to being in the Record here, the report is available on the Forest's website under the heading "Forest-wide Travel Analysis Report" along with the Forest Plan and other planning documents. *See* https://www.fs.usda.gov/r09/whitemountain/planning.

culverts will reduce runoff; and reconstruction provides for drainage to "areas suitable for trapping sediment" and will "not drain directly into streams, wetlands, or vernal pools." AR_12144 (citing AR_1368). Standing Trees has not demonstrated a NEPA violation related to road construction.

### 6.    Water quality

The Forest Service considered the Project's effects on water quality. AR_6732-33. The Forest Service delineated the four watersheds in the Project area, AR_6173; AR_6732, and assessed the impacts to water quality by analyzing the percent basal area[10] removed in each watershed that contains a perennial stream, AR_6732; *see also* AR_6181 (describing methodology and application Forest-wide). "When basal area removed in a watershed does not exceed 20 percent, there is high confidence of no measurable effect on water quality or water quantity resulting from timber harvest."[11] AR_6732 (citing studies). Only one of the four watersheds will exceed this 20 percent threshold. *Id.* This watershed is 78.9 acres with a basal area reduction of 35.8 percent, and it contains an unnamed perennial stream near harvest unit 23 that flows into Cold River. *Id.* Potential water quality impacts to this stream include a decrease in pH or an increase in aluminum. *Id.* The Forest Service determined that those impacts will not be significant because it is not a fish-bearing stream and is "quite small;" the gentle slope in the area will increase soil infiltration before any runoff reaches the stream; and beaver activity in the watershed slows waterflow, reducing acidification and aluminum risks. *Id.* In addition, a 3.7-acre wetland complex

---

[10] "Basal area is the common term used to describe the average amount of an area (usually an acre) occupied by tree stems." AR_6730.

[11] Standing Trees cites (Siemion et al. 2011) in a footnote. That paper supports the Forest Service's analysis here, concluding that "limiting timber harvests in this region to a harvest intensity of less than 40-68% basal area removal will assist in maintaining the long-term viability of the forest ecosystem, reduce the risk to downstream aquatic ecosystems, and help ensure future timber productivity." AR_9053.

downstream of the Project area will provide further protection from changes in water quality. *Id.*

The Project also includes several design criteria to minimize the effects of the Project on water quality. These include incorporation of appropriate national core and state best management practices; limiting ground-disturbing activities to appropriate ground conditions to limit erosion; and minimizing stream crossings to the extent practical. AR_6747. As stated in the EA, "[m]onitoring has shown best management practices and forest plan standards and guidelines to be effective in protecting water resources[.]" AR_6732 (citing studies).

Standing Trees disagrees with this methodology. But the Forest Service is entitled to deference in its methodology for evaluating environmental effects. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."); *Advocs. for Transp. Alts., Inc. v. U.S. Army Corps of Eng'rs*, 453 F. Supp. 2d 289, 304 (D. Mass. 2006) ("[T]he Court grants substantial deference to the agency's choices regarding methodology and technical analyses." (citing *Town of Norfolk v. U.S. Army Corps of Eng'rs*, 968 F.2d 1438, 1446 (1st Cir. 1992))). And this district in *Standing Trees* held that this same methodology and level of effects analysis fell within the "broad zone of reasonableness." *Standing Trees*, 2025 WL 2411206, at * 11 (quoting *Seven Cnty.*, 605 U.S. at 183). That Standing Trees would have preferred water sampling at the site, Dkt. No. 11-1 at 37, does not render the Forest Service's analysis arbitrary or capricious.

Finally, Amici Wonalancet Preservation Association and Wonalancet Out Door Club ("Plaintiff Amici") assert that the Forest Service's water quality analysis is not supported by scientific evidence. Dkt. No. 16 at 1-2. This misstates the standard under NEPA and is inconsistent with the Record. *See* AR_6732 (listing scientific studies); AR_6180 (discussing Hubbard Brook

research). That Plaintiff Amici are concerned about Forest Serving staffing cuts does not change the effectiveness of these practices or Forest Plan standards.

### 7.   Roadless areas

The Forest Service analyzed the effects of the Project on roadless areas in the EA. AR_6736. By way of background, Forest Plan inventoried roadless areas[12] are areas that the Forest Service determined met certain criteria during the Forest Plan EIS process, resulting in 27 inventoried roadless areas on the Forest, totaling 403,000 acres. AR_6527 (Inventoried Roadless Area Background). The Forest Service evaluated each area for capability and need as wilderness, recommending that Congress designate 34,500 acres as wilderness. *Id.*; *see also Wagner*, 555 F.3d at 23. In response, Congress passed the New England Wilderness Act in 2006, which created the 24,000-acre Wild River Wilderness and added 10,800 acres to the Sandwich Range Wilderness. AR_6528. The remaining inventoried lands were assigned to other management areas, including, as applicable here, Management Area 2.1, which allows for timber harvest. *Id.*; AR_12228.

