UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| **STANDING TREES, INC.**<br><br>       *Plaintiff*,<br>v.<br><br>**UNITED STATES FOREST SERVICE; DEREK IBARGUEN**, in his official capacity as Supervisor of the White Mountain National Forest; and **JAMES INNES**, in his official capacity as the District Ranger for the Saco Ranger District,<br><br>       *Defendants*. | CASE NO.   1:25-cv-00237-SE-TSM |

MEMORANDUM OF LAW OF
WONALANCET PRESERVATION ASSOCIATION AND
WONALANCET OUT DOOR CLUB AS *AMICI CURIAE,* IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

**I.   Statement of Interest**

The **Wonalancet Preservation Association (WPA)** is a voluntary, not-for-profit corporation, chartered by the State of New Hampshire under the provisions of RSA Chapter 292, as recorded on July 27, 1973 and granted tax exempt status on January 13, 1977 under 501(c)(3) of the Internal Revenue Code.  Its membership consists of residents and landowners in the area known as Wonalancet, New Hampshire,  a valley that straddles the towns of Sandwich, Tamworth, Albany and Waterville and abuts the Sandwich Range of the White Mountain National Forest (WMNF).

The WPA was founded by individuals who deeply loved their setting next to the forest and wanted to control commercial development in the valley.  The founding charter states:

1

> The objects for which the corporation is established are to prevent pollution and commercial and other activities detrimental to the natural beauty of the Wonalancet Basin situate in the towns of Tamworth, Sandwich, Waterville and Albany, New Hampshire; to promote the common good and general welfare of the Wonalancet Basin; to provide facilities and services within the Wonalancet Basin which, due to its remote location, are not provided by the towns, such as civic betterments, recreational facilities for the accommodation of persons within the area and the general public, policing the area and the properties within it, disposing of waste materials and holding land and interests in land within the Basin so as to preserve its natural beauty.

In support of those purposes, the WPA adopted and its members signed back-to-back 30-year covenants starting in 1973 and running until December 31, 2031. The covenants specify:

> The goal of the Association [WPA] and these covenants is to maintain Wonalancet as a physically beautiful, rural location, so that both the residents and the public may continue to benefit from and enjoy the unspoiled character of the area. To do so requires, above all, special commitment to ensure that human activities and habitation do not diminish the assets of the area.

The covenants allow for timber harvesting, *provided* it is managed for sustained yield and conforms to "good forest management practice."

The Wonalancet Out Door Club (WODC) was founded in 1898 and incorporated in 1976; it also enjoys tax exempt status. Almost all members of the WPA also belong to the WODC, which, like the WPA, was chartered to protect the natural beauty of the area and conserve the forest lands. The WODC works closely with the Forest Service (USFS) to maintain paths and hiking trails in the forest, not only for use by the club's membership, but for the public at large. As the charter states:

> The objects for which the corporation is established are for provision and care of paths, trails and other facilities **for persons visiting** the White Mountain National Forest and other mountain and forest lands; regarding these lands, to promote their conservation and the enforcement of the laws regarding their conservation and use…. (Emphasis added.)

2

In dedicating ourselves to preserving the natural beauty of the Wonalancet area, members of both groups (Amici) carry on a tradition begun in the 1800's by the area's earliest settlers and visitors, including notables like Henry David Thoreau.  The area was originally settled in the early 19${}^{th}$ century, with the first home built in 1803.  That home, listed on the National Historic Register, today is owned and inhabited by Amici members.  Over the early years, several property owners opened inns.  To entertain their guests, they created a network of hiking trails in the Sandwich Range.   Katherine Sleeper Walden, an inn owner and a founder of the WODC, created many trails in the area, several of which are named for her.  Before it was acquired by the USFS, the area experienced extensive logging and significant fires.  After lobbying by Katherine Sleeper Walden and others, Congress passed the Weeks Act in 1911, allowing the federal government to purchase and manage public forests.

In 1952 local landowners formed "The Wonalancet Associates, Inc." and donated forest land abutting the WMNF to the New England Forestry Foundation (NEFF).   They specified that NEFF must respect the aesthetic value of the forest and its hiking trails:

> "This conveyance is made on the understanding [that] … so far as possible in any cutting, aesthetic value shall be realized, especially along the trails."

Today the Amici continue to honor the legacy of visionaries like Henry David Thoreau, Katherine Sleeper Walden and the Wonalancet Associates.  Many members whose property abuts the WMNF have placed their land in conservation, teaming up with the Green Mountain Conservation Group and the Lakes Region Conservation Trust, among others, to protect against development and despoilation.  Some members donated land outright to the WMNF; many "adopt" trails in the area, volunteering to maintain the trails in safe condition.  Others

contribute money to build and maintain bridges and parking lots on private land to ensure the public has safe access to the WMNF and its network of volunteer-maintained trails.  Many are also members of the Tamworth Outing Club, which provides miles of groomed trails through the WMNF for cross-country skiing in the winter.

