# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW HAMPSHIRE

STANDING TREES, INC.

     *Plaintiff*,

v.

UNITED STATES FOREST SERVICE, et al.,

     *Defendants*.

Case No.: 1:25-cv-00237-SE-TSM

## PLANTIFF'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS-MOTION

Christophe Courchesne
NH Bar No. 20431
Associate Professor and Director
Environmental Advocacy Clinic
Vermont Law and Graduate School
164 Chelsea Street, PO Box 96
South Royalton, VT 05068
(802) 831-1630
(802) 831-1631 (fax)
ccourchesne@vermontlaw.edu

*Counsel for Standing Trees, Inc.*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................... iii

GLOSSARY ............................................................................................................................. v

INTRODUCTION ..................................................................................................................... 1

I.    The Service Violated the Requirements of NFMA and the Plan. ..................................... 2

II.   The Service's Arbitrary Alternatives Analysis Violated NEPA and the APA ..................... 5

    A.    The Service's High "Unresolved Conflicts" Threshold Would Evade NEPA's
        Statutorily Required Alternatives Analysis. ............................................................. 5

    B.    The Service's "Partial Implementation" Mantra and Misapplied Precedents
        Render Its NEPA Alternatives Analysis Arbitrary and Capricious. ........................ 8

    C.    The Service's No Action Analysis Was Deficient and Biased Against Inaction.  10

III.  The Service Failed to Take a Hard Look at the Project's Environmental Effects. .............. 11

IV.   The Service Unlawfully Ignored the Plan's Distinct Old Forest Habitat Protections, Contrary
    to the Service's Narrow Old Growth Framing. ...................................................................... 14

V.    The Service Did Not Properly Consider Cumulative Impacts. ........................................... 17

CONCLUSION ........................................................................................................................... 20

# TABLE OF AUTHORITIES

## Cases

*Aertsen v. Landrieu*, 637 F.2d 12 (1st Cir. 1980) ........................................................ 7

*All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105 (9th Cir. 2018) ............................ 17

*All. for the Wild Rockies v. U.S. Forest Serv.*, No. 2:24-CV-157-RLP, 2025 WL 2655984 (E.D. Wash. Sept. 16, 2025) ........................................................................ 13

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87 (1983)............................. 1, 18

*Bob Marshall All. v. Hodel*, 852 F.2d 1223 (9th Cir. 1988) ........................................... 9

*Citizens Against Burlington v. Busey*, 938 F.2d 190 (D.C. Cir. 1991) ................................. 10

*Ctr. for Biological Diversity v. U.S. Forest Serv.*, No. CV 23-110-M-DWM, 2025 WL 3549515 (D. Mont. Dec. 11, 2025) .................................................................. 14

*Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273 (1st Cir. 1996).................................... 1, 8, 9

*Earth Island Inst. v. U.S. Forest Serv.*, 87 F.4th 1054 (9th Cir. 2023)................................ 9

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850 (9th Cir. 2022)................... 8, 9

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009).......................................... 13

*Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095 (9th Cir. 2016)................... 11

*Hanly v. Kleindienst*, 417 F.2d 823 (2d Cir. 1972)................................................. 20

*Ind. Forest All. v. U.S. Forest Serv.*, 325 F.3d 851 (7th Cir. 2003)................................. 6

*Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062 (9th Cir. 2002) ................................ 13

*Kettle Range Conserv. Grp. v. U.S. Forest Serv.*, No. 2:21-CV-00161-SAB, 2023 WL 4112930 (E.D. Wa. June 21, 2023)................................................................... 12

*Lands Council v. Martin*, 529 F.3d 1219 (9th Cir. 2008) ........................................... 12

*Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008)............................................. 2

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755 (9th Cir. 2014)........................................................................... 14

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ............................................ 7

*Mont. Wilderness Assoc. v. Connell*, 725 F.3d 988 (9th Cir. 2013) ................................. 9

*N. Cascades Conserv. Council v. U.S. Forest Serv.*, 136 F.4th 816 (9th Cir. 2025) ................... 7

*Nat'l Audubon Soc'y v. U.S. Forest Serv.*, 46 F.3d 1437 (9th Cir. 1993)............................. 13

*Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059 (9th Cir 2002) ......................... 19

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989)................................ 16

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 605 U.S. 168 (2025).................... 11

*Sierra Club v. Wagner*, 555 F.3d 21 (1st Cir. 2009).................................................. 2

*Sierra Club v. Wagner*, 581 F. Supp. 2d 246 (D.N.H. 2008) ........................................ 2

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) .................................................... 7

*Smith v. U.S. Forest Serv.*, 33 F.3d 1072 (9th Cir. 1994) ........................................... 13

*Standing Trees, Inc. v. U.S. Forest Serv.*, 1:24-cv-138-JL-TSM, 2025 WL 2411206 (D.N.H. Aug. 20, 2025) ............................................................................. 5

*U.S. v. Garner*, 767 F.2d 104 (1985) ............................................................. 19

*WildEarth Guardians v. Conner*, 920 F.3d 1245 (10th Cir. 2019) ................................................. 9

*WildEarth Guardians v. U.S. Dep't Agric.*, 135 F.4th 717 (9th Cir. 2025) ................................... 1

*Wilderness Soc'y v. U.S. Dep't of Interior*, No. 22-cv-1871, 2024 WL 1241906 (D.D.C. Mar. 22, 2024) ................................................................................................................................ 11

## Statutes and Regulations

16 U.S.C. § 1604(g)(3)(C) ........................................................................................................... 5

16 U.S.C. § 1604(i) ...................................................................................................................... 4

36 C.F.R. § 220.4(c)(2) ................................................................................................................ 8

36 C.F.R. § 220.7(b)(2)(i) ........................................................................................................ 6, 7

36 C.F.R. § 220.7(b)(2)(ii) ......................................................................................................... 10

