**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| STANDING TREES, INC., | |
| Plaintiff, | |
| v. | |
| UNITED STATES FOREST SERVICE; DEREK IBARGUEN, in his official capacity as Supervisor of the White Mountain National Forest; and JAMES INNES, in his official capacity as the District Ranger for the Saco Ranger District, | Case No. 1:25-cv-00237-SE-TSM |
| Federal Defendants. | |

**FEDERAL DEFENDANTS' REPLY IN SUPPORT OF CROSS-MOTION FOR
SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 1

    I.        The Forest Service Complied with NEPA. .............................................................. 1

          A.      The Forest Service's alternatives analysis satisfies NEPA (Count 1). ....... 2

          B.      The Forest Service took a hard look at the environmental effects
               (Count 2). ................................................................................................... 5

          C.      The Forest Service considered cumulative effects (Count 2) ................... 10

    II.       The Forest Service Complied with NFMA (Count 4). ........................................ 12

          A.      The Project is consistent with the Forest Plan old growth standard. ........ 13

          B.      The Project is consistent with Forest Plan soil guidelines. ...................... 16

          C.      The Project is consistent with Forest Plan transportation guidelines. ...... 16

          D.      The Project is consistent with Forest Plan scenery standards and
               guidelines. ................................................................................................. 16

          E.      The Project is consistent with Forest Plan threatened, endangered,
               and sensitive species standards. ................................................................ 17

CONCLUSION................................................................................................................ 18

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Aertsen v. Landrieu*,
637 F.2d 12 (1st Cir. 1980)..................................................................................... 2

*Alliance for the Wild Rockies v. U.S. Forest Serv.*,
2025 WL 2655984 (E.D. Wash. Sept. 16, 2025) ........................................................ 8

*Badger Helicopters Inc. v. FAA*,
154 F.4th 902 (8th Cir. 2025) ............................................................................... 3, 6

*Baltimore Gas and Elec. Co. v. Nat. Res. Def. Council*,
434 U.S. 1030 (1978)............................................................................................ 10

*Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*,
153 F.4th 869 (9th Cir. 2025) .................................................................................. 5

*Ctr. for Biological Diversity v. U.S. Forest Serv.*,
2025 WL 3549515 (D. Mont. Dec. 11, 2025).............................................................. 9

*Dep't of Transp. v. Pub. Citizen*,
541 U.S. 752 (2004).............................................................................................. 8

*Dubois v. U.S. Dep't of Agric.*,
102 F.3d 1273 (1st Cir. 1996)................................................................................ 12

*Earth Island Inst. v. U.S. Forest Serv.*,
697 F.3d 1010 (9th Cir. 2012) ................................................................................. 3

*Friends of Rapid River v. Probert*,
427 F. Supp. 3d 1239 (D. Idaho 2019) ...................................................................... 6

*Friends of the Clearwater v. Probert*,
No. 3:21-cv-189, 2022 WL 2291246 (D. Idaho June 24, 2022)................................... 11

*Furtado v. Oberg*,
949 F.3d 56 (1st Cir. 2020)................................................................................... 12

*Kleppe v. Sierra Club*,
427 U.S. 390 (1976)............................................................................................ 10

*Lands Council v. McNair,*
537 F.3d 981 (9th Cir. 2008) ................................................................................ 12

*Native Ecosystem Council v. U.S. Forest Serv.*,
428 F.3d 1233 (9th Cir. 2005) ................................................................................. 3

*Native Ecosystem Council v. Weldon*,
697 F.3d 1043 (9th Cir. 2012) ............................................................................... 13

*Neighbors of Cuddy Mountain v. Alexander*,
   303 F.3d 1059 (9th Cir. 2002) .................................................................... 10

*Ohio Valey Env't Coal. v. U.S. Army Corps of Eng'rs*,
   716 F.3d 119 (4th Cir. 2013) ..................................................................... 11

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.*,
   957 F.3d 1024 (9th Cir. 2020) ................................................... 1, 12, 13, 18

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989).................................................................................... 2

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
   605 U.S. 168 (2025)............................................................................ passim

*Sierra Club v. Wagner*,
   581 F. Supp. 2d 246 (D.N.H. 2008)..................................................... 1, 13

*Standing Trees, Inc. v. U.S. Forest Serv.*,
   No. 1:24-cv-138-JL-TSM, 2025 WL 2411206 (D.N.H. Aug. 20, 2015).................................... 8

*Sullivan v. Neiman Marcus Grp., Inc.*,
   358 F.3d 110 (1st Cir. 2004).................................................................... 16

*Utah Env't Congress v. Bosworth*,
   439 F.3d 1184 (10th Cir. 2006) ................................................................ 3

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
   435 U.S. 519 (1978).................................................................................... 1

*Wyoming v. U.S. Dep't of Argic.*,
   661 F.3d 1209 (10th Cir. 2011) ................................................................ 5