The Project authorizes silviculture treatments on 248 acres within Forest Plan Chocorua Inventoried Roadless Area, which is 10,367 acres, and on 12 acres within the Forest Plan Sandwich 1 Inventoried Roadless Area, which is 771 acres. AR_6736; *see also* AR_6719-20 (maps). This is less than the 20% threshold for qualifying as a Forest Plan inventoried roadless area under the Forest Service's protocol. AR_6736; *see also* AR_6526-27 (listing the criteria for the inventory, including that "[t]wenty percent or less of the area has been harvested within the past ten years"); *see also Wagner*, 555 F.3d at 23 n. 1 (citing Forest Serv. Handbook 1909.12, § 7.12 (1992)). Nor does the Project include road construction in either inventoried roadless area. AR_6736. The Forest

---

[12] The requirements for a Forest Plan inventoried roadless area are different from the Roadless Area Conservation Rule, 66 Fed. Reg. 3244, 3272 (Jan. 12, 2001). AR_6527-28; AR_12146.

Service thus reasonably concluded that the Project would not impact the potential for either area to meet wilderness criteria in the future since they still meet the criteria that resulted in them being identified as Forest Plan inventoried roadless areas in the first place. *Id.*; *see also* AR_6526 (inventoried roadless areas are not management designations); AR_12146 (noting Forest Service previously evaluated the wilderness characteristics of these areas and declined to propose to Congress that they be designated as wilderness).

Standing Trees argues that the Forest Service violated NEPA because the draft EA did not disclose Project activities in Forest Plan inventoried roadless areas. Dkt. No. 11-1 at 38. Admittedly, the Forest Service made a mistake in the draft EA, which it corrected via August 25, 2023 email to Standing Trees before the close of the public comment period, AR_1482, in the Final EA, AR_6736, in its response to objections, AR_12146-47, and in the Decision Notice, AR_6759. *See also* AR_1359 (line 744) (response to comments noting that section on Forest Plan inventoried roadless areas along with maps showing location were added to the Final EA). This mistake did not hinder Standing Trees's participation in the NEPA process, as evidenced by its comments, AR_2378, and objections, AR_11233. Thus, Standing Trees suffered no injury from this inadvertent omission, and it cannot assert the claims of the general public. *See Warth v. Seldin*, 422 U.S. 490, 499 (1975) (noting that prudential standing requires a plaintiff to assert "his own legal rights"); *Citizens' Comm. To Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1025-26 (10th Cir. 2002) (holding that "generalized claims that the Forest Service failed to provide adequate notice to the public appear to fall below the prudential standing threshold." (citation omitted)); *see also* 40 C.F.R. § 1501.5(e) (2020) (requiring only that agencies "involve the public . . . to the extent practicable in preparing environmental assessments"). Plaintiffs fail to prove a NEPA violation with respect to roadless areas.

### 8.    Scenery and Recreation

The Forest Service analyzed the effects of the Project on scenery. AR_6730-31 (EA); AR_6225 (Scenery Resources Effects Analysis). The Forest Service considered the scenic impacts from a variety of viewpoints, based on the "the highest potential opportunity and volume of public access as well as having the best proximity and quality of viewshed of the project area." AR_1369. The Forest Service selected three viewpoints for initial analysis: Mount Chocorua, Route 113, and Mount Katherine as providing the best perspectives of the Project area. AR_6230. The Forest Service found that the Project harvest units were not visible from Route 113 or Mount Katherine. *Id.*; AR_6731; AR_6229 (noting harvest plan layouts were adjusted to account for scenery considerations). Satellite modelling in the Scenery Resources Effects Analysis shows the harvest units potentially visible from Mount Chocorua. AR_6232. The Forest Service reasonably concluded that the visual impacts would be similar to other vegetation management activities and would blend and fade over time. AR_6730. Following objections, the Forest Service clarified that vegetation should regenerate in three to five years, "when evidence of the treatments that occurred in the area will be minimal." AR_6763. This analysis meets NEPA's hard look. *Standing Trees*, 2025 WL 2411206, at * 13 ("because the agency's methodology for choosing viewpoints was rational and the agency made a 'reasonably complete discussion' of the projects' scenic impacts and mitigation measures, it has met its 'hard look' obligation under NEPA.")

Standing Trees argues that the Forest Service should have considered the visual impacts from Mount Israel and Whiteface. As noted in the Scenery Resources Effects Analysis, however, the surrounding area limited the potentially viable viewpoint options, AR_6230, and other suggested viewpoints, including Mount Israel, "were determined to have minimal view of the treatment units[,]" AR_1369.