Literally thousands of hikers – from all over the east coast of the United States and Quebec -- walk past our homes in every season to hike the local trails, climb the 4000-foot peaks in the Sandwich Range, ski local trails, and simply enjoy the beauty of the area.  They use the parking lot we provide, (the Ferncroft trailhead).   Indeed, one weekend day during COVID we had 129 cars in the parking lot and along our local road, brought by hikers who came to escape to the outdoors and enjoy the trails.  Many of us have assisted lost and injured hikers who come out of the forest and appear at our doorsteps.

Put simply, we, the local landowners and outdoor enthusiasts, do not care about preservation of the Sandwich Range simply for our own enjoyment, but actively work to ensure that this treasured spot is available for the public at large to enjoy and use safely.

Our past experience with logging in the forests that surround our property has not been positive.  In the 1970's the USFS did a massive clearcut in the Wonalancet Range, creating an eyesore that is only now beginning to fade.  Not only were the cuts unsightly; they did not achieve the USFS's stated goals of diversification of tree species and improvement of timber productivity.  Those areas have regrown as dense stands of tiny-diameter beech and birch, which are useless as timber and impenetrable for recreation.  Volunteer trail crews have spent decades repairing damage in those areas, where logging roads crossed hiking trails, creating erosion.  Likewise, in 2019 when NEFF logged its holdings, it ignored the donors' mandate to

respect aesthetics, "especially along the trails." Instead, the cut came right up to the trails, degrading them with erosion.

With this history in mind, the WPA as an organization and Amici members as individuals submitted extensive comments on the proposed Sandwich Vegetation Management Plan (the Plan). Our concerns were echoed in most of the 649 comments submitted by members of the public during the public comment period. Our concerns remain unaddressed in the Plan.

Because of our intense, active involvement in preserving the Sandwich Range to which we, as adjacent landowners and as WODC members, make possible access to the trails we help maintain, and because of our negative experiences with past logging operations that damaged the trails and marred the beauty of the area, we now submit this amicus brief in support of Standing Trees' Motion for Summary Judgment and in opposition to the Plan. We concur with Standing Trees that the USFS failed to follow federal law by not taking a "hard look" at the Plan's environmental impact or developing, describing or studying appropriate alternatives. Below we focus on three areas deficient in the Plan.

**II.       No plan for recreation management.**

As the USFS has acknowledged, the proposed action would take place in an area used heavily for recreation. Its statement on the purpose and need for the proposed action includes providing "a variety of recreation opportunities" and managing "high-use or highly developed recreation areas to acceptable social and ecological standards, while retaining some low-use and less developed areas." (AR6712)

Yet the USFS failed to properly assess and address potential impacts of the Plan on recreational use in the area, especially its various hiking and skiing trails, which are heavily used

in all seasons. Instead, it actually removed recreation management plans from the project. (AR6714)  The USFS's excuse was: "in the planning process the number of trails we were going to include exceeded the project area boundaries and for simplicity we decided to analyze the trails under a separate analysis." (Id.)  But the USFS still has not conducted that separate analysis of the impact on recreation or provided *any plan* for protecting this vital economic and cultural activity, even many months after completion of the Plan.

The Plan asserts, without evidence, that "the proposed action will not have significant impacts on the quality of life or recreation experiences of forest users in either the short or long term."  (AR6740)  This conclusion is both inadequate and absurd, as the proposed action will take place on or along several hiking trails, may necessitate trail closures, will affect parking and access to the trails, and damage scenery and quietude along trails.  And, while the USFS claims to have considered recreational resource concerns when selecting operating seasons, it states that cutting will occur in "summer, summer-fall, late summer-fall, fall, and winter" (AR6717) -- all high use periods for hiking and skiing.  The USFS acknowledges other significant impacts: new skid trails that will cross hiking trails; snowmobile trails that will "either be temporarily relocated or concurrent use of snow machines and vehicle traffic will be allowed on the plowed road surface if width allows for that safely;" and public use of the parking lot at the Ferncroft Trailhead that will be limited, "based on safety concerns during timber hauling." (AR6745)

The USFS claims the project design "will minimize adverse impacts such as temporary disruption of recreation due to decreased parking, trail relocations and noise during implementation: since "the impacts are temporary and will be short-term in nature."  (AR6740)

6

But how can the USFS make such a guarantee when it chose not to create *any* recreation plan, or include *any* steps in the Plan to minimize these impacts?

Those of us with homes in Ferncroft are acutely aware of the intense use of this part of the forest by thousands of hikers who use the Ferncroft parking lot and other local trailheads. Detailed planning is needed to protect the trails themselves as well the hikers who will have to pass logging trucks and other heavy equipment. The USFS's failure to plan for the impacts of logging on recreational use of this precious resource disregards the public's right to safely enjoy the forest during the multi-year duration of this project.