40 C.F.R. § 1508.27(b)(4) ............................................................................................................ 6

40 C.F.R. § 1501.5 ....................................................................................................................... 7

40 C.F.R. § 1508.1(g)(1) ............................................................................................................ 10

40 C.F.R. § 1508.27 ..................................................................................................................... 6

42 U.S.C. § 4332(H) ................................................................................................................. 6, 7

5 U.S.C. § 706(2)(A) .................................................................................................................... 1

## Other Authorities

73 Fed. Reg. 43,084 (July 24, 2008) ............................................................................................ 6

Merriam-Webster, Investigate, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/investigate (last visited Feb. 20, 2026) ................................................. 4

**GLOSSARY**

| | |
|---|---|
| Administrative Procedure Act | APA |
| Council for Environmental Quality | CEQ |
| Forest Service | Service |
| Forest Carbon Assessment | FCA |
| National Environmental Policy Act | NEPA |
| National Forest Management Act | NFMA |
| Northern Long-eared Bat | NLEB |
| White Mountain National Forest | Forest |
| 2005 White Mountain Land and Resource Management Plan | Plan |

## INTRODUCTION

The U.S. Forest Service (Service) defends its flawed and cursory review of the Sandwich Vegetation Management Project (Project) by mischaracterizing Standing Trees' positions and alternatives; overstating the transparency and rigor of its process; and relying on a self-serving reading of the governing regulations and case law to claim it satisfied its legal obligations.[1] But the Service's "see no evil, hear no evil" approach cannot stand. First, the Service offers no colorable defense to Standing Trees' claims that the Project, as authorized by the Service, violates the 2005 White Mountain Land and Resource Management Plan (Plan) and the National Forest Management Act (NFMA). Second, in violation of the National Environmental Policy Act (NEPA), the Service's excuses for failing to properly consider alternatives lack merit. Third, despite its contentions to the contrary, the Service failed to take the required "hard look" at the Project's environmental impacts under NEPA. Fourth, in further violation of NEPA, the Service arbitrarily and unlawfully defined the geographic scope of its cumulative impacts analysis.

Under the Administrative Procedure Act's (APA) "arbitrary and capricious" standard applicable here, 5 U.S.C. § 706(2)(A); Pl. Mem., ECF 11-1 at 14, the Court considers whether the Service "articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 105 (1983); *see Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1287 (1st Cir. 1996). The Service has the "burden to *provide* convincing 'support for its chosen level of analysis.'" *WildEarth Guardians v. U.S. Dep't of Agric.*, 135 F.4th 717, 731 (9th Cir. 2025) (emphasis added) (citing *Friends of the Wild Swan v. Weber,* 767 F.3d 936, 943 (9th Cir. 2014)). A challenger need only make "some effort"[2]

---

[1] The Service did not contest Standing Trees' standing in this case.
[2] *See* AR 336–388 (Scoping Comment Letter); AR 2346–2413 (Draft EA Comments); AR 11202–11261 (Objection Letter).

to demonstrate the agency "misinterpreted the evidence, overlooked certain testimony, or unreasonably reached its 'no significant impact determination.'" *Sierra Club v. Wagner*, 555 F.3d 21, 28 (1st Cir. 2009) (citations omitted). The Service claims Standing Trees did not meet this standard. Defs. Mem., ECF 18-1 at 45. But Standing Trees has exhaustively participated in every stage of the administrative process to show the Service's unreasonableness in approving the Project and repeatedly "adduce[d] evidence" where the Service failed to provide convincing—or any—explanations for its unreasonable conclusions. *Sierra Club v. Wagner*, 581 F. Supp. 2d 246, 268 (D.N.H. 2008).[3] Standing Trees carried its burden here, and the Service's decision-making violated the APA.

## ARGUMENT

### I.    The Service Violated the Requirements of NFMA and the Plan.

The Service erroneously claims NFMA does not require it to analyze and show how the Project conforms with the Plan and only requires "a project be consistent with the forest plan." ECF 18-1 at 46. But the "Service must support its conclusions that a project meets the requirements of the NFMA and relevant [] Plan with studies that the agency, in its expertise, deems reliable [and] must explain the conclusions it has drawn from its chosen methodology, and the reasons it considers the underlying evidence to be reliable." *Lands Council v. McNair*, 537 F.3d 981, 994 (9th Cir. 2008).[4]

---

[3] ECF 11-1 at 29–30 (Service omitted Plan-required old-forest-habitat analysis jeopardizing crucial forest features); 31 (Service disregarded mitigation for northern long-eared bats and adopted a Biological Opinion without meaningful independent review); 32–33 (Service failed to quantify carbon emissions by any method or framework); 34–35 (Service failed to adequately assess soil impacts from skid-trail construction and offered only conclusory statements about perennial streams); 36–37 (Service omitted baseline water-quality data).
[4] To avoid accountability for this clear obligation based in the APA, the Service inaptly focuses on a footnote on the technical inapplicability of 2012 NFMA regulations to the Service's activities in the Forest. ECF 18-1 at 46 n.16.

The failure of the Service to demonstrate Plan compliance is fatal to its defense. The Service repeatedly muddles its obligations to follow different components of the Plan. Standards "must be followed" absent a Plan amendment. AR 12164. Guidelines are "required course[s] of action or level[s] of attainment," but a project may deviate from them if it still meets the purpose of the guideline *and* the Service "document[s] in a project-level analysis and signed decision" the reason for the deviation. *Id.* Yet, the Service authorized departures from the Plan's requirements without adequate explanation or reasoning.

*Forest Health*. The Service mischaracterizes its obligations and fails to show compliance with the Plan on forest health in violation of NFMA and NEPA, as discussed in Part IV, *supra*.