**Statutes**

42 U.S.C. § 4336(b)(3) ...................................................................................... 6

**Regulations**

7 C.F.R. § 1b.5(b)(1)........................................................................................ 12

36 C.F.R. § 220.4(f) (2024) ............................................................................. 10

66 Fed. Reg. 3244 (Jan. 12, 2001) .................................................................... 7

73 Fed. Reg. 43084 (July 24, 2008).................................................................... 2

**INTRODUCTION**

It is black letter administrative law that Plaintiff Standing Trees has the burden of proof in this case, and the Court should reject Standing Trees's repeated attempts to shift that burden. *Sierra Club v. Wagner*, 581 F. Supp. 2d 246, 254-55 (D.N.H. 2008). Contrary to Standing Trees's arguments, it is not enough to object to the Project or identify areas where the Forest Service could have expanded its analysis. *Id.* at 268. As the Supreme Court in *Seven County* recently affirmed, "NEPA is not a 'game' where project objectors can engage in 'unjustified obstructionism'—here, for example, by raising a slew of remote effects that they think 'ought to be considered.'" *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 190 (2025) (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553-54 (1978)). Standing Trees must *prove* (1) the Forest Service failed to adequately consider reasonably foreseeable environmental effects of the Project and that this failure was material to its Decision, *id.* at 185, and (2) that the Record "plainly demonstrates that the Forest Service made a clear error in judgment in concluding that [the Project] meets the requirements of the NFMA and relevant Forest Plan." *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 957 F.3d 1024, 1035 (9th Cir. 2020). Standing Trees fails to meet this burden.

**ARGUMENT**

I.     **The Forest Service Complied with NEPA.**

As the Supreme Court stated in its "course correct[ing]" opinion in *Seven County*, "an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry" under NEPA, and courts should afford agencies "substantial deference" as long as those choices "fall within a broad zone of reasonableness." *Seven Cnty.*, 605 U.S. at 183-84. Irrespective of Standing Trees's flyspecking of the Forest

1

Service's NEPA analysis, the only question for this Court is whether the Decision authorizing the Project was reasonably explained. *Id.* at 181. The Record demonstrates that it was.

### A. The Forest Service's alternatives analysis satisfies NEPA (Count 1).

The Forest Service complied with NEPA by considering the reasonably foreseeable environmental effects of the proposed action and the consequences of no action. Dkt. No. 18-1 at 17-23. On reply, Standing Trees first argues that this analysis was inadequate because the Forest Service did not reach "consensus." Dkt. No. 23 at 11-12. Notably, Standing Trees cites no case law in support of this argument, undoubtedly because NEPA does not require stakeholder consensus. *Seven Cnty.*, 605 U.S. at 177 ("[An] agency is not constrained by NEPA from deciding that other values outweigh the environmental costs.") (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989)). NEPA "does not mandate particular results." *Id.* As discussed in Federal Defendants' opening brief, there are no "unresolved conflicts" regarding "alternative uses of available resources" because Standing Trees' alternative use is the status quo, which this Circuit has rejected as insufficient. Dkt. No. 18-1 at 19-20; *Aertsen v. Landrieu*, 637 F.2d 12, 21 (1st Cir. 1980) ("[T]he only unresolved conflict concerning an alternative . . . was a continuation of the status quo. That alternative [the agency] plainly considered."). Standing Trees attempts to expand the universe of "unresolved conflicts" on reply by simply listing resources, Dkt. No. 23 at 11, but it fails to identify conflicting "alternative uses" of those resources.

Standing Trees quotes the Federal Register Notice for the Forest Service's 2008 NEPA regulations as stating most proposals will have alternatives, but the quoted language is followed by "[u]ltimately, the responsible official must decide on whether alternatives to the proposed action are appropriate, 'based on input from interested parties.'" 73 Fed. Reg. 43084, 43092 (July 24, 2008). The Forest Service considered proposals from the public (including Standing Trees)

and determined these alternatives were not appropriate because they would not meet the purpose and need of the Project. AR_6759 ("No substantive alternatives were brought forward by the public that met the purpose and need[.]"). This determination is entitled to substantial deference. *Seven Cnty.*, 605 U.S. at 181-82 (directing courts to be at their "most deferential" when agencies determine feasibility of alternatives).[1]

At bottom, Standing Trees advocates for a reading of NEPA unsupported by case law. The Ninth and Tenth Circuits have consistently held that an agency does not violate NEPA where it considers only the preferred action and no action in an EA. *See e.g.*, *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1021-22 (9th Cir. 2012) ("We conclude that the Forest Service's consideration of a no action alternative and its preferred action was not arbitrary and capricious under the less rigorous requirements of an EA (rather than an EIS)."); *Utah Env't Congress v. Bosworth*, 439 F.3d 1184, 1995 (10th Cir. 2006) ("[T]he Forest Service examined a reasonable range of alternatives and did not act arbitrarily when it considered only the no-action alternative and the modified proposed action."); *Native Ecosystem Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005) ("To the extent that Native Ecosystems is complaining that having only two final alternatives—no action and a preferred alternative—violates the regulatory scheme, a plain reading of the regulations dooms that argument."). This Court should too.