Standing Trees next argues that the Forest Service did not assess impacts to hikers along trails. Dkt. No. 11-1 at 38. But the Forest Service did consider the effects on trail users, engaging with the public on recreation, meeting with trail clubs, walking the trails, and discussing buffers. AR_6757. In response, there is a minimum 66-foot buffer between trails and regeneration harvests. AR_6758. The Forest Service also reduced the silviculture treatments by 10 acres to protect resources and increase the distance between treatment units and the Brook Trail. AR_6762; *see also* AR_6745-46 (design criteria to minimize effects on recreation). While Standing Trees objects to silviculture treatments in the Project area, the Forest Service determined that no action would not meet the management objectives of the Forest Plan. AR_6726; AR_6760. As this district recognized in *Standing Trees*, the "Forest Service is entitled to deference for its decision that policy interests outweigh potential environmental impacts." *Standing Trees*, 2025 WL 2411206, at * 13 (citing *Conservation L. Found.*, 374 F. Supp. 3d at 111).

### 9.    The Forest Service considered cumulative effects.

As discussed in the EA and the various specialist reports incorporated into the EA by reference, the Forest Service analyzed the cumulative effects of the Project by resource within the "relative spatial and temporal boundaries" of that resource. AR_6728 (noting, for example, that water quality was considered at the watershed scale); *see* AR_6728-30; AR_6738; AR_6396-98 (soils); SR_6229-31 (scenery); AR_6105-06 (carbon and climate); AR_4614-8 (northern long-eared bat). The Forest Service's cumulative effects analyses were sufficient to support the Forest Service's determination that the Project will not have significant impacts on the environment. 40 C.F.R. § 1502.2(b) (2020); *Safeguarding the Historic Hanscom Area's Irreplaceable Res., Inc.*, 651 F.3d at 218 ("NEPA requires a cumulative analysis only to ensure that a project is assessed as a whole and not sliced into small component parts." (cleaned up)).

Standing Trees argues the Forest Service's cumulative effects analyses were deficient because, it claims, the Forest Service applied the wrong NEPA regulations and failed to consider the cumulative impacts of other projects on the Forest. Both arguments fail. First, the Forest Service applied the 2020 CEQ NEPA regulations, AR_6765, as well as Forest Service NEPA regulations applicable at the time, which call for consideration of cumulative effects. AR_6738 (citing 36 C.F.R. § 220.4(f)). Standing Trees raises the argument of which CEQ regulations apply for the simple reason that the 2020 CEQ regulations did not require an explicit cumulative impacts analysis, Dkt. No. 11-1 at 39, but it fails to articulate why this matters. *See Wagner*, 555 F.3d at 25 (noting that plaintiffs failed to explain how a more rigorous standard would have likely altered the analysis). Since the Forest Service's then-applicable NEPA regulations directed the agency to consider cumulative effects, and the Forest Service *did* consider cumulative effects, Standing Tree's argument regarding the applicable CEQ regulations is irrelevant.[13]

Second, the geographic scope of an agency's cumulative impacts analysis is entitled to deference. *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1071 (9th Cir. 2002) ("[U]nder NEPA we defer to an agency's determination of the scope of its cumulative effects review."). The Forest Service is not seeking deference to a void, as Standing Trees suggests. Dkt No. 14 at 7 (quoting *Los Padres ForestWatch v. U.S. Forest Serv.*, 25 F.4th 649, 657 (9th Cir. 2022)). The Forest Service must merely explain its decision. *See Los Padres ForestWatch v. U.S. Forest Serv.*, No. 23-cv-55054, 2024 WL 885130 at * 1 (9th Cir. 2024) (affirming summary judgment for Forest Service following remand where the Forest Service subsequently explained

---

[13] It is worth noting, however, that the revised USDA NEPA regulations applicable to Forest Service decisions after July 2025 do not require an explicit cumulative effects analysis, *see* 7 C.F.R. § 1b.5 (requirements for an EA), and thus vacating the decision to conduct additional cumulative effects analysis would be futile since no current regulation requires such an analysis.

the basis for defining "generally small diameter timber" as 21-inch dbh for that forest). And the Forest Service explained the geographic scope of its analysis with respect to each resource. *See e.g.*, AR_6396-98 (defining the cumulative effects analysis for soils as the Project area); AR_6229-31 (defining the cumulative effects analysis area for scenery as the viewshed from viewpoints up to 10 miles away); AR_6105-06 (carbon and climate); AR_4611 (defining the cumulative effects analysis area for northern long-eared bat as the Sandwich Habitat Management Unit). These analyses are proportional to the significance of the impacts, consistent with NEPA.[14]

Standing Trees challenges the cumulative impacts on the northern long-eared bat specifically. Dkt. No. 11-1 at 41. As explained in the biological evaluation, the Forest Service delineated the cumulative effects analysis area for threatened and endangered species as the Sandwich Habitat Management Unit, which is 25,369 acres, AR_6548, because the area is "large enough to cover the home ranges of both wildlife and plant species and to account for effects to habitat connectivity and travel and migration corridors[.]" AR_4611. "This large area also provides for the consideration of habitat diversity at the landscape level as well as recent or proposed projects near the action area that may affect habitat diversity." *Id.*  The Forest Service considered past activities, ongoing hazard tree removal, and future stand improvement work, *id.*, and concluded that the cumulative loss of roosting habitat would not have an adverse effect because the bat is not limited by the availability of habitat in the Forest. AR_4618.