### III.     No protection of mature forests.

#### A.   Mature growth trees.

The draft management plan asserted that "no treatments in this project will take place within identified old growth stands." Of course, there are virtually no "old growth stands" of trees anywhere in New England, since the forest was almost completely logged in the past (the Wonalancet wilderness area known as "the Bowl" is one of the few such remnants, a local treasure). Nevertheless, the area scheduled for cutting contains acres of mature trees which, if given the opportunity, will become old growth. The existence of mature forest in the WMNF -- near and accessible to heavily populated areas for recreation -- is a precious resource that should be protected and preserved.

#### B.   Carbon sequestration.

The Plan asserts: "the effects of the project activities on carbon, greenhouse gases, and climate **overall will be negligible**" because the proposed action will "largely be limited to carbon stocks found in above ground, live vegetation … about 37% of the total ecosystem

7

carbon stocks of the White Mountain National Forest;" "Ecosystem carbon stored in soils" (38% in the White Mountain National Forest); "and other pools are **not likely to be affected** by the proposed action." (AR6733, emphasis added.)  The Plan also claims no "significant impacts to soil resources," only "soil displacement and soil compaction."  (AR6740)  However, as member scientists[1] pointed out in comments to the USFS that were ignored, the unsupported assertion that "carbon stored in soils...and other pools are not likely to be affected by the proposed action" (AR6733) is certainly inaccurate.

Most of the carbon in soils in the White Mountains is associated with plant roots, associated microbial flora, and complex organic matter;  much of this carbon is tied up in mycorrhizal fungi, which live in symbiosis with plant roots, exchanging nitrogen and other soil nutrients for sugars produced by the plants. In our forests, most trees support and depend on ectomycorrhizal fungi that specialize in scavenging nitrogen from organic soil sources. In a healthy ecosystem, more carbon is stored below than above ground.

Ectomycorrhizal trees (oaks, beeches, birches, pines, firs, spruce and hemlock) together comprise most of our forest cover. Other local trees (maple and ash) are arbuscular mycorrhizal, associating with different symbiotic fungi. Scientists know for certain that mycorrhizal fungi play a major role in the carbon cycle, both locally and at a global scale.  The relationships among these fungi, their plant hosts and the insects that feed on their plant hosts are complex. In each case, the mycorrhizal fungi depend on the trees for sustenance. When the trees are cut, mycorrhizal fungi die, to be replaced in part by saprotrophic fungi, free-living rot fungi that live on decaying organic matter, such as the roots of trees that have been cut.  When

---

[1] See comments by Dr. Vinton N. Thompson (AR10939, AR2182) and Dr. Susan Goldhor  (AR1831) and their citations to scientific papers.

8

a tree dies, the life that comprises its associated soil will die, and its carbon is lost over time and not replaced unless it's a natural death with neighboring trees all contributing nutrients. When there's a clearcut, killing all the trees in an area, the soil usually dies, releases its carbon, and becomes dirt.  And it takes a long time for it to rebuild, generally rebuilding in an impoverished way for a long time.

The bottom line is that cuts, particularly large ones, are likely to have profound consequences for carbon sequestration.  The USFS's failure to consider this scientific research shows a careless disregard of science in the haste to push forward a logging plan.

**I.**       No  Protection for Water Quality.

As with the USFS's assertions of no significant effect on recreation or mature trees or carbon sequestration, its assertions regarding water quality are unsupported by scientific evidence.  The Sandwich Range is the source of several significant wild rivers and streams, and provides water for agriculture and residential use in the Wonalancet basin, as well as downstream.

The Plan considers, but rejects, the possibility of impacts from logging 35.8 percent of the trees in one part of the watershed, and from newly constructed or modified roads and bridges.  (AR6740)  The Plan asserts: "Monitoring has shown best management practices and forest plan standards and guidelines to be effective in protecting water resources."  (AR6732) Yet extensive staff cuts in the USFS make it likely that no monitoring will take place, let alone monitoring to protect water resources.  Merely inspecting the site afterwards and ordering the contractor to remediate if damage has occurred is too little too late to protect water quality in the Plan area.

Logging projects always cause some erosion: from tires of heavy equipment, from cutting and removing trees thus churning the soil, and from uprooting saplings and ground cover.  Open soil then washes downhill into streams during rainstorms and spring snowmelt.  If the USFS were to monitor, it could insist on more careful treatment of sensitive areas (such as protective mats under tires, avoiding steep slopes and wet areas, not cutting certain trees), but given Defendants' limited resources and practices, that is extremely unlikely to happen.

**CONCLUSION**

Because the USFS failed to follow federal law by considering alternatives to the proposed cutting and failed to make a recreation plan to safeguard public use of the Sandwich Range or consider the science regarding preservation of mature trees and carbon sequestration in forests or account for safeguarding water quality, we support Standing Trees' Motion for Summary Judgment.

Respectfully submitted ,

/s/ Judith Reardon, NH Bar No. 2113  
Law Office of Judith N. Reardon  
PO Box 350, 216 Chocorua Mtn Hwy  
Chocorua, NH 03817

/s/ Ruth Moscovitch  
154 Ferncroft Rd.  
Wonalancet, NH

Dated:  December 4, 2025