*Soils.* Vegetation Management Guideline G–5 requires skid roads to be located on grades of less than 20 percent. AR 12219; ECF 11–1 at 20. But the Service's Soil Report states roads in areas with slopes of 35 percent may be required. AR 6392–93; ECF 18-1 at 50. Despite the discrepancy, the record does not document how the deviation from the guideline will still meet the guideline's purpose in a project-level analysis or why deviation is necessary. AR 6392–93.[5]

*Scenery.* Similarly, the Service fails to meet, or give adequate reasoning for deviating from, scenery guidelines. *See* ECF 11–1 at 22. One of the harvest areas slated for clearcutting is visible from a Mount Chocorua viewpoint and will not appear as natural, violating the Plan's guidance. AR 12231. Yet the Service provides no rationale for this deviation, nor explains how it

---

[5] As discussed in Standing Trees' opening brief, many of the roads planned for "reconstructions" have been fully reclaimed by the forest and would be unrecognizable as anything but forest. ECF 11-1 at 21; AR 11237. These are "existing roads" in name only as is obvious from the photographs taken by Standing Trees on August 12, 2023. AR 11300–11302. The Service claims the photographs are not part of the record and that Standing Trees has failed to identify when, where, or by whom the photographs were taken. ECF 18-1 at 51–52. The photographs can be found at AR 11301–02 where the preceding paragraph states, "[t]he photos below, taken August 12, 2023, are in order of ascending elevation, and depict what we believe is considered FS Road 5460." AR 11300. The Service has never substantively replied to this photograph.

will meet the purpose of the guideline. Additionally, regardless of whether the Service properly deviated from the guideline, the Service is still required to follow all scenic guidelines in accordance with Scenery Management Standard S-2. AR 12215. The Service must follow all aspects of the Plan and cannot cherry pick provisions to implement. 16 U.S.C. § 1604(i).

***Bats.*** The Service claims it met its obligation under the Plan to "investigate" the presence or habitat of the northern long-eared bat (NLEB). ECF 18-1 at 49–50; AR 12202. Rare and Unique Features Standard S-1 requires an investigation before ground-disturbing activity begins, for all threatened, endangered and sensitives species, which includes the NLEB. AR 12202, 12681. The ordinary meaning of investigate is "to observe or study by close examination and systematic inquiry."[6] The Service merely assumed the bat to be present. ECF 18-1 at 26 (citing AR 4611). It cannot point to any fieldwork or site-specific inquiry through which it "investigated" the bat's habitat. Interpreting "investigate" to permit merely "assuming" renders the standard meaningless, and risks harm to NLEB potentially living in the Project area. *See Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 962 (9th Cir. 2005) ("[a]n agency's position that is contrary to the clear language of a Plan is not entitled to deference.").

The Service tries to distract from the above violations of NFMA and Plan requirements by incorrectly contending that Standing Trees believes the Service violated NFMA by using an outdated Plan. ECF 18-1 at 45–46. Standing Trees does not claim that the Service's use of the Plan is a violation of NFMA; rather, it is important context for the Court that the Plan has surpassed the 15-year statutory revision requirement, making the Service's obligations to collect and use current site-specific information and scientific research all the more critical. ECF 11-1

---

[6] Merriam-Webster, Investigate, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/investigate (last visited Feb. 20, 2026).

at 16–17. The Plan itself specifies two of the purposes for monitoring and evaluation as "[k]eeping the Plan current" and "[e]nsuring compliance with specific standards, laws, and regulatory requirements." Plan at 4-3.[7] Under NFMA, the Service must conduct detailed site-specific analysis, as the provisions of forest plans must "insure research on and (*based on continuous monitoring and assessment in the field*) evaluation of the effects of each management system." 16 U.S.C. § 1604(g)(3)(C) (emphasis added). Its technical validity aside, the Plan requires continuous monitoring of Forest conditions to ensure current and accurate management planning and decision-making, particularly given the Plan is no longer up-to-date.

## II.    The Service's Arbitrary Alternatives Analysis Violated NEPA and the APA.

The Service's opening brief fails to resuscitate its arbitrary and unlawful alternatives analysis, and this Court should reject the Service's arguments. First, the Service cites irrelevant precedents and imposes an artificially high "unresolved conflicts" threshold to evade NEPA's alternatives mandate. Second, it dismissed proposed alternatives as "partial implementations" of the proposed action—ignoring that the final Project itself is a partial implementation of the original proposal. Third, it mischaracterizes NEPA's demand for a neutral assessment of an action as a demand for a standalone no action alternative.[8]

### A.    The Service's High "Unresolved Conflicts" Threshold Would Evade NEPA's Statutorily Required Alternatives Analysis.

NEPA requires alternatives development when resource disputes arise, but the Service's impossibly high threshold—unsupported by case law or its own regulations—would nullify this

---

[7] In an apparent error, the Plan chapter in the AR differs from the publicly posted version, with apparent revisions that do not appear on the Service's website with the correction notice. *See* https://www.fs.usda.gov/r09/whitemountain/planning (visited Feb. 20, 2026).

[8] Notably, the Service's arguments rest on the *Standing Trees* opinion now on appeal, *Standing Trees, Inc. v. U.S. Forest Serv.*, 1:24-cv-138-JL-TSM, 2025 WL 2411206 (D.N.H. Aug. 20, 2025), but Standing Trees has explained why the Court's NFMA and NEPA analysis was incorrect. *See* ECF 11-1 at 3 n.2; Pl. Supp. Mem., ECF 14 at 2–3.

obligation for virtually all proposals. The Service posits that unresolved conflicts "does not mean mere disagreement with a project," but Standing Trees does not merely disagree. ECF 18-1 at 19. NEPA requires alternatives analysis "in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(H). While neither NEPA nor Service regulations define "unresolved conflicts," the preamble to the Service's NEPA regulations states "most [] Service proposals will have alternatives." 73 Fed. Reg. 43084, 43,092 (July 24, 2008). The Service explained it may only proceed without considering alternatives "[w]hen there is consensus about the proposed action based on input from interested parties." *Id.* (citing Council on Environmental Quality guidance).