Standing Trees next challenges the Forest Service's allegedly unexplained rejection of its alternative proposal, Dkt. No. 23 at 15, but disregards that Standing Trees has the burden to show its proposal is within the range of reasonable alternatives. *Badger Helicopters Inc. v. FAA*, 154

---

[1] In a footnote, Standing Trees asks this Court to rely on the regulations applicable to Environmental Impact Statements ("EIS"). Dkt. No. 23 at 11 n.10. But it is beyond dispute that the requirements of an EA are less stringent than an EIS. *Native Ecosystem Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005) ("[W]e join our sister circuits in holding that an agency's obligations to consider alternatives under an EA is a lesser one than under an EIS.").

F.4th 902, 917 (8th Cir. 2025) ("It is for Petitioners to establish that their preferred alternative is within the range of alternatives that reasonably needed to be considered."). Regardless, the Record is clear that the Forest Service's decision not to consider Standing Tree's proposals in more detail was "within a broad zone of reasonableness." *Seven Cnty.*, 605 U.S. at 183-84. Standing Trees advocated for avoiding Forest Plan roadless areas to preserve those area's potential to meet wilderness criteria in the future, AR_339, but the Forest Service determined that the Project "will have no effect" on the Chocorua and Sandwich 1 Roadless Areas' potential to meet wilderness criteria in the future. AR_6736. Standing Trees proposed "avoiding all mature and old forest," AR_339, which is captured in the consequences of no action. AR_6726; *see also* AR_6565 ("The mature age class is dominant among all habitat types."). Standing Trees's other proposals, increasing buffers on water features and wilderness, AR_339, were also deemed inappropriate because the Project would not negatively affect these resources. AR_6728 ("No measurable water quality or quantity impacts are anticipated[.]"). Standing Trees did not propose alternative silviculture treatments that would enable the Forest Service to meet management objectives.

Standing Trees argues that the Project is already a "partial implementation" because the Forest Service "removed all recreational work," Dkt. No. 23 at 13, but as explained in the Decision, the recreational proposal exceeded Project boundaries, prompting that work to be implemented under a separate decision. AR_6714; AR_6758. Standing Trees argues that the Forest Service's removal of 50 acres of old growth somehow shows the Forest Service could further downscale the Project, Dkt. No. 23 at 13, but the Forest Service removed those 50 acres for consistency with the Forest Plan. AR_6757.

Lastly, Standing Trees challenges the Forest Service's no-action analysis as "biased," Dkt. No. 23 at 15, but agencies "are not required to be subjectively impartial" in their NEPA analyses.

4

*Wyoming v. U.S. Dep't of Argic.*, 661 F.3d 1209, 1263 (10th Cir. 2011) (citation modified). In any event, the Record is replete with neutral discussion of the current condition and consequences of no action. AR_6726 ("In the absence of management action, current vegetative conditions and trends, and natural succession processes would continue in the project area."); AR_6563-64 ("Because of the intense timber harvest history on the WMNF . . . many forested stands are no longer supporting the natural vegetation that would be expected."); AR_6392 (soils report discussion of consequences of no action); AR_6232 (scenery report photo of the current condition); AR_6177 (hydrology report summarizing existing condition). Standing Trees's disagreement with the need for the Project does not support a NEPA violation.

**B.      The Forest Service took a hard look at the environmental effects (Count 2).**

Similarly, Standing Trees's medley of "hard look" arguments fail to prove a NEPA violation. Even assuming the "hard look" standard is not obsolete following *Seven County*, it must be applied in a manner that affords substantial deference to the agency. *See Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*, 153 F.4th 869, 903 (9th Cir. 2025) ("Substantial deference to the agency . . . includes deferring to the agency regarding what level of detail is required, what alternatives are feasible, and the scope of the environmental effects that the NEPA document will address.") (citing *Seven Cnty.*, 605 U.S. at 180-83). Standing Trees's passing shots at the EA without any evidence or argument of how the analysis impacted the Decision is insufficient to meet their burden of proof. As demonstrated in the Record, the Forest Service considered the environmental effects of the Project on Northern Long-Eared bats ("NLEB"), water quality, roadless areas, carbon, and soils,[2] and reasonably determined these impacts would not be significant. AR_6739.

---

[2] Standing Trees waives its arguments regarding scenery and recreation on reply.

Standing Trees first argues that the Forest Service did not provide baseline data or site-specific analysis for any of the issues it raises in litigation. Not so. AR_4614-5 (NLEB baseline); AR_4615-19, 6741-42 (effects on NLEB); AR_6732, 10657 (water quality baseline); AR_6178, 6728, 6732, 10658 (effects on water quality); AR_6524, 6736 (roadless baseline); AR_6736 (effects on roadless); AR_6105, 6115-43 (carbon baseline); AR_6105-7, 6733 (effects on carbon); AR_6390-91 (soil baseline); AR_6729, 6391-98 (effects on soils).