Standing Trees argues that the Forest Service failed to consider the cumulative effects of the Project in conjunction with 13 "past, present, and reasonably foreseeable commercial logging

---

[14] Standing Trees argues that NEPA requires "quantification" of impacts, but that would make little sense where impacts are qualitative and cannot be readily quantified, such as habitat quality. Regardless, neither NEPA nor any CEQ or Forest Service NEPA regulations require "quantification."

projects" in the Forest and this somehow takes the Forest Service's analysis outside the "zone of reasonableness" standard clarified by the Supreme Court in *Seven County*. Dkt. No. 14 at 6. But the Forest Service explained that these past, present, and reasonably foreseeable projects do not overlap in time or space with the Project's analyses areas. AR_12133. The Forest Service is entitled to deference in the spatial and temporal scope of its cumulative effects analysis.

The Forest Service took a hard look at the Project's environmental effects, and the Court should grant summary judgment in favor of Federal Defendants on Count 2.

### C.     The Forest Service considered all relevant factors in deciding to prepare an Environmental Assessment (Count 3).

Consistent with applicable regulations, the Forest Service reasonably determined that the Project would not have a significant impact on the environment and an EIS was not required. AR_6739; 42 U.S.C. § 4336(b)(2); 40 C.F.R. § 1501.3 (2020). "An agency's decision not to prepare an EIS can be set aside only upon a showing that it was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Pub. Citizen*, 541 U.S. at 763 (quoting 5 U.S.C. § 706(2)(A)). The Forest Service's decision here fits within the "broad zone of reasonableness," *Seven Cnty.*, 605 U.S. at 183, and Standing Trees has not demonstrated the usefulness of any new potential information. *Pub. Citizen*, 541 U.S. at 767.

In determining whether to prepare an EIS, CEQ's 2020 NEPA regulations required agencies to consider the potentially affected environment and the degree of effects, including short- and long-term effects; beneficial and adverse effects; effects on public health and safety; and effects that would otherwise violate laws protecting the environment. 40 C.F.R. § 1501.3 (2020). This analysis is documented in the FONSI. AR_6739-42.

Standing Trees cites the context and intensity factors from the 1978 and 2024 CEQ regulations, but the Forest Service appropriately applied the factors from the 2020 CEQ

regulations, as evidenced in the draft EA, EA, and Decision Notice. AR_6678-82 (Draft EA) ("As described above, this environmental analysis has been prepared using the current, 2020 [CEQ] regulations for [NEPA] compliance."); AR_6739-42 (Final EA); AR_6762 ("Clarify that the 2020 [NEPA] regulations, not the 1978 regulations, were used in the NEPA process for the Sandwich project."); *see also* AR_12133 (explaining that the Forest Service applied the 2020 regulations).

Regardless, the different versions of these regulations represent a distinction without a difference in this case. *See id.* (describing how the analysis meets both the 1978 and 2020 regulations); *compare* 40 C.F.R. § 1501.3(b)(1) (2020) (requiring the agency to consider "the affected area (national, regional, or local) and its resources . . . . For instance, in the case of a site-specific action, significance would usually depend only upon the effects in the local area") *with* 40 C.F.R. § 1508.27(a) (2019) (stating that "context" "means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality."); *Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005) ("Context refers to the setting in which the proposed action takes place."). The Forest Service's analysis satisfies either standard. AR_6739. The Project area consists of 638 acres of silviculture treatments, implemented over several years, within the 800,000 acres administered by the Forest. *Id.* "Based on the proposed action and associated design elements, the potential environmental effects will be site-specific, localized to the project area, and will not be measurable at a regional or larger scale." *Id.* Plaintiff fails to identify what else the Forest Service should have considered in its context analysis.