Far from expressing "mere disagreement with a project,"[9] Standing Trees and other interested parties submitted extensive comments that made clear the conflicts inherent in managing numerous resources and the lack of consensus on the Project. ECF 18-1 at 19. *See* AR 3556, 4147, 11202. Standing Trees identified the tensions present "concerning alternative uses of available resources," including trade-offs between timber harvesting, forest health, water quality, carbon storage, Inventoried Roadless Areas, soils, and endangered species—more than sufficient to trigger NEPA's alternatives mandate. *See* 42 U.S.C. § 4332(H); *see also* 36 C.F.R. § 220.7(b)(2)(i) (2020).[10]

---

[9] The Service's authority interprets the "highly controversial" context and intensity factor, an indicator of significance under NEPA in whether to require the preparation of an EIS, and is not related to alternatives analysis. *See Ind. Forest All. v. U.S. Forest Serv.*, 325 F.3d 851, 856–57 (7th Cir. 2003) (citing *State of N.C. v. Fed. Aviation Admin*, 957 F.2d 1125, 1134 (4th Cir. 1992) (explaining "mere opposition" does not amount to "highly controversial" under 40 C.F.R. § 1508.27(b)(4) (2020)); *see generally* 40 C.F.R. § 1508.27 (2020) (defining "significantly").
[10] Defendant claims that EIS-specific regulations concerning alternatives are not applicable in this case. ECF 18-1 at 11 n.3. Those regulations remain relevant; they explain NEPA's alternatives mandate and purpose. Nonetheless, NEPA itself—in addition to both CEQ and Service regulations—makes clear that alternatives must be studied in "any proposal" which

The Service argues the unresolved conflicts Standing Trees identified only called for no action, and because the Service studied no action, "NEPA requires nothing more." ECF 18-1 at 20 (citing *Aertsen v. Landrieu*, 637 F.2d 12, 21 (1st Cir. 1980)). Not only is it factually incorrect that Standing Trees solely called for no action, but in *Aertsen*, "no one had made a realistic proposal" of alternatives. 637 F.2d at 21. Here, Standing Trees presented numerous reasonable and technically feasible alternatives, including alternatives that allow for timber harvest. *See* ECF 11-1 at 24–25; *see also* AR 11210–11 (proposed alternatives in Objection); 2393 (same in Draft EA Comments); 339 (same in Scoping comments).

To accept this reading of "unresolved conflicts" would convert 36 C.F.R. § 220.7(b)(2)(i)'s narrow exception into a general rule, exempting nearly all proposals from NEPA's alternatives mandate. The Service merits no deference for such a strained, self-serving statutory distortion. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 402–03 (2024). The Service's interpretation does not warrant *Skidmore* respect as it is inconsistent with the Service's own contemporaneous preamble. *See Loper Bright Enters.*, 603 U.S. at 388 (under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), agency interpretation merits weight based on "the thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements."). The record clearly demonstrates unresolved conflicts and lack of consensus on use of Project resources, requiring the Service to perform a meaningful alternatives analysis.

---

involves unresolved conflicts. 42 U.S.C. § 4332(H); 36 C.F.R. § 220.7(b)(2)(i) (2020) (requiring alternatives in EAs when unresolved conflicts are present); 40 C.F.R. § 1501.5(c)(2) (2020) (EA shall "briefly discuss… alternatives as required by… NEPA"); *see also N. Cascades Conserv. Council v. U.S. Forest Serv.*, 136 F.4th 816, 826 (9th Cir. 2025) ("NEPA requires agencies to give full and meaningful consideration to all reasonable alternatives in an EA") (internal quotation omitted).

B.  <u>The Service's "Partial Implementation" Mantra and Misapplied Precedents Render Its
    NEPA Alternatives Analysis Arbitrary and Capricious.</u>

NEPA and the APA demand reasoned consideration of significant public comments and

alternatives, not formulaic dismissals. *See Dubois*, 102 F.3d at 1289 ("agency… must

*legitimately* assess the relative merits of reasonable alternatives before making its decision"

(emphasis added)); ECF 11-1 at 23–28. The Service claims it "responded" to Standing Trees'

alternatives (while denying any duty to do so); the Service dismissed them as "partial

implementations"; and it cites inapposite precedent arguing that it need not consider "mid-range"

alternatives. ECF 18-1 at 20–22. All three excuses fail.

The Service's conclusory dismissals of proposed alternatives do not comply with Service

and CEQ NEPA regulations, nor are they reasoned and supported by the record as the APA

demands. 36 C.F.R. § 220.4(c)(2) (2020); *see* 5 U.S.C. § 706(2)(A). Agencies "must provide a

'detailed statement' regarding why [alternatives] were eliminated or not considered." *Env't Def.*

*Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 876 (9th Cir. 2022). The record shows no

reasoned engagement with Standing Trees' detailed proposals, only formulaic, nonresponsive

answers restating predetermined conclusions. *See* ECF 11-1 at 18–20.