Standing Trees next argues that the Forest Service relied on "general Forest data" rather than conducting new site-specific studies. But NEPA is clear that an agency may "make use of any reliable data" and "is not required to undertake new scientific or technical research[.]" 42 U.S.C. § 4336(b)(3); *Badger Helicopters Inc.*, 154 F.4th at 914-15 (holding an agency's use of 20-year old data did not render the decision arbitrary or capricious "particularly in light of NEPA's instruction that an agency 'is not required to undertake new scientific or technical research'" (quoting 42 U.S.C. § 4336(b)(3))); *Friends of Rapid River v. Probert*, 427 F. Supp. 3d 1239, 1258 (D. Idaho 2019) ("[T]he fact that some of the data is 'old' does not mean that the data is unreliable.").

Standing Trees maintains the Forest Service should have surveyed for NLEB within the Project area. Dkt. No. 23 at 16-17. This makes no practical sense. Forest Service surveys in 2023 detected NLEB within the National Forest, AR_4614, the Forest Service assessed the Project area and determined it may provide suitable habitat, AR_4614, and it analyzed the effects of the Project as if NLEB were present. AR_4611. If the Forest Service had conducted additional NLEB surveys in the Project area, as Standing Trees demands, it may not have found NLEB, in which case the Forest Service could have reasonably concluded that the Project would have *no* effect on NLEB.

6

But detecting a bat in the Project area would not have changed the Forest Service's effects analysis, which assumed NLEB were present. AR_4611.

Similarly, Standing Trees argues the Forest Service should have conducted new baseline water sampling in the Project area. Dkt. No. 23 at 17. Again, water sampling would not have changed the analysis. Past research has demonstrated that "when basal area removed in a watershed does not exceed 20 percent"—as is the case here in three of the four watersheds—"there is a high confidence of no measurable effect on water quality or water quantity resulting from timber harvest." AR_6732. The Forest Service gave a further site-specific explanation of why any impacts to the fourth watershed would not be significant. *Id.*

Next, Standing Trees continues to conflate inventoried roadless areas under the Roadless Area Conservation Rule, 66 Fed. Reg. 3244, 3272 (Jan. 12, 2001), with *Forest Plan* inventoried roadless areas, citing cases related to the Roadless Area Conservation Rule that have no application to this case. Dkt. No. 23 at 17-18; *see* AR_6736. ("No project activities are planned in designated wilderness areas or roadless area conservation rule designated areas."). Forest Plan inventoried roadless areas represent "additional lands—areas outside the [Roadless Area Conservation Rule] inventoried roadless boundaries—[that] would meet the roadless area inventory criteria in the Forest Service Handbook." *See* AR_6527-28. Forest Plan inventoried roadless areas that Congress did not designate as wilderness were assigned to other management areas, including those that allow timber harvest. AR_6528. Since the Forest Service concluded that the Project would not impact whether these areas satisfy the criteria for Forest Plan inventoried roadless areas and analyzed the Project's effects like elsewhere in the Project area, the Forest Service satisfied NEPA. AR_6736. There is no heightened standard for Forest Plan inventoried roadless areas.

7

Turning to carbon, Standing Trees asserts, without explanation, that the Forest Service's analysis of the Project's reasonably foreseeable carbon effects "deviate[s] from standard practice." Dkt. No. 23 at 18. Putting aside this ambiguity, the Record demonstrates the Forest Service considered carbon in proportion to its significance, consistent with NEPA's "rule of reason." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004); *see* AR_6105-6107 (Project-specific carbon assessment); AR_6111-6163 (Forest carbon assessment); AR_6733 (EA); *see also Standing Trees, Inc. v. U.S. Forest Serv.*, No. 1:24-cv-138-JL-TSM, 2025 WL 2411206, at * 15 (D.N.H. Aug. 20, 2015) (describing the same analysis the Forest Service conducted for this Project). Given the Project's "extremely small contribution to overall emissions," AR_6105, and that those emissions "will be balanced and possibly eliminated as the stand recovers and regenerates," AR_6107, quantifying the Project's carbon emissions would neither inform decisionmaking nor public participation. The Forest Service's depth of inquiry falls with the "broad zone of reasonableness" and is entitled to deference. *Seven Cnty.*, 605 U.S. at 183-84.