Similarly, the Forest Service considered the degree of the effects in its FONSI and throughout the EA. *See* AR_6741 ("The proposed action will not have significant impacts on the White Mountain National Forest's forest resources as effects are well documented and consistent

35

with past forestry practices."); *id.* (noting the potential for short-term impacts, but contrasting with the long-term benefits of improved, diversified habitat for wildlife). This is a standard timber project, and it will not have a significant impact on public health or safety. AR_6742 ("The Forest Service has implemented this type of project and similar project activities many times on National Forest System lands locally and in the region without substantial impacts to public health or safety."); *id.* ("Application of forest plan standards and guidelines, project-specific design elements, and best management practices further ensure that potential impacts to public health and safety are minimized or avoided."); AR_12134. There is no scientific controversy regarding the Project's effects. AR_12134 ("Effects from project activities are 'reasonably foreseeable and have a reasonably close causal relationship to the proposed action[.]'" (citation omitted)); *see also Ind. Forest All. Inc.*, 325 F.3d at 858 ("[C]ontroversy does not refer simply to the existence of public opposition to a use."). And the Project will not have significant cumulative effects on sensitive species. AR_12135. Standing Trees asserts that this analysis was somehow deficient without explaining what the Forest Service failed to consider. Such conclusory allegations amount to flyspecking and are not enough to meet their burden of proof. *Dubois*, 102 F.3d at 1287. The Court should grant summary judgment in favor of Defendants on Count 3.

## II.    The Forest Service Complied with NFMA (Count 4).

The Forest Service complied with NFMA because the Project is consistent with Forest Plan standards. For a NFMA claim, a court may "conclude that the Forest Service acts arbitrarily and capriciously only when the record plainly demonstrates that the Forest Service made a clear error in judgment in concluding that a project meets the requirements of the NFMA and relevant Forest Plan." *Or. Nat. Desert Ass'n*, 957 F.3d at 1035. Standing Trees has not met its burden.

As a preliminary matter, Standing Trees asks this Court to apply the wrong standard. First,

Standing Trees suggests that the Forest Service violated NFMA because the Forest Plan dates to 2005. Dkt. No. 11-1 at 16. But Congress has made it clear that the Forest Service is not in violation of NFMA just because more than 15 years have transpired since a plan revision. Pub. L. 118-42, 138 Stat. 285 (Mar. 9, 2024) ("The Secretary of Agriculture shall not be considered to be in violation of section 6(f)(5)(A) of the Forest and Rangeland Renewable Resources Planning Act of 1974 (16 U.S.C. § 1604(f)(5)(A)) solely because more than 15 years have passed without revision of the plan for a unit of the National Forest System."); *Montanans for Multiple Use v. Barbouletos*, 568 F.3d 225, 228 (D.C. Cir. 2009) (noting Congress has repeatedly extended deadline). Nor does Standing Trees cite any authority that the Forest Service must "conduct[] detailed site-specific analyses" to fulfill its NFMA obligations "[w]ithout a revised Plan[.]" Dkt. No. 11-1 at 17.

Second, Standing Trees argues that the Forest Service violated NFMA by failing to "cogently explain how the project aligns with standards and guidelines in the [Forest] Plan." Dkt. No. 11-1 at 17.[15] But NFMA does not require the Forest Service to "analyze and show" that an action conforms to the applicable Forest Plan provisions. *Or. Nat. Desert Ass'n*, 957 F.3d at 1034 ("Because the Forest Service was not obligated by statute, regulation, or caselaw to memorialize each site-specific grazing authorization's consistency with the forest plan, the absence of such a document is not in itself arbitrary and capricious."). NFMA just requires a project be consistent with the forest plan. 16 U.S.C. § 1604(i).[16] Regardless, the Record demonstrates that the Project

---

[15] Standing Trees cites to vegetation management *goals*, not standards or guidelines. AR_12184.

[16] While the 2012 planning rules require the Forest Service to document consistency with applicable Forest Plan standards in its decision document, 36 C.F.R. § 219.15(d), that regulation only applies to projects with forest plans developed or revised after the regulation became effective. *Id.* § 219.17(c) ("None of the requirements of this part apply to projects or activities on units with plans developed or revised under a prior planning rule until the plan is revised under this part."). Here, the governing Forest Plan dates to 2005, AR_12161, making the 2012 planning rules inapplicable. 36 C.F.R. § 219.17(c). For this reason, the case cited by Standing Trees at Dkt.

is consistent with applicable Forest Plan provisions. AR_6727 (documenting consistency).

### A.    The Project is consistent with Forest Plan old growth standards.

Forest Plan Rare and Unique Features Standard 3 prohibits timber harvest in old growth forest. AR_12202. The Project is consistent with this standard because the Project does not include harvesting old growth stands. AR_6708; AR_6757 ("[N]o treatments in this project will take place within identified old growth stands."). The Forest Service conducted field surveys of proposed units and "identified, removed from the project, and protected fifty acres of habitat meeting [the] forest plan definition of old growth." AR_6757. In addition, the Forest Service inventoried and mapped an additional area outside of the proposed units for future protection as meeting the forest plan definition of old growth. AR_1367; *see also* AR_6302 (map).