The Service argues it need not consider any of Standing Trees' proposed alternatives

because they represent "partial implementations" of the proposed action. ECF 18-1 at 21. But

labeling alternatives as "partial" is not a valid basis for declining to analyze them. Indeed, the

final proposed action is a partial implementation of the original proposal; the Service removed all

recreation work and reduced logging acreage by over 50 acres—precisely the kind of scaling it

deems unreasonable when proposed by Standing Trees. *See* AR 6714; ECF 11-6 at ¶ 12. If the

purpose of the Project were truly to advance Management Area (MA) 2.1 goals, then Standing

Trees' feasible proposals would be reasonable alternatives achieving the same ends, not partial

implementations. The Service's boilerplate dismissal, devoid of analysis or rationale, is arbitrary decisionmaking. *See Dubois*, 102 F.3d at 1289; *Env't Def. Ctr.*, 36 F.4th at 877.[11]

The Service doubles down on this flawed reasoning by citing cases that supposedly excuse consideration of mid-range alternatives, but those cases only bolster the conclusion that its alternatives analysis was arbitrary. The Service cites *Standing Trees*, which relies on *Mont. Wilderness Assoc. v. Connell*, 725 F.3d 988 (9th Cir. 2013), and *Earth Island Inst. v. U.S. Forest Serv.*, 87 F.4th 1054 (9th Cir. 2023) for the principle that agencies need not study "mid-range" alternatives. ECF 18-1 at 21 (citing 2025 WL 2411206, at *8). But the *Standing Trees* court misapplied these cases. *Connell* excused the study of an *additional* mid-range alternative because the agency had already studied six alternatives and adding a nearly identical mid-range alternative would not foster informed decisionmaking. *See* 725 F.3d at 1004–05. Similarly, in *Earth Island*, the mid-range alternative was not significantly distinguishable from the proposed action. *See* 87 F.4th at 1065–66. Here, Standing Trees' alternatives are significantly distinguishable from the proposed action—so much so the Service deems them "partial implementations"—and the required analysis would foster NEPA's informed decisionmaking.

Finally, the Service defends its narrow reading of its purpose and need, claiming this Project design alone best advances select MA 2.1 goals like sustained yield, habitat, and recreation. ECF 18-1 at 22. But the record belies this. The EA admits recreation improvements

---

[11] The Service explained it considered the "maximum effects" of the project, thus Standing Trees' "smaller-scale proposals are encompassed with the EA." ECF 18-1 at 21 (citing *WildEarth Guardians v. Conner*, 920 F.3d 1245, 1258 (10th Cir. 2019)). But plaintiffs in *WildEarth* challenged only one impact of the project, not various competing resource use trade-offs. *See* 920 F.3d at 1255–56. An EA's maximum effects analysis lacks the contrast of alternatives that is essential to informed decisionmaking. *See Bob Marshall All. v. Hodel*, 852 F.2d 1223, 1228 (9th Cir. 1988) ("alternatives...guide[] the substance of environmental decisionmaking and provide[] evidence that the mandated decisionmaking process has actually taken place").

were dropped altogether, even though logging will interfere with trails and recreation sites for years. ECF 11-5 at ¶ 17; AR 6714. The Service violates NEPA by cherry-picking timber-centric goals to pretermit alternatives, rendering the purpose so narrow that only maximum logging fits. *See Citizens Against Burlington v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991) ("agency may not define the objectives of its actions so unreasonably narrow that only one alternative… would accomplish the goals"). This foreordained formality violates NEPA, as the Service's narrow framing of their facially broad purpose and need precluded the reasonable alternatives analysis NEPA demands. *See* ECF 11-1 at 25–28. The Service's arbitrary dismissal of reasonable alternatives, misapplied precedents, and narrow purpose-and-need framing render its alternatives analysis arbitrary and capricious under NEPA and the APA.

C. <u>The Service's No Action Analysis Was Deficient and Biased Against Inaction.</u>

NEPA demands a balanced no-action analysis that genuinely contrasts both the beneficial and detrimental impacts of inaction with the proposed action. *See* ECF 11-1 at 28–29. The Service's one-sided analysis falls short. The Service misleadingly argues that Standing Trees demands a standalone no-action alternative required only for EISs. ECF 18-1 at 22–23. But Standing Trees sought a *genuine* no action alternative, that "legitimately assess[es] the relative merits" of inaction, as NEPA requires. ECF 11-1 at 28 (quoting *Dubois*, 102 F.3d at 1289).

The Service argued it complied with the no-action requirement because its regulations permit it to consider no action "by contrasting the impacts of the proposed action… with the current condition and expected future condition if the proposed action were not taken." ECF 18-1 at 23 (quoting 36 C.F.R. § 220.7(b)(2)(ii) (2020)). The issue here is whether the Service assessed both beneficial and detrimental impacts of no action, according to NEPA. *See* 40 C.F.R. § 1508.1(g)(1) (2020) (defining "Effects or Impacts" to include "those resulting from actions that

may have both beneficial and detrimental effects").[12] The EA highlights only negatives, skewing NEPA's requisite merits assessment and violating NEPA and the APA.

## III.    The Service Failed to Take a Hard Look at the Project's Environmental Effects.

The Service asserts it engaged in an extensive analysis of the reasonably foreseeable environmental effects of the Project and its analyses "fall within the broad zone of reasonableness." ECF 18-1 at 24, 43. But the missing evidence and analysis make it evident that the authorization of this Project was not "well-considered," "fully informed," or "reasonably explained." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 605 U.S. 168, 185 (2025) (citation modified). The Service here failed to provide evidence, reasoning, or analysis for the NLEB, water quality, roadless areas, carbon, or the effects on soil—a clear violation of NEPA.

The Service's decision cannot be fully informed without the baseline and site-specific data needed to make that decision. *Wilderness Soc'y v. U.S. Dep't of Interior*, No. 22-cv-1871, 2024 WL 1241906, at *19 (D.D.C. Mar. 22, 2024) ("[Service] cannot hang its hat where it never placed a peg"). The Service insists that its methodology is fully informed and reasonable. ECF 18-1 at 26–27 (NLEB analysis); 29 (carbon and climate analysis); 35–37 (water quality analysis). While agencies get deference for their chosen methodologies, a methodological choice cannot be given deference if void of foundational data needed to conduct the intended assessment. *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1103 (9th Cir. 2016) ("baseline estimate must be based on accurate information and defensible reasoning" (citation modified)).

The Service continuously chose to substitute general Forest data for Project specific data without explanation. One example is the assumption that NLEBs are present. AR 4614; ECF 18-

---

[12] The Service's study of no action must comply both with its own regulations *and* the 2020 CEQ regulations it invokes. *See* AR 12135 (clarifying analysis used 2020 instead of 1978 CEQ NEPA regulations).