Regarding skid trails, Standing Trees cites cases out of context for its argument that the Forest Service must disclose during the NEPA process the exact location of skid trails that are only known post-decision and after contracting. Dkt. No. 23 at 18-19; *see* AR_1379, line 288 ("[L]ocations of skid roads and landings are subject to agreement with purchaser of timber sale and different equipment requires different kinds of access, so identification of these features at this stage is not realistic or required."). In *Alliance for the Wild Rockies v. U.S. Forest Service*, the Eastern District of Washington considered whether condition-based management, where the Forest Service develops a decision framework but ultimately decides what project activities will occur where based on on-the-ground conditions and design criteria, provided sufficient detail to assess the project's environmental effects. No. 2:24-cv-157, 2025 WL 2655984, at *8 (E.D. Wash.

Sept. 16, 2025), *appeal docketed*, No. 25-7488 (9th Cir. Nov. 28, 2025). Conversely, the Project here describes exactly what type of silviculture activities will occur and where.

In *Center for Biological Diversity v. U.S. Forest Service*, the district of Montana held that the exact location of temporary roads was necessary to assess the effects on grizzly bear secure habitat (defined as a minimum of 10 acres more than 500 meters from a motorized route) because the location of the roads determined whether the amount of secure habitat would be reduced and by how much. No. 23-cv-110, 2025 WL 3549515, at *4 (D. Mont. Dec. 11, 2025), *appeal docketed*, 26-835 (9th Cir. Feb. 12, 2026). There is no analogous resource concern in this case. The Forest Service assessed effects of skid trails based on their likely location, Dkt. No. 18-1 at 31-33; AR_6390-94, and NEPA requires nothing more.

Finally, Standing Trees argues—in a footnote within its NFMA argument—that the Forest Service violated NEPA "by failing to disclose the ages of the stands it intended to cut." Dkt. No. 23 at 21 n.13. This undeveloped argument fails because the Record identifies stand age in the Sandwith Habitat Management Unit, AR_6565, the Forest Service already explained to Standing Trees that the majority of the harvest units would be "classified as 'mature' and the rest would be 'young'" and the difference between age classes for wildlife and silviculture definitions, AR_1473, and Standing Trees does not identify an environmental "effect" the Forest Service failed to consider under NEPA.

The Forest Service took a "hard look" at the reasonably foreseeable environmental effects of the Project in proportion to their significance, and the Court should afford the Forest Service substantial deference. *Seven Cnty.*, 605 U.S. at 183-84.

9

### C.      The Forest Service considered cumulative effects (Count 2).

As described in Federal Defendants' opening brief, the Forest Service considered the reasonably foreseeable cumulative effects of the Project, Dkt. No. 18-1 at 40-43, and the Forest Service's spatial boundaries for its cumulative impacts analyses by resource are entitled to deference. *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1071 (9th Cir. 2002) ("[U]nder NEPA we defer to an agency's determination of the scope of its cumulative effects review.") (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 413-14 (1976)). Standing Trees attempts to dismiss this deference by citing *Baltimore Gas and Electric Co. v. Natural Resources Defense Council*, 434 U.S. 1030 (1978), but that case says nothing about the scope of cumulative effects. Regardless, the Record demonstrates support for the Forest Service's analyses. *See e.g.*, AR_6105-06 (considering the Project's contribution to global and national emissions); AR_4611 (identifying the cumulative effects analysis area for NLEB as the Sandwich Habitat Management Unit because it "is large enough to cover the home ranges of both wildlife and plant species and to account for effects to habitat connectivity and travel and migration corridors of some of the species discussed in [the Biological Evaluation]"); AR_6391-92, 6396-98 (explaining that the soils cumulative effects analysis area is the Project boundary because expected effects limited to Project area).

Standing Trees reiterates its belief that the Forest Service should have catalogued past, ongoing, and future Forest Service projects across the entire Forest. Dkt. No. 23 at 24. This is more than NEPA requires. 36 C.F.R. § 220.4(f) (2024) ("The CEQ regulations, however, do not require agencies to catalogue or exhaustively list and analyze all individual past actions."). Rather, "NEPA calls for the agency to focus on the environmental effects of the project itself, not on the potential environmental effects of future or geographically separate projects." *Seven Cnty.*, 605 U.S. at 190. As explained in the Record, the projects identified by Standing Trees do not overlap in time of

10

space with the Project's cumulative effects analysis areas by resource. AR_12133. The Forest Service's determination that that the Project will not have significant environmental effects in combination with these other projects, which are separate in time and space, is owed substantial deference. *Seven Cnty.*, 605 U.S. at 183-84.

Standing Trees next challenges the Forest Service's use of four watersheds for its water analysis as "illogical," citing the number of watersheds and wetlands in the entire National Forest. Dkt. No. 23 at 23-24. But NEPA guidance has long identified the watershed as an appropriate geographic unit for evaluating the cumulative effects on water quality,[3] and other courts have upheld use of the watershed as an appropriate boundary. *See e.g.*, *Ohio Valey Env't Coal. v. U.S. Army Corps of Eng'rs*, 716 F.3d 119, 122 (4th Cir. 2013) ("The Dingess Run watershed was the relevant area for assessing the mine's cumulative impact."); *Friends of the Clearwater v. Probert*, No. 3:21-cv-189, 2022 WL 2291246, at *23 (D. Idaho June 24, 2022) (assessing cumulative effects at the watershed scale). Standing Trees claims that the Forest Service "acknowledges the Project will negatively affect water" quality, but its Record citation plainly states the opposite: "No measurable water quality or quantity impacts are anticipated." AR_6728; *id.* ("Therefore, the project will not contribute substantially to cumulative impacts in the analysis area.").