Standing Trees argues, without any support, that NFMA requires "continuous monitoring and field assessments," Dkt. No. 11-1 at 18, but "continuous monitoring" would make little sense in the context of whether a stand qualifies as old growth. Standing Trees then appears to argue that the Sandwich Botany Field Work Summary, which details the stand surveys for this Project, AR_6333, demonstrates that the Project involves cutting old growth, stating that the surveys list 16 plots[17] scoring a 5 to 8 on the Late Succession Index ("LSI"). Dkt. No. 11-1 at 18. As shown in the LSI Table, however, an LSI score of 9 is the "[t]hreshold above which a stand is old-growth or is statistically similar to old-growth." AR_6365 (citing AR_6245 (table)); AR_6246 ("Stands above '8' suggest that the stand may be an old-growth stand."). The Forest Service is entitled to deference in the interpretation and implementation of Forest Service standards, including what

---

No. 11-1 at 22 and 23, *Center for Biological Diversity v. U.S. Forest Service*, No. 23-2882, 2025 WL 586358, at *3 (9th Cir. Feb. 24, 2025), which considered a 2015 forest plan adopted under the 2012 planning rules, is also inapplicable.

[17] The Report assesses "plots" not "stands." AR_6355.

qualifies as old growth under the Forest Plan. *Or. Nat. Desert Ass'n*, 957 F.3d at 1035. More fundamentally though, those 16 plots are largely part of the reserve area and will not be cut. AR_6355. ("The proposed reserve area includes the western portion of the originally larger stand 127-17. The remainder of 127-17 depicted on the map below became part of payment unit 07. The reserve area reflects only the portion of old growth adjacent to the proposed harvest units (payment unit 07)."); AR_6357 (map). There are no stands with an LSI of 9 or higher slated for harvest. AR_6357 (map); AR_6301 (map).

In their supplemental brief, Standing Trees includes a figure from Manomet Center for Conservation Sciences LSI, arguing that it represents a Forest Service classification that prohibits harvesting trees with LSI scores of 7 or 8. Dkt. No. 14 at 7. Not only is this figure not a Forest Plan standard,[18] but it also does not contain the language Standing Trees asserts: "Stands *above* '8' suggest that the stand *may* be an old-growth stand. If the stand scores '5' to '8', we recommend applying a harvest prescription that retains as much LS value as possible." AR_6246 (emphasis added). Late successional forest or mature trees is not synonymous with old growth.[19] *Id.*

Similarly, Standing Trees states that "many" trees are around 200 years old, Dkt. No. 11-1 at 18, but the Record demonstrates that these trees are outside the sale units for the Project and will not be cut. AR_6359 (map). As explained in the Decision, the Forest Service identified 50 acres of old growth, excluded it from Project sale areas, and further inventoried additional, adjacent old growth in the Claybank Brook area. AR_6757; *see also* AR_6355; AR_6359 (maps). This is

---

[18] "The LSI scores are just a tool to help determine extent of late successional and potential old growth conditions." AR_6351.

[19] Notably, Plaintiff Amici agree the Project does not include cutting old growth. Dkt. No. 16 at 9 ("Of course, there are virtually no 'old growth stands' of trees anywhere in New England, since the forest was almost completely logged in the past (the Wonalancet wilderness area known as 'the Bowl' is one of the few such remnants, a local treasure).").

consistent with the Forest Plan and NFMA.

**B.    The Project is consistent with Forest Plan standards for threatened, endangered, and sensitive species, including the northern long-eared bat.**

The Record demonstrates Project consistency with applicable Forest Plan standards for the northern long-eared bat. The Forest Plan Rare and Unique Features Standard 1 states that

> All project sites must be investigated for the presence of [threatened, endangered, and sensitive] species and/or habitat prior to beginning any authorized ground-disturbing activity at the site. [Threatened, endangered, and sensitive] plant surveys must be completed for all new ground-disturbing projects, unless biologists/botanists determine [threatened, endangered, and sensitive] species occurrence is unlikely (e.g., no habitat exists).

AR_12202. Standing Trees misrepresents the plain language of this standard. Dkt. No. 11-1 at 19 n.11. In short, the Forest Service must "investigate" project sites for the presence of threatened, endangered, and sensitive species "and/*or* their habitat." AR_12202 (emphasis added). The standard requires surveys of threatened, endangered, and sensitive *plant* species—not animals—unless occurrence is unlikely. *Id.* The Forest Service conducted the requisite investigation and determined that the habitat for northern long-eared bat is present, consistent with the requirements of this standard. AR_4615. *See also supra* Section I.B.2.

Standing Trees misrepresents the plain language of this standard, erroneously claiming that the Forest Plan requires bat population surveys of the Project area, contrary to the standard's plain language. Dkt. No. 11-1 at 19. This district found in favor of the Forest Service on this same issue in the recent *Standing Trees* case. 2025 WL 2411206, at *18. There, the Court correctly noted that the Forest Plan does not require bat population surveys, and "the Forest Service complied with the Forest Plan because it investigated the effects of [the project] on the bat, through project-specific biological evaluations and through consultation with the U.S. Fish and Wildlife Service." *Id.* ("The Forest Service correctly points out that the Forest Plan requires surveys only for threatened,

endangered, or sensitive *plant* species, and that for endangered animal species, the Service is only required to 'investigate' the project sites.").