1 at 26. The Service acknowledges that significant roosting habitat is present, including "potential roost trees," but fails to identify whether any bats currently *use* any of those roost trees. AR 4615. The Service offers no reasonable explanation why there is no site-specific assessment other than: "[w]ith populations reduced from white-nose syndrome and ample roost trees available . . .the likelihood of a bat being in a tree when it is cut is low." AR 4615. The failure to conduct site-specific analysis or provide adequate justification that such analysis is unnecessary, beyond saying the species is already almost extinct, violates NEPA's hard look requirement. *Kettle Range Conserv. Grp. v. U.S. Forest Serv.*, No. 2:21-CV-00161-SAB, 2023 WL 4112930, at *10 (E.D. Wa. June 21, 2023) (finding the Service violated NEPA where it failed to consider site-specific effects of project on, *inter alia*, endangered bat species).

Similarly, the Service relies solely on a 2018–2019 Forest-wide monitoring report and generalized standards for a select type of tree harvest to assess the effects to water quality. AR 12143; AR 6181; ECF 18-1 at 35. The only explanation the Service provides for failing to use Project specific data is a conclusory declaration in an Objection Response letter stating, "[t]hese evaluations of effects provide a reasonable baseline to analyze potential impacts for NEPA." AR 12143. Stating something is reasonable does not make it so.

The Service asserts the Project will not disqualify any roadless areas from future consideration for wilderness designation by the Service or Congress, a conclusion that conveniently absolves the Service from any further look at the Projects' impacts on roadless areas, despite Standing Trees' reasoned requests for such an analysis. ECF 18-1 at 37–38. Roadless areas contain "certain attributes that must be analyzed [], such as water resources, soils, wildlife habitat, and recreation opportunities, [which] possess independent environmental significance." *Lands Council v. Martin*, 529 F.3d 1219, 1230 (9th Cir. 2008). Given the "serious

environmental consequences" of disturbing roadless areas, the impacts must be assessed and shared with the public, which did not happen here. *Nat'l Audubon Soc'y v. U.S. Forest Serv.*, 46 F.3d 1437, 1448 (9th Cir. 1993); *see also Smith v. U.S. Forest Serv.,* 33 F.3d 1072, 1077–78 (9th Cir. 1994).

In assessing the Project's impacts on carbon and climate change, the Service failed to explain its deviation from standard practice. The Service's discussion of how it quantifies carbon across the entire Forest does not answer whether the carbon impacts of *this* Project were adequately considered. ECF 18-1 at 29–30; AR 6111–6163. The Service states it is "immaterial" that it "may have engaged in a more in-depth analysis for a different project…" ECF 18-1 at 31. Although the Service may choose to use different levels of attention, it must explain, consider, or at least mention *why*. AR 6106; *see FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position").

The Service claims it is not realistic or required to identify or consider effects of skid trails during the NEPA process. ECF 18-1 at 33. However, "NEPA requires more than a shorthand reference to consider environmental impacts of an agency's mitigation measures." *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1074 (9th Cir. 2002) (citation omitted). Rather than analyze likely skid trail locations or their soil impact, the Service offered no site-specific considerations at all. ECF 18-1 at 33. Courts have rejected this kind of deferral as "too vague to satisfy the requirements of NEPA." *All. for the Wild Rockies v. U.S. Forest Serv.*, No. 2:24-CV-157-RLP, 2025 WL 2655984, at * 8 (E.D. Wash. Sept. 16, 2025). Failing to assess any potential locations of skid trails "detract[s] from the decisionmaker's or public participant's ability to assess a proposed action's environmental consequences." *Ctr. for Biological Diversity*

*v. U.S. Forest Serv.*, No. CV 23-110-M-DWM, 2025 WL 3549515, at * 4 (D. Mont. Dec. 11,

2025) (citing *N. Cascades Conserv. Council v. U.S. Forest Serv.*, 136 F.4th 816, 829 (9th Cir.

2025). Even without exact routes, the Service knows the location of timber harvests and their

proximity to existing roads, AR 6718–20—more than enough information for the Service to

evaluate the reasonably foreseeable skid trail location and the associated environmental impacts

to soil and water, particularly where anticipated skid trails may abridge Plan requirements. *See*

*supra* Part I.A. The refusal to do so violates NEPA.

The Service failed to provide accurate data and environmental analyses to the public to

explain their decisions, undermining a vital part of the NEPA process. *League of Wilderness*

*Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 761 (9th Cir. 2014)

(public should not have to "parse the agency's statements to determine" project impacts).

**IV.    The Service Unlawfully Ignored the Plan's Distinct Old Forest Habitat Protections, Contrary to the Service's Narrow Old Growth Framing.**

The Plan proscribes harvest not only in old growth forest, but also in stands that contain

"old forest habitat"; the Service's insistence that it met "old-growth standards" does not answer

Standing Trees' claim that the Service's analysis erased that separate, no-harvest category. The

lack of consideration of old forest habitat is a Plan-consistency violation under NFMA and fails

NEPA's hard look requirement.

The Plan categorizes forest conditions along two separate axes: age-class and habitat.

Age-classes are a coarse, but objective way of grouping stands based solely on ages. FEIS B-18.

Habitat categories, by contrast, describe the progression of forest complexity—tree size, vertical

canopy layers, and dead wood, including snags; decades of growth and natural death gradually

turn young stands into complex late-successional forest. AR 12671. The Plan prizes late

successional conditions by proscribing harvest in old growth forest and *old forest habitat*— two habitat categories that feature rare late-successional features. AR 12202, AR 12671.