Finally, Standing Trees persists with its argument that the Forest Service applied the wrong CEQ regulations. Dkt. No. 23 at 24-25. The fact remains, however, that the Forest Service also applied its own NEPA regulations, which at the time required consideration of cumulative effects. AR_6738 (citing 36 C.F.R. § 220.4(f)). But now no operative regulation or statute requires explicit analysis of cumulative effects, and thus any remand for further cumulative effects analysis would

---

[3] Council on Environmental Quality ("CEQ"), Considering Cumulative Effects Under NEPA at 15 (January 1997), *available at* https://ceq.doe.gov/docs/ceq-publications/ccenepa/sec2.pdf (last visited Mar. 20, 2026).

be futile. *See* 7 C.F.R. § 1b.5(b)(1) ("In preparing the environmental assessment, the USDA subcomponent will focus its analysis on whether the environmental effects of the proposed action (and action alternatives, if any) or project at hand are significant.").

*** 

The Forest Service complied with NEPA by evaluating the reasonably foreseeable environmental effects of the Project and the consequences of no action, and the Court should afford substantial deference to the agency's determination of the depth and breadth of that inquiry. *Seven Cnty.*, 605 U.S. at 183-84. Standing Trees has not met its burden of proving a deficiency that could have reasonably caused the Forest Service to disapprove the Project. *Id.* at 185. Rather, Standing Trees's NEPA arguments are mere "fly specks," insufficient to carry their burden of proof. *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1287 (1st Cir. 1996) ("We apply a rule of reason because courts should not 'fly speck' an [environmental analysis] and hold it insufficient based on inconsequential or technical deficiencies."). The Court should grant summary judgment in favor of Federal Defendants on Standing Trees's NEPA claims.

## II.    The Forest Service Complied with NFMA (Count 4).[4]

The Project is consistent with applicable Forest Plan standards and guidelines, Dkt. No. 18-1 at 45-53, and Standing Trees has not demonstrated that the Forest Service made a "clear error of judgment." *Or. Nat. Desert Ass'n*, 957 F.3d at 1035. Standing Trees cite *Lands Council v. McNair* for the proposition that the Forest Service must demonstrate consistency with the Forest Plan with "studies." Dkt. No. 23 at 7 (citing 537 F.3d 981, 994 (9th Cir. 2008)). But like elsewhere

---

[4] Standing Trees waived any argument with respect to Count III by failing to respond to Federal Defendants' argument that the Forest Service considered all relevant factors in deciding to prepare an EA in compliance with NEPA. *Furtado v. Oberg*, 949 F.3d 56, 59 (1st Cir. 2020) ("Our caselaw also makes clear that we may treat a party's failure on appeal to respond to a properly raised argument for summary judgment as waiver.").

in their briefing, Standing Trees misstates the law. In *Oregon Natural Desert Association v. U.S. Forest Service*, the Ninth Circuit clarified that NFMA and the Ninth Circuit's prior decisions *do not* require the Forest Service to "analyze and show" forest plan consistency. 957 F.3d at 1033-34. Plaintiffs in that case, as in this one, conflated "NEPA-mandated documentation" with the Forest Service's substantive obligations under NFMA. *Id.* at 1034. Under NFMA, "the Forest Service was not obligated by statute, regulation, or caselaw to memorialize" the project's "consistency with the forest plan." *Id.*[5] Rather, "[t]he Forest Service's interpretation and implementation of its own Forest Plan is entitled to substantial deference[,]" *id.* at 1035 (quoting *Native Ecosystem Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012)), and Standing Trees must prove the project is inconsistent with the Forest Plan in violation of NFMA. *Wagner*, 581 F. Supp. 2d at 254-55. The Record demonstrates that the Project is consistent with relevant Forest Plan standards and guidelines, and Standing Trees has not met its burden of proof.[6]

### A.     The Project is consistent with the Forest Plan old growth standard.

Standing Trees argues that the Project is inconsistent with the alleged prohibition on harvest in "old forest habitat." Dkt. No. 23 at 19. But no Forest Plan standard prohibits harvest in "old forest habitat," and Standing Trees cites none. The definition of "old forest habitat" in the glossary is not a Forest Plan standard. The Forest Plan prohibits harvest in "old growth forest." AR_12202. And as discussed in Federal Defendants' opening brief, the Project does not authorize

---

[5] Standing Trees asks this Court to ignore the 2012 Planning Rule, Dkt. No. 23 at 7 n.4, which *does* require the Forest Service to document Forest Plan consistency in a decision, but only for projects authorized pursuant to Forest Plans that have been revised under the 2012 Planning Rule, which is not the case here. *See* Dkt. No. 18-1 at 46 n.16.