Plaintiffs cite *Sierra Club v. Martin*, 168 F.3d 1 (11th Cir. 1999), for the proposition that NFMA requires population surveys. Not so. In *Sierra Club*, the Eleventh Circuit found that seven timber sales on Georgia's Chattahoochee National Forest violated NFMA because "the Forest Service did not obtain, and therefore did not consider, population inventory and population trend data . . . *as required by the Forest Plan* and the Forest Service's own regulations." 168 F.3d at 3 (emphasis added). The Forest Plan here has no requirement to conduct a population inventory for the bat or any other animal. AR_12202. The Record thus does not "plainly demonstrate[]" that the Forest Service made a "clear error in judgment" in concluding that the Project meets Forest Plan standards. *Or. Nat. Desert Ass'n*, 957 F.3d at 1035.

### C.    The Project is consistent with Forest Plan guidelines for soil.

The Forest Service reasonably concluded that the Project is consistent with non-binding Forest Plan guidelines for soil. Forest Plan Vegetation Management Guideline 5 states "[w]here exposure of mineral soil is expected, skid roads should generally be located on grades of less than 20 percent, with only short steeper pitches." AR_12219. This is not, as Standing Trees suggests, a prohibition on skid trails greater than 20 percent. Further, the Forest Plan "permits operational flexibility [with respect to guidelines] to respond to variations in conditions." AR_12192. The Soils Report documents this guideline, and notes that there are slopes *in the project area* up to 35 percent, but does not state, as Standing Trees argues, that the Project *authorizes* skid trails on slopes of 35 percent. AR_6392. Nor does the Soils Report itself authorize anything. In fact, the Project design criteria is clear that skid trails are limited to grades of less than 20 percent, "with only short steeper pitches," consistent with Guideline 5. AR_6746 (Project Design Criteria);

AR_6758-59 (incorporating project design criteria).

**D.    The Project is consistent with Forest Plan transportation guidelines.**

Forest Plan Transportation Guideline 1 states that "new through roads should not be constructed." AR_12217.[20] The Project is consistent with this guideline because the Project plainly does not include new road construction. AR_6725 ("No new roads will be constructed."); AR_6752-53 (table of roads); AR_6400-04 (description and map of roads). Rather, consistent with Forest Service regulations, the Project includes reconstruction of existing, classified roads. AR_6725; AR_6726 ("Reconstruction and maintenance activities are used to restore or regain the management objective of the road and improve or realign the roadway."); AR_12675 (defining "road reconstruction" as "[a]ctivity that results in the improvement or realignment of an existing classified road as defined."); 36 C.F.R. § 212.10 ("The Chief may acquire, construct, reconstruct, improve, and maintain National Forest System roads within and near the National Forests and other lands administered by the Forest Service in locations and according to specifications which will permit maximum economy in harvesting timber from such lands[.]"). The only roads designated for reconstruction are classified as existing roads in the transportation network. AR_6752-53 (table of roads). That small segments of these existing classified roads may have fallen into disrepair is immaterial under the Forest Plan.

In support of its argument that these roads have been "reclaimed by the forest," Standing Trees attaches a photograph from outside the Administrative Record. The Court's review is limited

---

[20] Standing Trees argues that the Project authorizes more road construction than "allowed" under the Forest Plan EIS, but the Forest Plan EIS is an environmental analysis document, not a NFMA planning document, and an EIS does not "allow" anything, nor can it serve as a basis for a NFMA violation. At best, Standing Trees may be referring to the "estimated practices" for mileage of road construction and reconstruction for 2005 through 2015, AR_12335, but this is neither a standard nor a guideline nor otherwise an upper limit on road construction.

to the administrative record that existed at the time the agency made its decision, *Pitts*, 411 U.S. at 142 ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); *Lovgren*, 701 F.3d at 20 ("Our review is limited to the administrative record…."), and Standing Trees has neither moved for consideration of extra-record evidence nor established that their attached photograph meets one of the very narrow exceptions to record review. *Housatonic River Initiative v. EPA*, 75 F.4th 248, 278-79 (1st Cir. 2023) (excluding extra-record evidence). Furthermore, Standing Trees fails to identify when, where, or by whom this photograph was taken. Accordingly, the Court should disregard this impermissible extra-record evidence.