"Mature forest habitat" is where these late-successional features emerge, as tree mortality begins. AR 12668. Old forest habitat builds on mature forest habitat as the forest gains late-successional features. AR 12671; ECF 11-1 at 18. Old growth forest is a subset of stands with the most advanced late-successional characteristics. AR 12671. Yet the Service's brief, like its project-level analysis, never treats old forest habitat as a distinct protected category. It talks only about "old-growth standards," as if compliance with that alone satisfied the Plan; it says nothing about whether Project stands meet the Plan's old-forest-habitat definition and therefore cannot be harvested. ECF 18-1 at 47–49.

The Service knew it had to distinguish old forest habitat from mature forest habitat. Its own guidance concedes it "could not distinguish" between mature and old forest habitats with existing data and offered two paths: collect the necessary data to identify old forest habitat or combine both habitat distinctions under the mature forest habitat designation. AR 6532. It chose to combine them. The Service's first excuse for this flawed decision is that "there are no species on the WMNF that require old (instead of mature) forest habitat," so combining the two "age classes" would not "substantially alter the analysis of habitat suitability." ECF 18-1 at 25 (quoting AR 6532). This explanation conflates age class with structure. Age-class is a temporal label "based on stand boundaries and year of origin." FEIS B-18; AR 12341. By contrast, forest habitat categories define stages of structural conditions and forest succession. The Plan protects old growth forest and old forest habitat because of their structural characteristics, not because some species "require" old instead of mature forest. Treating age class and habitat as

15

interchangeable lets the Service avoid identifying which stands provide old forest habitat, essentially erasing Plan mandated protections.

In a second excuse, the Service recast old forest habitat as "simply a placeholder" for lands that are unsuitable for harvest that will grow old, "not an objective that is managed for." AR 6532. This is wrong on multiple levels. Old forest habitat *is* an objective that is managed for: Wildlife Habitat Management Objective 3 directs the Services to "maintain high quality mature forest and old forest habitats on a majority of the forest." AR 12187. This also conflates three distinct concepts: old forest habitat (a protected structural and successional condition), old age class (a temporal category), and land unsuitable for harvest (an operability classification).

This conflation rests on a 2009 Administrative Correction that relabeled the Plan's "old age class objective" as "land unsuitable for harvest." AR 12152, 12188.[13] But that correction did not purport to eliminate the Plan's old forest habitat protection—indeed the former old age class objective (now called, unsuitable for harvest objective) and the old forest habitat objective are independent objectives. *Compare* AR 12188 (MA 2.1 Age Class Objectives) *with* AR 12187 (old forest habitat objective). The Service's administrative relabeling of an objective did not eliminate the old age class designation or the substantive harvest prohibition for old forest habitat that the correction never addressed.[14]

---

[13] Notwithstanding any NFMA effect of this document, the Service nonetheless violated NEPA by failing to disclose the ages of the stands it intended to cut. The Plan draws a categorical line between mature and old age class because they often contain materially different forest—cutting a 60-year-old stand is not the same as cutting a 160-year-old-stand. When the Service declined to report mature and old age classes separately, it failed to disclose to the public a central aspect of the Projects' impacts that NEPA and the APA require it to confront. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350–51 (1989) (explaining that NEPA requires that agencies "take a hard look" and broadly disseminate "relevant environmental information" to foster informed decisionmaking (citation omitted)).

[14] The Administrative Correction left the Plan's appendix intact, including the old age class definition. *See* AR 12512 (only making changes to old age class objective on Plan page 1-21).

The Service's use of the Manomet Late Successional Index (LSI) lays bare this material omission. The Service uses the LSI to score stands based on their late-successional features. The Service only considers stands "above 8" to be old growth under the Plan definition. AR 6365. But the LSI—and the Service—recognize that late-successional features develop far lower down the scale: scores above 5 are the "threshold between economic mature and late-successional stages." AR 6365. The Service never explained why stands between 6–8, that contain less late-successional features than old growth but more than mature, are not old forest habitat. Nor has it explained why it did not use LSI, or any other methodology, to identify and protect stands containing old forest habitat, as the Plan requires.

Old forest habitat and old growth forest are separate, no-harvest categories; the Service wrote as if only the latter existed and treated the former as if it were mature forest. The Service cannot ignore relevant Plan definitions in favor of those that are more convenient. *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1116–17 (9th Cir. 2018). By collapsing its analysis into "old-growth standards" and a single "mature forest habitat" category, the Service potentially authorized logging in protected late-successional stands without proper consideration. That is not semantics; it is a failure to follow the Plan's protections in violation of NFMA, and a failure to give the decisionmaker and the public the hard-look analysis NEPA demands.

V.    **The Service Did Not Properly Consider Cumulative Impacts.**

Seeking to avoid a proper cumulative impacts analysis, the Service first claims broad deference in the geographic scope of its cumulative impacts analysis but does not support its decision with data or logical explanations, contrary to the APA and NEPA. ECF 18-1 at 40–43. Second, the Service fails to persuasively respond to Standing Trees' argument about the applicable regulations.

The Service claims broad deference in the scope of its cumulative impacts analysis. ECF 18-1 at 41. But agencies only receive deference when they "articulate[] a rational connection between the facts found and the choices made." *Baltimore Gas,* 462 U.S. at 105. Here, beyond conclusory statements, the Service did not explain how and why it concluded that the geographic designations it used for some resources were adequate to analyze the cumulative impacts of the Project on those resources or the Forest as a whole, and it did not rationally explain its decision to exclude other Service-approved projects in the Forest from its analysis. AR 6728–30. [15] The geographic scope designations, and resulting cumulative impacts analysis, are not accompanied by an "articulated rational connection" to the facts of the resources or the activities in the Forest as a whole. *Baltimore Gas,* 462 U.S. at 105.