[6] Standing Trees argues that the Forest Service must conduct "continuous monitoring of Forest conditions" in light of the age of the Forest Plan. Dkt. No. 23 at 9-10. Notwithstanding that NFMA does not impose a heightened obligation based on the age of a Forest Plan, the Forest Service publishes monitoring reports approximately every two years. *See* AR_10415 (2024 report covering 2020-2022); AR_9928 (2021 report covering 2018-2019).

harvest in "old growth forest." Dkt. No. 18-1 at 47-49; AR_6757 ("[N]o treatments in this project will take place within identified old growth stands."). The Forest Plan references "old forest habitat" only in Wildlife Objective 3: "Maintain high quality mature forest and old forest habitats on a majority of the Forest."[7] AR_12187. Objectives, unlike standards, are "not absolute." AR_12163. With the exception of "old growth forest," the Forest Plan allows for timber harvesting in all areas of Management Area 2.1 identified as suitable for timber harvest. AR_12492 ("Lands that are designated in the Revised Plan as 'suitable for timber production' can be harvested, under the standards and guidelines required by the plan.").

Standing Trees's confusion seems to lie with the "suitable for timber harvest" characterization. The Forest Plan includes "old forest habitat" in its designation of lands "unsuitable" for timber harvest. AR_6531-32; AR_6542; AR_12512. Across the National Forest, nearly 25 percent of forested land in Management Area 2.1 is designated as unsuitable for timber harvest, and "[t]hese stands are currently young, mature, or old forest habitat." AR_6531; *see generally*, *id.* (describing the Forest Plan revision process with respect to age and habitat classification). "[T]hey will continue to age and evolve into old forest." *Id.* The "acres of land unsuitable for timber harvest were totaled to create an old age class objective." *Id.*; *see also* AR_12512 ("As stated in the Forest Plan (page 1-21), '(t)he old age class objective is based on the amount of MA 2.1 lands identified as unsuitable for timber harvest.'"). To avoid confusion with

---

[7] The Forest Service manages for Wildlife Objective 3 by emphasizing "dispersed recreation experiences within unroaded landscapes on approximately 53 percent of the Forest. These management areas will provide older forest conditions and large blocks of non-manipulated landscapes[.]" AR_12486. The remaining 47 percent is managed for timber production, "road systems for public access, developed recreation areas, non-motorized trails, Nordic and downhill ski areas, snowmobiling, and a host of other activities." *Id.*

the term "old," the Forest Service "change[d] the label for lands that will provide old forest habitat in the future from 'old objective' to 'land unsuitable for harvest'" AR_6532.

The majority of the Sandwich Habitat Management Unit (76 percent) is not categorized as Management Area 2.1 and is unsuitable for timber harvest. AR_6562 (map); AR_6566. Within Management Area 2.1 in the Sandwich Habitat Management Unit, 53 acres are unsuitable for timber harvest. AR_6569. The Project does not authorize timber harvest on lands that are unsuitable for timber harvest. AR_6431 (confirming "land included for harvesting on forest land defined as suitable for timber production").

Standing Trees suggests that the Forest Service did not follow the Manomet Late Successional Index ("LSI"). Dkt. No. 23 at 22. As explained in Federal Defendants' opening brief, however, the Manomet LSI is not a Forest Plan standard. Dkt. No. 18-1 at 48; AR_6351 ("The LSI scores are just a tool to help determine extent of late successional and potential old growth conditions."). And any supposed threshold on the LSI for identifying "old forest habitat" is Standing Trees's, not the Forest Service's.

Finally, Standing Trees appears to argue that the Forest Service should have quantified old forest habitat in the Project area, but, again, this is also not a Forest Plan requirement. "Old forest habitat" is not, as Standing Trees claims, a "distinct" protected category. And the definition of "old forest habitat" is not absolute. *Compare* AR_12671 (defining "old forest habitat" as "[d]esired habitat conditions start with those for mature forest and can include greater size, decadence, structural complexity, etc.") *with id.* (defining "old growth forest" as "[u]neven-aged (three or more age classes) forest with an abundance of trees at least 200 years old, multiple canopy layers, large diameter snags and down logs, and a forest floor exhibiting pit-and-mound topography. . . ."). The Forest Service confirmed suitability for timber harvest. AR_6431 ("Every forest stand

15

considered for harvest in this project has been visited and examined by a forester to verify suitability for timber management."). The Record demonstrates that the Project does not authorize timber harvest in stands that provide "old forest habitat," which are categorically "unsuitable for timber harvest."