### E.    The Project is consistent with Forest Plan scenery guidelines.

In Management Area 2.1, Forest Plan Scenery Management Guideline 1 states that from high elevation viewpoints, no more than nine percent of the viewshed should be regenerated within a 30-year period, and no more than four percent in a given project. AR_12231. Guideline 3 states that from areas of "high" scenic integrity objective, the maximum observed size of opening should be limited to four to five acres and "should appear as natural occurrences and be well-distributed in the viewed landscape." *Id.* As stated in the Decision, the Forest Service analyzed the Project's effects on scenery and concluded the Project is consistent with these guidelines. AR_6760. The Forest Service identified the eight harvest units with potential visibility from Mount Chocorua, and none will exceed the 5-acre guidance. AR_6731 (map and table with visible acreage by unit). Nor does the Project exceed the four percent project cap or nine percent cap over 30 years. AR_6730. As evidenced by the modeling in the Scenery Resources Effects analysis, the units have minimal impact on the viewshed from Mount Chocorua. AR_6232 (satellite image showing potentially visible units).

Standing Trees misrepresents these guidelines as mandatory, stating that it "require[s]" logged areas to appear natural. In fact, the guideline states only that observed openings "should" appear as natural occurrences, AR_12146, and again, guidelines are non-binding and allow for operational flexibility. AR_12192; *Standing Trees*, 2025 WL 2411206, at *17. As stated in the EA, any impacts "will fade and blend over time[,]" AR_6730, with vegetation regenerating within three to five years, "when evidence of the treatments that occurred in the area will be minimal." AR_6763; *see also* AR_6228 (describing change in visibility over time).

Standing Trees has not met its burden to show the Forest Service made a clear error in judgment in determining that the Project is consistent with applicable Forest Plan standards. Accordingly, the Court should grant summary judgment to Federal Defendants on Count 4.

## III.  The Court should disregard Plaintiff Amici's submission.

The Court should disregard the submission of Plaintiff Amici in its entirety. First, Plaintiff Amici exceeded the 10-page limit for amicus briefs set by the Court's September 26, 2025 Order, Dkt. No. 9 at 2, and those page limits were unchanged by the revised schedule, Dkt. No. 13. *See* Dkt. No. 12 at 2 ("The parties agree that all other page limits and deadlines set in the Court's September 26 Scheduling Order (Dkt. No. 9) remain unchanged."). Second, Plaintiff Amici impermissibly introduce new arguments waived by Standing Trees in its opening brief. *Ryan v. U.S. Immigration and Customs Enforcement*, 974 F.3d 9, 33 n. 10 (1st Cir. 2020) ("The customary praxis in this circuit is to eschew arguments raised only by amici and not by the parties." (citations omitted)). Specifically, Plaintiff Amici assert that the Forest Service violated NEPA by not adequately assessing the impacts of the Project on soil carbon storage and failed to include a recreation management plan. Dkt. No. 16 at 7, 9-11. Standing Trees waived these arguments by not raising them in its Summary Judgment brief. *Sparkle Hill, Inc. v. Interstate Mat Corp.*, 788

F.3d 25, 29 (1st Cir. 2015). To allow Plaintiff Amici to assert new arguments would allow Standing Trees to circumvent the page limits in this case and elevate Plaintiff Amici to the status of an intervenor without satisfying the requirements of Federal Rule of Civil Procedure 24 or Article III standing. Accordingly, the Court should disregard Plaintiff Amici's brief in its entirety.

Regardless, the record is clear that the Forest Service considered the effects of the Project on soil carbon storage. "About 39 percent or more of the ecosystem carbon is in the soils, a very stable and long-lived carbon pool[.]" AR_6105 (citing studies). And "analyses in the eastern region suggest that total soil carbon stocks are not significantly affected by harvest." AR_6133. Likewise, the Forest Service considered the effects of the Project on recreation, AR_6729; AR_6740; AR_6758, and explained that future recreation projects will be analyzed separately, AR_6758.

## IV.    Remedy

The Forest Service satisfied its statutory obligations under NEPA and NFMA. If the Court concludes otherwise, it should permit the parties to brief remedy. Courts have wide discretion to fashion an appropriate remedy. *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 541-42 (1987). Whether to vacate an agency decision "rests in the sound discretion of the reviewing court; and it depends *inter alia* on the severity of the errors, the likelihood that they can be mended without altering the order, and on the balance of equities and public interest considerations." *Cent. Maine Power Co. v. FERC*, 252 F.3d 34, 48 (1st Cir. 2001) (citation omitted). Until a specific violation is established, however, it is unclear what, if any, would be an appropriate remedy, particularly given the recent changes in the NEPA regulatory landscape.

## CONCLUSION

The Court should grant summary judgment in favor of Federal Defendants on all Counts.

Respectfully submitted this 15th day of January.

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

*/s/ Reade E. Wilson*
READE E. WILSON
Trial Attorney
Natural Resources Section
150 M Street NE
Washington, DC 20002
(202) 598-3546
reade.wilson@usdoj.gov

*Counsel for Federal Defendants*