For example, the Service's arbitrarily chosen geographic scope for water is illogically narrow. The Forest contains 35 watersheds, 12,000 acres of wetlands, and 4,750 miles of streams.[16] The Service acknowledges the Project will negatively affect water in the Project area, but acts as though this degraded water will stay in the four watersheds within the Project area indefinitely. AR 6728–30. The cumulative impacts discussion does not even differentiate between the four watersheds, nor does it analyze how other past, present or reasonably foreseeable projects impact water quality across Forest watersheds. AR 6732. By only addressing the four watersheds that the Project physically overlaps, the Service ignores the larger streams,

---

[15] *See, e.g.*, AR 6391 ("The analysis area for… soil productivity… is the project area proposed for treatment. The area has been selected because the expected effects are limited to this area"); AR 6105–06 (failing to define geographic scope for carbon and climate; only stating project "would be conducted on… 1,230 acres" and "scope and degree of change would be minor"); AR 6728 ("water quality considered effects on a watershed scale" with no reason as to why); AR 6174 (failing to articulate geographic scope for water quality beyond "one watershed").

[16] *See* https://www.fs.usda.gov/r09/whitemountain/about-area (last visited Feb. 20, 2026).

rivers, estuaries, and wetlands that the watersheds flow into, including those where other commercial timber harvesting has occurred recently, is presently ongoing, or is planned.

The Service's claim that the "past, present, and reasonably foreseeable projects do not overlap in time or space with the Project's analysis areas" strains credulity and is based on an unsupported, extremely limited determination of spatial and temporal scope. ECF 18-1 at 43. The very case the Service cites for a broad standard of deference, *Neighbors of Cuddy Mountain v. Alexander*, held that the Service "failed to evaluate adequately the cumulative impact of three other planned sales" in a 2.3 million acre National Forest, and only on remand and sequential appeal did the court hold that the newly completed second supplemental EIS properly considered all past, present, and proposed sales. 303 F.3d 1059, 1063, 1071 (9th Cir 2002). In the 800,000 acre Forest at issue here, the Service already approved the ongoing Peabody West and Tarleton projects; is reviewing objections for the Lost River Integrated Resource Project (IRP); opened the objection period for the One Mile Lonesome Ridge IRP; is preparing an EIS for the Waterville Valley Expansion, and started scoping for Jefferson Notch IRP, in addition to more projects in its Schedule of Proposed Actions. These projects, in conjunction with the Project, may well have a cumulative significant impact on resources like the NLEB or carbon emissions, even if the impact in just one individual project might "not have an adverse effect" or be "negligible." AR 4618; 6106. That the Service would not have to analyze *any* of these proposed and ongoing projects' impacts, either on the environment or in support of Plan goals, in conjunction with this Project flies in the face of NEPA and reasoned decisionmaking.

Finally, the Service claims that its shifting use of CEQ regulations is irrelevant. This is incorrect. The Service is violating NEPA and the APA by invoking two sets of regulations. *U.S. v. Garner*, 767 F.2d 104 (5th Cir. 1985) (establishes that agencies cannot rely on multiple

regulatory frameworks promulgated at different times without explaining their relationship, interaction, or how they work together); ECF 11-1 at 39; ECF 14 at 10. The Service's supposed "switch" in regulatory frameworks only underscores the hollowness of its work: if applying both the 1978 regulations that required a cumulative impacts analysis and the 2020 regulations that deleted the very concept leads to the same barebones analysis and conclusion, that is powerful evidence the Service never actually grappled with what either regime required. And the Service's invocation of the rescinded NEPA regulations, ECF 18-1 at 41 n.13, is irrelevant to the Service's decisions on remand because, regulations notwithstanding, NEPA itself requires agencies to take a hard look at the cumulative impacts of past, present, and reasonably foreseeable projects. *Hanly v. Kleindienst*, 471 F.2d 823, 830–31 (2d Cir. 1972) (agency must consider "cumulative harm that results from [the Proposed Action's] contribution to existing adverse conditions or uses in the affected area"). The Service's cumulative impacts analysis did not meet this requirement.

## CONCLUSION

For the reasons above and those in prior briefs, the Court should grant Standing Trees' motion for summary judgment and deny the Service's cross-motion for summary judgment.[17]

---

[17] Plaintiff Amici's brief is timely, helpful, and should be accepted. Plaintiff Amici recently filed a corrected version of its brief that is compliant with the Local Rules and Court's scheduling order. *See* ECF 22. Contrary to the Service's argument, Plaintiff Amici's soil carbon argument is an extension of Standing Trees' carbon argument. *See* ECF 11-1 at 32. By contrast, Defendant Amici's brief should be disregarded as procedurally and substantively improper. Defendant Amici initially failed to consult the parties named party before filing and exceeded the Court's 10-page limit for amicus briefs. *See* ECF 21 at 1–2; ECF 19-1 at 11; ECF 12 at 2. It misnames the project as the "Sandwich Integrated Resources Project," repeats the Service's arguments, and distinguishes an executive order unmentioned in any briefing. *See* ECF 19-1 at 10 n.1. Defendant Amici engages in red-herring attacks on Plaintiff, its Amici, and their motives. *See* ECF 19-1 at 5–8. This overlong, duplicative and unserious filing—recycled from a prior submission—does not assist the Court in resolving the issues of this case and should be disregarded in full.

Respectfully submitted, this 20th day of February 2026.

STANDING TREES, INC.

By its attorney:

/s/ Christophe Courchesne
Christophe Courchesne
NH Bar No. 20431
Associate Professor and Director
Environmental Advocacy Clinic
Vermont Law and Graduate School
164 Chelsea Street, PO Box 96
South Royalton, VT 05068
(802) 831-1630
(802) 831-1631 (fax)
ccourchesne@vermontlaw.edu

*Environmental Advocacy Clinic fellow Rachel Westrate and student attorneys Joe Anderson, Blythe Faris, Eric Grimes, and Julia Wickham made major contributions to this brief.*

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2026, I served the foregoing document electronically through ECF upon all counsel of record.

/s/ Christophe Courchesne
Christophe Courchesne
Counsel for *Standing Trees, Inc.*