**B.     The Project is consistent with Forest Plan soil guidelines.**

Forest Plan Vegetation Management Guideline 5 allows for "short" pitches of skid roads greater than 20 percent grade, AR_12219,  and the Project limits skid roads to less than a 20 percent grade, "with only short steeper pitches," AR_6746. Standing Trees focuses on the existence of steeper grades in the Project area, Dkt. No. 23 at 8, but the Forest Service did not authorize skid trails on steeper grades, except for "short" pitches, consistent with the Forest Plan guideline. AR_6746. Standing Trees has not proven a NFMA violation with respect to the soil guidelines.

**C.     The Project is consistent with Forest Plan transportation guidelines.**

As discussed in Federal Defendants' opening brief, the Project is consistent with Forest Plan guidelines on transportation. Dkt. No. 18-1 at 51-52. Standing Trees relegates its response on reply to a footnote. Dkt. No. 23 at 8 n.5. There, Standing Trees attempts to rescue its extra-record evidence by citing the Record location of the photograph—which would have been the proper procedure in their opening brief—and identifies the picture as taken of Forest Service Road 5460. *Id.* Notably, however, the Project does not authorize reconstruction of Forest Service Road 5460, and, in fact, the Forest Service calls for it to be decommissioned. AR_6753. Standing Trees has not proven a NFMA violation with respect to Forest Plan transportation guidelines.

**D.     The Project is consistent with the Forest Plan scenery standards and guidelines.**

Standing Trees raises Scenery Management Standard S-2 for the first time on reply and thus has waived any argument that the Project is inconsistent with this standard. *Sullivan v. Neiman*

16

*Marcus Grp., Inc.*, 358 F.3d 110, 114 n.1 (1st Cir. 2004) (issues not raised in an opening brief on appeal are waived). Regardless, the Record is clear that the Project is consistent with all scenery standards and guidelines.

Scenery Management Standard S-2 states, in part, that scenery objectives will be met by "[f]ollowing current and/or future guidelines developed specifically for the White Mountain National Forest to achieve Scenic Integrity Objectives within individual management areas." AR_12215. As detailed in Federal Defendants' opening brief, the Forest Service followed the scenery guidelines for Management Area 2.1. Dkt. No. 18-1 at 52-53. On reply, Standing Trees attempts to convert a "should" in that guideline to a "must." Dkt. No. 23 at 8. The plain language of Guideline 3 states that openings "*should* appear as natural occurrences." AR_12231 (emphasis added). Examples of "natural occurrences" include "wind, fire, or landslides." AR_12669. Here, as stated in the Decision, "color, shadows, lighting, and textural changes on the landscape are most likely to be seen, but not bare ground." AR_6758. These changes "will fade and blend over time," AR_6730, and the visual effects within three to five years will be "minimal." AR_6763; *see also* AR_6232 (satellite image). Whether the visual impacts of the Project appear as "natural occurrences"—i.e. the product of wind, fire, or landslide—is entirely subjective. Standing Trees has not proven the Project is inconsistent with Forest Plan scenery guidelines.

**E.      The Project is consistent with Forest Plan threatened, endangered, and sensitive species standards.**

The Project is consistent with the Forest Plan Rare and Unique Features Standard 1, which requires the Forest Service to investigate for endangered species "and/or habitat[.]" AR_12202. Apparently conceding that the Forest Service was not required to survey for endangered animal species, Standing Trees argues that the Forest Service "cannot point to any fieldwork or site-specific inquiry through which it 'investigated' the bat's habitat." Dkt. No. 23 at 9. But again,

17

NFMA does not require the Forest Service to "analyze and show" consistency. *Or. Nat. Desert Ass'n*, 957 F.3d at 1033-34. Regardless, the Biological Evaluation documents the field work that led to the conclusion that "roosting and foraging habitat does exist within the action area." AR_4614; AR_4610 (noting "recent field reviews conducted within the action area between 2018 and 2020 by Forest Service staff during the planning of this project."). Based on the "abundant and available" NLEB habitat in the Project area, the Forest Service assumed NLEB are present in the Project area. AR_4614; AR_4644. The Project is consistent with the standard.

***

In sum, the Forest Service is entitled to deference in the interpretation and application of its own Forest Plan, and Standing Trees has not demonstrated that the Forest Service made a "clear error in judgment" in finding consistency. *Or. Nat. Desert Ass'n*, 957 F.3d at 1035. The Court should grant summary judgment in favor of Federal Defendants on Standing Trees's NFMA claim.

<strong><u>CONCLUSION</u></strong>

For these reasons, and those stated in Federal Defendants' opening brief, Dkt. No. 18-1, the Court should grant summary judgment in favor of Federal Defendants on all Counts.

Respectfully submitted this 20th day of March, 2026.

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

*/s/ Reade E. Wilson*
READE E. WILSON
Trial Attorney
Natural Resources Section
150 M Street NE
Washington, DC 20002
(202) 598-3546
reade.wilson@usdoj.gov

18

*Counsel for Federal Defendants*

19